**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JOHN CARFAGNO, derivatively on behalf of CENTERLINE HOLDING COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>MARC D. SCHNITZER, STEPHEN M. ROSS, JEFF T. BLAU, LEONARD W. COTTON, ROBERT J. DOLAN, NATHAN GANTCHER, JEROME Y. HALPERIN, ROBERT L. LOVERD, ROBERT A. MEISTER, JANICE COOK ROBERTS, AND THOMAS W. WHITE,<br><br>Defendants.<br><br>and<br><br>CENTERLINE HOLDING COMPANY,<br><br>Nominal Defendant. | Civil Action No.<br><br>08 CV 00912<br><br><br><br>**JURY TRIAL DEMANDED** |

## VERIFIED DERIVATIVE COMPLAINT

Plaintiff, by and through his attorneys, derivatively on behalf of Centerline Holding Company ("Centerline" or the "Company"), alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Company's press releases, Securities and Exchange Commission ("SEC") filings by Centerline and media reports about the Company, the following:

### NATURE OF ACTION

1.     This is a shareholder's derivative action brought on behalf of Centerline by one of its shareholders against its Board of Trustees (the "Board"), which is comprised of defendants Marc D. Schnitzer, Stephen M. Ross, Jeff T. Blau, Leonard W. Cotton, Robert J. Dolan, Nathan Gantcher, Jerome Y. Halperin, Robert L. Loverd, Robert A. Meister, Janice Cook Roberts, and Thomas W.

White (collectively, the "Defendants"), to remedy Defendants' breaches of their fiduciary duties of loyalty, candor, due care, fair dealing, and for their waste of corporate assets.

    2.      Centerline is a publicly owned investment holding firm. Through its subsidiaries, Centerline operates as a real estate finance and investing company, providing capital solutions to developers and owners of properties, as well as investment products to institutional and retail investors. Centerline provides its services for multifamily, office, retail, industrial, mixed-use, and other properties.

    3.      Beginning at least as early as March 13, 2007 and continuing through the present (the "Relevant Period"), certain of the Defendants, including defendants Ross, Blau, and Schnitzer, devised and implemented a plan to alter the Company's financial structure (and shareholder base) from that of an income-oriented company to a growth-oriented company. Because this change of Company structure would draw an immediate and negative response from the Company's income-oriented investors, the Defendants concealed their plan from the Company's shareholders through a series of false and misleading public statements in press releases and on conference calls.

    4.      On December 28, 2007, Defendants finally revealed their secret plan and shareholders learned the shocking truth. In violation of their fiduciary duties, Defendants had secretly financially re-engineered Centerline from an income-oriented company to a growth-oriented company. As a result, Defendants caused the Company's dividend to be suddenly slashed by 64%. Moreover, shareholders learned that Centerline's Non-Executive Chairman defendant Ross and its Managing Trustee defendant Blau, who already controlled 10,295,085 shares or 13 % of the Company, made a sweetheart investment in the Company. Through an affiliated company, Ross and Blau invested $131 million in return for newly-issued convertible preferred stock, which pays an 11% annual dividend and is convertible to 12.2 million Common Shares of Centerline.

    5.      As a result of Defendants' conduct, the price of Centerline stock plummeted $2.57 or 25.0%, closing at $7.70 per share, on heightened volume of 4.1 million shares, for an instant loss of $41 million in market capitalization.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over all claims asserted herein under 28 U.S.C. § 1332, because complete diversity exists between plaintiff and each defendant and the amount in controversy exceeds $75,000.

7.      The Court has personal jurisdiction over each of the Defendants, because Centerline's principal place of business is located within this District, several of the Defendants are residents of the state of New York, and all of the Defendants have conducted business in this District, including business related to the claims involving Centerline.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Centerline maintains its headquarters within this District, and because many of the acts complained of herein occurred in this District.

## THE PARTIES

9.      Plaintiff John Carfagno is a resident of New Jersey. Plaintiff is currently and has been during the Relevant Period a shareholder of Centerline.

10.     Nominal Defendant Centerline is a Delaware Corporation with its principal place of business at 625 Madison Avenue, New York, NY 10022. Centerline is a publicly owned investment holding firm whose common shares are traded on the New York Stock Exchange ("NYSE") under the symbol "CHC."

11.     Defendant Marc D. Schnitzer ("Schnitzer"), upon information and belief, is a resident of New York. Schnitzer has been a Managing Trustee of the Company since 2003. Schnitzer has long been a Company insider, having joined CharterMac Capital (a predecessor and/or affiliate of the Company) in 1988. Since March 14, 2006, Schnitzer has served as the Company's President and CEO, and pursuant to an employment agreement dated February 1, 2007, will continue to serve as President and CEO, and also Executive Managing Director of Centerline Advisors (an affiliate), until December 31, 2009, with a provision for annual automatic renewal thereafter. The February 2007 agreement also granted Schnitzer $3,000,000 of restricted Company shares, vesting over a 3 year period. According to the 2007 Proxy, Schnitzer received over $2,145,000 in total compensation for

his services as President and CEO of the Company, and can expect to receive similar amounts for those positions under the February 2007 agreement. Moreover, according to the 2007 Proxy, Schnitzer directly or indirectly controls 1,244,731 or 1.6% shares of the common stock of Centerline. Finally, Schnitzer is also chairman of the Board of Trustees of American Mortgage Acceptance Company, a publicly traded real estate investment trust managed by an affiliate of Centerline.

12.     Defendant Stephen M. Ross ("Ross"), upon information and belief, is a resident of New York. Ross has been a Managing Trustee of the Company since 1999, and has been the Non-Executive Chairman of the Board during the Relevant Period. Defendant Ross is also the founder, Chairman, CEO and Managing General Partner and 92% owner of The Related Companies, L.P. ("The Related Companies"). The Related Companies owns Related II, L.P. ("Related II"), which is Centerline's largest shareholder. According to Company's 2007 Proxy Statement filed on April 23, 2007 (the "2007 Proxy"), Ross owns directly or beneficially 11,070,430 or 13.9% of the Common Shares of Centerline. Defendant Ross also serves on the Board of Equinox Holdings, Inc. (an affiliate of The Related Companies). Finally, Defendant Ross served as interim CEO of Centerline from about November 15, 2005 until about March 14, 2006, when defendant Schnitzer was appointed CEO of the Company.

13.     Defendant Jeff T. Blau ("Blau"), upon information and belief, is a resident of New York. Blau has been a Managing Trustee of the Company since 2003. Blau also serves on the board of trustees of American Mortgage Acceptance Company, a publicly traded real estate investment trust managed by an affiliate of Centerline, and is a Managing Trustee, the President, and 8% owner of The Related Companies. Defendant Blau also serves on the Board of Equinox Holdings, Inc. (an affiliate of The Related Companies). According to the 2007 Proxy, Blau owns directly or beneficially 10,295,085 or 13% of the Common Shares of Centerline.

14.     Defendant Leonard W. Cotton ("Cotton"), upon information and belief, is a resident of Connecticut. Cotton has been a Managing Trustee and Vice Chairman of Centerline's Board since 2006. Cotton served as the CEO of Centerline REIT (formerly ARCap REIT, Inc.), which was

- 4 -

acquired by Centerline in 2006. Cotton also serves as Chairman of the Board of Centerline REIT. According to the 2007 Proxy, defendant Cotton owns directly or beneficially 366,008 Common Shares of Centerline.

15.    Defendant Robert J. Dolan ("Dolan"), upon information and belief, is a resident of Michigan. Dolan has been a Managing Trustee of Centerline since February 2007. Dolan has been the Dean of the Stephen M. Ross School of Business at the University of Michigan since 2001. At the University of Michigan, Defendant Dolan also serves as the Stephen M. Ross Professor of Business and the Chair of the University Development Subcommittee.

16.    Defendant Nathan Gantcher ("Gantcher"), upon information and belief, is a resident of New York. Gantcher has been a Managing Trustee of Centerline since 2003. According to the 2007 Proxy, defendant Gantcher owns directly or beneficially 148,499 Common Shares of Centerline.

17.    Defendant Jerome Y. Halperin ("Halperin"), upon information and belief, is a resident of Michigan. Halperin has been a Managing Trustee of Centerline since 2003. According to the Company's 2007 Proxy Statement, Halperin owns directly or beneficially 5,281 Common Shares of Centerline. Defendant Halperin is currently or has in the past served on the Board of Equinox Holdings, Inc. (an affiliate of The Related Companies).

18.    Defendant Robert L. Loverd ("Loverd"), upon information and belief, is a resident of New York. Loverd has been a Managing Trustee of Centerline since 2003. According to the 2007 Proxy, defendant Loverd directly or indirectly controls 9,849 of the common stock of Centerline.

19.    Defendant Robert A. Meister ("Meister"), upon information and belief, is a resident of Florida. Meister has been a Managing Trustee of Centerline since 2003. According to the 2007 Proxy, Meister owns directly or beneficially 37,859 Common Shares of Centerline.

20.    Defendant Janice Cook Roberts ("Roberts"), upon information and belief, is a resident of New York. Roberts has been a Managing Trustee of Centerline since 2003. According to the Company's 2007 Proxy Statement, Roberts owns directly or beneficially 7,959 Common Shares of Centerline.

- 5 -

21.     Defendant Thomas W. White ("White"), upon information and belief, is a resident of Maryland. White has been a Managing Trustee of Centerline since 2000. White is also a paid consultant to the Company since July 2001. White is serving or has served on the Board of CharterMac Mortgage Capital (an affiliate of the Company). According to the 2007 Proxy Statement, White owns directly or beneficially 972 Common Shares of Centerline.

## DEFENDANTS' DUTIES

22.     By reason of their positions as trustees and/or officers of the Company, the Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

23.     Each trustee and/or officer of the Company owes to it and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as trustees and/or officers of a publicly held company, the Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

24.     The Defendants, because of their positions of control and authority as trustees and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of the Company.

25.     At all times relevant hereto, each of the Defendants was the agent of each of the other Defendants and of the Company, and was at all times acting within the course and scope of such agency.

26.     To discharge their duties, the trustees and officers of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the trustees and officers of the Company were required to, among other things:

     a.     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

     b.     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

     c.     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

     d.     Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

     e.     Ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

27.     Each Defendant, by virtue of his position as a trustee and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due

care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as trustees and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Defendants who were also officers and/or trustees of the Company during the Relevant Period have been ratified by the remaining Defendants who collectively comprised all of the Company's Board during the Relevant Period.

28.     Defendants breached their duties of loyalty and good faith by allowing certain Defendants to cause, or by themselves causing, the Company to misrepresent or otherwise fail to disclose the lack of independence of its Board, and to engage in self-dealing transactions and the re-engineering and transformation of the Company to their benefit and to the detriment of the Company, as detailed herein infra, and by failing to prevent any Defendant(s) from taking such actions.

29.     Moreover, the Defendants abdicated their fiduciary duties of loyalty and good faith by failing to adequately oversee the Company's operations and business practices to ensure that the Company complies with all applicable laws, rules, and regulations.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

30.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

31.     During all times relevant hereto, Defendants collectively and individually initiated a course of conduct that was designed to and did deceive shareholders and the investing public regarding Centerline's business operations, management and the intrinsic value of Centerline common stock.

- 8 -

32.     Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period. During this time, Defendants caused the Company to conceal the true fact that the Company was misrepresenting its financial well-being and future business operations and prospects.

33.     The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Defendants' breaches of fiduciary duty, waste of corporate assets and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

34.     Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently release misleading statements. Because the actions described herein occurred under the authority of the Board, each of the Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

35.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

36.     As members of the Board, Defendants were themselves directly responsible for authorizing or permitting the authorization of, or failing to monitor, the practices which resulted in the misappropriation of confidential corporate information and violation of the federal securities laws as alleged herein. Each of them had knowledge of and actively participated in and approved of the wrongdoings alleged or abdicated his responsibilities with respect to these wrongdoings. The alleged acts of wrongdoing subjected Centerline to unreasonable risks of loss.

37.     By reason of their membership on the Board and positions as executive officers of the Company, the Defendants were each controlling persons of Centerline and had the power and

influence to cause, and did cause, the Company to engage in and/or permit the conduct complained of herein.

## SUBSTANTIVE ALLEGATIONS

38.     On March 13, 2007, the beginning of the Relevant Period, Defendants caused and/or allowed the Company to conduct a conference call with the Company's analysts to discuss its Fourth Quarter 2006 ("4Q06") earnings. The call also served to advise investors about the Company's so-called "corporate re-engineering" initiative.  Defendant Schnitzer stated in part:

> **The final initiative that I would like to discuss is our corporate reengineering. Following our management change in November of 2005, we began a complete reengineering of our organization, the goal of which was to create a more efficient operating platform while maintaining our high level of service**. We examined several areas of our Company and found redundancies and inefficient procedures. Following the ARCap acquisition, we took another look at our structure in the context of our growth plans and the desire to broaden our asset classes. As a result of these efforts, we have created a new credit approval process and strengthened our asset management platform. We also recognized that we were a difficult company to understand and explain to our many stakeholders. Beginning in 2001, we made a series of acquisitions and as a result we operate through several subsidiaries, each of which has its own brand name. **In connection with our reengineering, we launched a branding initiative that is nearly complete**. We believe that it is critical to operate as one Company, with one brand name and all 530 employees aligned with and focused on the success of that single company.
>
> Therefore, within the next 30 days, we will announce that we will change the name of our Company and eliminate our subsidiary structure and all existing other brand names. When our new brand is rolled out, we will introduce our new structure, which will consist of four business groups: Affordable Housing, Commercial Real Estate, Asset Management and Credit Risk Products. We have identified the leaders of each group and will announce their appointments at the time we announce our new name. The four business groups will be supported by our risk policy, legal, human resources, finance, corporate communications and information technology departments, which together will form our corporate group. We believe that this structure will enable to us reap even greater benefits from the integration of our past and future acquisitions and describe our business in a clearer fashion. **Our first quarter 2007 financial reports will be modified to reflect our new structure and we will introduce new performance metrics for each of our business groups**.
>
> **After completing all these initiatives in 2006, we have a very positive outlook for 2007**. With respect to our Commercial Real Estate group, we are very bullish on the year ahead and have identified several new

products that we intend to launch in the coming months. We expanded our originations team, bringing on a group of five commercial originators in our Dallas office at the beginning of 2007. We already have built a healthy pipeline and have completed several large transactions, including a $90 million mezzanine loan for a large mixed-use development in Snowmass, Colorado, and $30 million in mezzanine and bridge financing for the refinancing of a high-end 85% presold condominium development in Chicago's Lake Shore area. Both of these investments were shared between AMAC and Aris, two of the funds that we manage.

39.    Defendants' conference call was false and misleading. While Schnitzer presented the

Company's "re-engineering" and "branding" initiative as virtually completed, and as serving the

purpose of strengthening the Company and improving its prospects, in fact, Schnitzer and the other

individual Defendants were engaged in a process of self-dealing, aimed at improving their own

interests at the expense of the Company and its investors. Rather than engaging in a public roll-out

of a beneficial restructuring, Schnitzer proceeded to secretly put in place a plan to benefit himself at

the expense of the Company's income-minded investors, a plan that was approved by a hopelessly

conflicted board. As a result, investors were given the false impression that Schnitzer and the other

Defendants had "re-engineered" the Company in investors' interests and that their investment in the

Company had matured, into a re-branded, stable and profitable dividend-producing business entity.

40.    On April 23, 2007, the Company filed a proxy statement which, among other things,

reported on the purported independence of the Company's Board of Trustees:

**Trustee Independence**

Pursuant to NYSE listing standards, our Board has adopted a formal set of Categorical Standards for Determining Trustee Independence (the "Categorical Standards") with respect to the determination of trustee independence. In accordance with these Categorical Standards, a trustee must be determined to have no material relationship with our Company other than as a trustee. The Categorical Standards specify the criteria by which the independence of our trustees will be determined, including strict guidelines for trustees and their immediate families with respect to past employment or affiliation with the Company or its independent registered public accounting firm. The Categorical Standards also limit commercial relationships of all trustees with the Company. All trustees are required to deal at arm's length with the Company and its subsidiaries, and to disclose any circumstance that might be perceived as a conflict of interest.

The provisions of the Board Categorical Standards regarding trustee independence meet the listing standards of the NYSE. The Categorical Standards are attached to this proxy statement as Appendix B.

In accordance with these Categorical Standards, the Board undertook its annual review of trustee independence. During this review, the Board considered transactions and relationships between each trustee or any member of his or her immediate family and the Company and its subsidiaries and affiliates. The Board also considered whether there were any transactions or relationships between trustees or any member of their immediate family (or any entity of which a trustee or an immediate family member is an executive officer, general partner or significant equity holder). As provided in the Categorical Standards, the purpose of this review was to determine whether any such relationships or transactions existed that were inconsistent with a determination that the trustee is independent.

As a result of this review, the Board affirmatively determined that the following trustees are independent of the Company and its management under the criteria set forth in the Categorical Standards: Peter T. Allen, Nathan Gantcher, Jerome Y. Halperin, Robert L. Loverd, Robert A. Meister, Janice Cook Roberts and Robert J. Dolan.

In making these determinations, the Board considered that in the ordinary course of business, transactions may occur between the Company and its subsidiaries and companies at which some of our trustees are or have been officers. In each case, the amount of transactions from these companies in each of the last three years did not approach the thresholds set forth in the Categorical Standards. *In particular, with respect to Mr. Dolan, the Board determined that the fact that our non-executive chairman had donated $100 million to endow the "Stephen M. Ross School of Business" at The University of Michigan, where Mr. Dolan is the dean, did not impact Mr. Dolan's independence.*

41.    The Company's Proxy Statement for the period ended April 23, 2007 was false and misleading. While the Company purported to assure investors that the integrity of their Board was adequately protected, the process to assess the independence of Board trustees was, in fact, highly flawed and defective. For example, the Company's flawed and defective process is evidenced by its analysis of Defendant Dolan's independence. As the Dean of the "Stephen M. Ross School of Business" at the University of Michigan, assertions of Defendant Dolan's independence lack credibility when viewed in light of the $100 million endowment made by Defendant Ross in September 2004 – according to the University of Michigan, the largest of its kind ever made to a business school in the United States. A reasonable person would find that Defendant Dolan is

beholden to Ross, an interested person – both in the financial sense and in terms of the personal and professional relationships that flow from their connection to the "Stephen M. Ross School of Business." As a result, Defendants were able to continue the concealment of their on-going plan to "re-engineer" the Company, while investors were lulled into believing that the Company's corporate re-engineering process had already been completed and had been performed in the best interests of the Company and its investors.

42.    On May 10, 2007, Defendants caused and/or allowed Centerline to conduct a conference call with analysts to discuss the Company's First Quarter 2007 ("1Q07") earnings. During the call, Defendant Schnitzer stated in part:

> In connection with the August 2006 acquisition of ARCap and *our subsequent corporate reengineering we have strengthened our asset management platform and greatly enhanced the capabilities of our asset management group*.
>
> During the quarter as the properties have season we reassessed our strategy with respect to the recovery of our advances to these properties and undertook an initiative to determine the most advantageous strategy preserving our capital. While the strategy remains under review to date, based upon the current analysis we recorded the $13.7 million impairment with respect to 4 of the revenue bonds due in part to revised estimates of the level and timing of the cash flows we used to value the properties.
>
> In connection with that determination the Asset Management Group concluded that advances made to partnerships in connection with those underlying properties may not be fully recoverable, and we recorded a reserve of approximately $5.5 million. Our Asset Management Group is moving aggressively to analyze alternatives to determine the best course of action with respect to the recovery of our advances; and, therefore, we cannot be certain that we will not record any future impairments.
>
> *            *            *
>
> I'd like to spend a few moments discussing recent events that have taken place in the commercial mortgage market and how they have affected Centerline. In the past month fueled by the meltdown in the sub prime market the rating agencies have begun to crack down on lax commercial mortgage underwriting.
>
> While default rates in the commercial mortgage industry remain at an all time low, the low interest rate environment and increased capital flows have caused a massive increase in competition and weakened credit standards. The rating agencies' actions cause buyers of securitized commercial debt to take pause, causing spreads to widen

and riskier assets to be re-priced. *We view this development as not only necessary but welcome*. This tapping on the breaks signals the exit of some overzealous participants in the marketplace and will enable credit standards to normalize.

*We believe that Centerline is well positioned to take advantage of some of the repercussions of these actions*. Last week, on behalf of one of our funds, we acquired $18.4 million of the BBB rated bonds and $9.2 million of the BBB minus rated bonds of the 2007 top 26 issuants. Top is a CNBS issuance partnership among Morgan Stanley, Nationwide, Wells Fargo, Principal Financial and Bear Stearns. Since we had already purchased the below investment grade bonds in this pool for another fund we manage the transaction represented an excellent opportunity to acquire high quality investment grade bonds at an attractive spread on assets that we were already familiar with. *In addition, if the commercial mortgage market begins to see signs of strain and default rates increase Centerline, as a highly rated special services, will be well positioned to benefit*.

We plan to launch a distress dead fund in the second half of the year that will focus on opportunistic transactions in the commercial mortgage market. We have already received indications of interest from some of our institutional investors for this type of fund product, and we expect that based upon our special service and capabilities we will be able to successfully raise and deploy capital for this type of fund.

*I would like to reiterate that we do not have any exposure to the sub-prime, single-family loan market in any area of our business. We are not engaged in any form of sub-prime lending activities and do not hold any single family investments in any of the funds that we manage.*

43.     Defendant Schnitzer's comments during the May 10, 2007 conference call were false and misleading. Schnitzer once again affirmed that the Company's corporate re-engineering process was complete, not still in progress. Although Schnitzer pointed to asset impairment related to four of its revenue bonds, he stated that the impairment was limited, consistent with the setting aside of a $5.5 million reserve. Moreover, Schnitzer sought to reassure investors that, unlike other real estate investment vehicles, the Company lacked any exposure to subprime mortgage losses. As a result, investors were falsely reassured that the Company was in sound financial shape and not at serious risk from problems in the sub-prime lending market. Each of these assurances were blatant misrepresentations of the Company's state of affairs.

44.    Moreover, Schnitzer elaborated on the strategic opportunities Centerline was now

"well positioned" to benefit from, including new product initiatives and business opportunities.

These statements were also inherently misleading, as they only served to confirm the purportedly

complete and highly successful nature of the Company's corporate re-engineering activities.

45.    On August 9, 2007, Defendants caused and/or allowed Centerline to conduct a

conference call with analysts to discuss the Company's Second Quarter 2007 ("2Q07") earnings.

During the call, Defendant Schnitzer stated in part:

> In the past few weeks, the financial markets have been impacted by a
> repricing of risk and withdrawal of liquidity, due to the serious credit
> problems in the single-family subprime mortgage industry. *I would
> like to assure you that Centerline does not have any single-family or
> subprime exposure whatsoever. We are a commercial real estate
> finance and investment company, and we provide financing only
> for commercial and multifamily properties. As evidenced by our
> CAD growth this quarter, our core businesses continue to perform
> well, and the credit quality of the investments we manage remains
> strong.*
>
> In spite of the instability in the financial markets, operating
> fundamentals in the commercial real estate and affordable housing
> sectors are healthy. We have sufficient capital resources to execute
> our business plan, and we are not experiencing any liquidity
> problems. In fact, during the past 30 days, we have priced a
> collateralized debt obligation offering from one of our CMBS funds
> and closed on the expansion of our revolving credit facility. Both
> transactions demonstrate our ability to execute in a volatile market
> environment.
>
> *The recent market dislocation has created numerous opportunities
> to make investments that offer attractive returns and strong credit
> quality.* In times of market instability, we would expect to see a flight
> to quality that benefits firms like Centerline, that have a proven
> ability to assess and manage real estate risk.
>
> *Our business is sound.* Despite that, we have seen our stock price
> decline in recent weeks as concerns about mortgage or real estate-
> related businesses spread to the stock market. *Many of our investors
> inquired as to why we did not make any public statements during
> this period. We felt that it was important to wait until we released
> our earnings, so we could support the confidence we have in our
> business with solid facts.*
>
> As we reported in this morning's press release, we had a very strong
> quarter, with CAD per share of $0.46, which is a 12.2% increase over
> CAD per share in the second quarter of 2006. As of June 30th, our
> direct assets under management were $17.1 billion, an increase of 7%
> over the first quarter.

\*    \*    \*

> We expect that the disruption in the financial markets will continue
> through at least Labor Day. But we are confident in our ability to
> weather the storm and carefully take advantage of new opportunities.
> We believe that the recent decline in our stock price is a reaction to
> the real estate market as a whole. ***Our current stock price does not
> accurately reflect the health of our business or the credit quality of
> the assets we manage. We are confident investors will appreciate
> this distinction and will recognize the value of the Centerline brand.***

46.    Defendant Schnitzer's comments during the August 9, 2007 conference call were
false and misleading. Schnitzer affirmed his confidence in the Centerline, not only that the
Company's business focus remained unchanged, but that the business enjoyed strong fundamentals
and positive growth. Once again, Schnitzer pointed to minimal historic and current asset impairment
and falsely asserted that the Company was not exposed to sub-prime mortgage losses.

47.    Schnitzer also explained that CAD (cash available for distribution) had increased
12.2% versus the previous quarter, to $0.46. As a result, the Company's income-oriented investors
were again reassured that, ***as a result of the Company's corporate re-engineering program that was
purported to have been completed in 2006***, the financial state of the Company was sound, and that
the market's dislocations had created abundant and lucrative business opportunities for the
Company.

48.    Following Schnitzer's convincing statements on August 8, 2007, which detailed
Schnitzer's confidence in the Company's business focus, direction, growth and future prospects, the
price of Centerline stock recovered, increasing over 14%, to an unadjusted intermediate high of
$15.59 per share on August 22, 2007.

49.    On November 9, 2007, Defendants caused and/or allowed Centerline to conduct its
conference call to discuss its Third Quarter 2007 ("3Q07") earnings. During the call, Schnitzer and
Levy stated in part:

> ***Despite the ongoing credit crisis, Centerline had another strong
> quarter of operations.*** In very difficult market conditions, we closed
> a $585 million high yield CMBS fund and priced and closed a $986
> million collateralized debt obligation for one of our CMBS
> investment funds. In addition, our affordable housing group closed a
> $108 million guaranteed tax credit fund. ***We believe these
> accomplishments are evidence of the strength of the Centerline***

*brand and are a strong endorsement of our ability to assess and manage real estate risk.*

50. Following Defendant Schnitzer's remarks, Levy stated in part:

Finally, we are reiterating our CAD per share earnings guidance that we gave on the second quarter conference call. At that time, we provided guidance for flat growth in 2007. We remain comfortable with that guidance. *Based on our current outlook, we're confident that we will earn CAD in excess of our dividend and would therefore not recommend a change in dividend policy to our Board.*

51. On the issue of how to increase the price of the Company's stock, Defendant

Schnitzer continued, in part:

Nicole Jacoby – Liberation Investments – Analyst:

I just wanted to ask you guys, particularly in the current market environment you've been putting us out some really solid performance. However, it's obvious in your stock price that you're not being rewarded for that in the marketplace. *You addressed before a little bit about your -- you're thinking about stock buybacks. But more generally, can you walk us through your thinking about how you can help close that value gap or initiatives you might take to close that gap between where your stock price is and the true value of the Company?*

Marc Schnitzer – Centerline Holding Company – President and CEO:

Well yes, we believe and we have believed for some time that the way to really increase the value of the Company is to continue to evolve the Company into a fund manager. And, many of you will recall that back in 1997, when we were called CharterMac and the company first went public, it had one line of business and that was really to be a tax-exempt bond fund that lent money long and borrowed short.

Ever since that time, our growth has really focused on evolving into externally managed funds whether it's our tax credit funds, our CMBS funds, our high yield debt funds, our joint venture equity funds, the CLO business. All of these significant growth initiatives and others that we're thinking about, such as this debt opportunity fund are steering us toward an evolution into much more of a pure fund manager which is where we really see the growth for the Company and we believe that the marketplace rewards companies like that with a higher valuation on their income stream to a much greater extent than our Company realizes today.

*So, we've been going through this evolution. We will continue to go through this evolution and our goal will be to make the Company into much more of a pure fund manager and then go out and tell the world about it in the most effective way that we can. And our thesis would be that our multiple should go up and that's what our*

*advisors have suggested. So, that's more of a global approach. I
don't know if that is as specific an answer as you wanted.*

Nicole Jacoby – Liberation Investments – Analyst:

Well, I understand. I think we've had some of these discussions
before about turning into a fund manager. There are two further
issues. One is, you are obviously executing along that track. But the
market still doesn't seem to either recognize it or be rewarding it.
*And, sort of related to that, have you ever considered putting --
taking the bonds off your balance sheet or letting them roll off into
some other sort of vehicle?*

Marc Schnitzer – Centerline Holding Company – President and CEO:

*Well, clearly a strategy like that plays into the overall evolution of
the Company. So, clearly it's something that we've thought of from
time to time. We're not yet in a position where we can make the case
in a very compelling way that we are a pure fund manager when we
have $2.9 billion of bonds on our balance sheet which is
reminiscent of the bond fund that we were.* So, I think that
complicates the story and our goals are really to try to simplify the
story as much as we can.

Nicole Jacoby – Liberation Investments – Analyst:

And is there anything -- *so you generally thought about the bond
issue but I guess you're not commenting right now on the specifics
of it?*

Marc Schnitzer – Centerline Holding Company – President and CEO:

*We've thought about that and many other options. But, clearly
that's one that would come to mind right away.*

52.     The statements made by Schnitzer and Levy during the November 8, 2007 conference
call were false and misleading. They both abandoned their previous statements regarding the
completion of the Company's corporate re-engineering process in 2006. They now explained how
the Company would "unlock shareholder value" through its evolution into a "pure fund manager."
According to them, the Company's advisors believed that this evolution was the path the Company
would need to take to "unlock shareholder value".

53.     However, Schnitzer and the other Defendants knew and concealed the fact that the
Company was far beyond "thinking about" options -- the massive (and self-interested) $2.9 billion
bond securitization was clearly under way, which the Company planned to complete with the

assistance of its "advisors" prior to the end of the 2007 fiscal year. Moreover, Defendants knew and concealed that this plan would drain available cash and leverage the Company on highly unfavorable terms, and result in a huge dividend cut, a massive stock dilution, or both.

54.     Levy's affirmation of a stable "dividend policy" was also blatantly false and misleading. Had Levy revealed Defendants' plans about the massive securitization, the disclosures of the transaction would have underscored the liquidity issue. As a result, investors would have understood the inherently false and misleading nature of the statements regarding the Company's intentions to maintain a stable dividend payout policy.

55.     Following the November 8, 2007 conference call, Hilliard Lyons analyst Tony Howard expressed surprise and confusion regarding the Company's stance on its dividend payout:

> Somewhat surprisingly, management once again reiterated its full year 2007 CAD guidance to be basically in line with 2006 CAD results of $1.89 a share. Given that the first nine months of 2007 generated CAD of $1.06 a share, fourth quarter results would require a significant improvement over the $0.49 a share reported in 2006's fourth quarter. While doable, we are reducing our forecast to $1.80 a share. More importantly, our revised estimate would still cover the $1.68 a share dividend payment.

56.     The statements as contained in ¶¶ 38, 40, 42, 45, 49-51 were false and misleading. Among other things, Defendants' public disclosures served to actively conceal their true plan to benefit themselves at the expense of investors. Particularly, Defendants concealed:

    a.      the Company's deficient and defective process for assuring the independence of its Board members;

    b.      the approval by the Company's Board of management's self-dealing transactions without the knowledge or consent of shareholders, including one that involved entities owned by Defendants Ross and Blau and Centerline's largest shareholder;

    c.      continued aggressive and risky efforts to further re-engineer and transform the Company, despite Defendants' claims that the corporate re-engineering process had been completed in 2006;

d.    aggressive and immediate efforts to "re-engineer" the Company for the benefit of Defendants Ross and Blau, in the form of a self-dealing transaction involving a $131 million convertible note with an 11% coupon, at the expense of shareholders;

e.    the $2.9 billion securitization which would result in large transaction costs and charges, resulting in serious liquidity issues;

f.    that a stable dividend policy could not be maintained in light of the Company's plans to undertake a massive $2.9 billion securitization; and

g.    the "first loss" position on the Company's $2.9 billion securitization along with other aspects of the Company's sudden re-engineering and transformation would worsen its risk profile.

57.    Finally, on December 28, 2007, before markets opened, Defendants issued a press release entitled, "Centerline Holding Company Completes Securitization of $2.8 Billion Tax-Exempt Affordable Housing Bond Portfolio with Freddie Mac - Commitment Secured from Affiliate of Related Companies for $131 Million Equity Investment." The press release stated in part:

> NEW YORK--(BUSINESS WIRE)--Centerline Holding Company (NYSE:CHC - News), the parent company of Centerline Capital Group, Inc. ("Centerline" or the "Company"), today announced the completion of a securitization of the Company's $2.8 billion tax-exempt affordable housing bond portfolio with Freddie Mac. For accounting purposes, most of the securitization will be treated as a sale. The transaction represents a major step in Centerline's plan to transform itself into an alternative asset management company. ***Centerline also announced a $131 million equity investment commitment from an affiliate of Related Companies, its largest shareholder.***
>
> "Over the past several years, the strategic vision embraced by Centerline's Board of Trustees and management has been to transform Centerline into an alternative asset management company," said Marc D. Schnitzer, Chief Executive Officer and President of Centerline. "With the securitization of our bond portfolio with Freddie Mac, we have accelerated our progress toward that goal. ***The transaction has materially improved our risk profile by reducing the funding and interest rate risk inherent in our liability structure.*** Centerline now has a leaner balance sheet, improved credit metrics and an increased percentage of revenues derived from asset management services. As an alternative asset manager with $11.6 billion of assets under management, we aim to produce returns and growth comparable to other publicly-traded alternative asset managers."

"Centerline's goals are to increase assets under management and to create greater earnings power. With Related's investment, we have the resources to achieve our goals," continued Mr. Schnitzer. "Greater liquidity will enable us to capitalize on opportunities arising from the volatility in the capital markets. Our growth plans adhere to our core investment strategy of Buy-Watch-Fix: invest prudently, monitor performance diligently and manage investments aggressively."

*Stephen M. Ross, Chairman of Related Companies and Centerline, added, "Centerline has undergone an amazing evolution from the affordable housing firm I started 35 years ago to an industry leader in real estate investment and finance. Centerline has a premier, seasoned management team and a compelling growth story as an alternative asset manager. This equity investment in Centerline will help the Company implement its new initiatives and build the foundation for future expansion. I strongly endorse Centerline's growth strategy and the ability of the management team to execute it."*

### Freddie Mac Transaction

Centerline completed a securitization of the Company's $2.8 billion tax-exempt affordable housing bond portfolio with Freddie Mac. The bond portfolio is secured by mortgages on approximately 59,000 units of affordable multifamily properties in 31 states. For accounting purposes, most of the securitization will be treated as a sale. *Centerline retained a high-yielding first-loss position (the "B-Piece") in the portfolio and will remain the primary and special services.*

"We are thrilled to partner with Freddie Mac on this innovative transaction," said Mr. Schnitzer. "Retaining the B-Piece and our ongoing servicing arrangement creates a fund management structure for the bond portfolio similar to our other funds. Through our partnership with Freddie Mac, as their first Targeted Affordable Housing Lender, we will improve the competitiveness of our affordable housing business and assist in the expansion of assets under management."

Centerline used the proceeds from the Freddie Mac bond securitization to redeem its existing financing arrangements, retire corporate debt and pay the costs and expenses associated with the transaction.

In connection with the transaction, Centerline expects to record net, one-time charges of $45 million to $55 million in the fourth quarter of 2007. Net of minority interest allocations, the Company expects these charges to reduce net income by $30 million to $40 million. Gains incorporated in the net charge include a gain on the sale of the bonds, previously deferred revenues and recovery of impairment charges. Losses incorporated in the net charge include writing off deferred costs associated with the bonds and securitization trusts, recognizing fair value losses on certain interest rate swaps, costs to

terminate existing financing arrangements and transaction related costs. ***These transaction-related costs of approximately $95 million will impact the Company's 2007 Cash Available for Distribution ("CAD").*** Centerline has reduced the Company's previous CAD per share guidance for 2007 from $1.89 to a range of $1.70 to $1.75, exclusive of the transaction related costs associated with the securitization.

### $131 Million Investment from An Affiliate of Related Companies

***An affiliate of Related Companies has committed to invest $131,250,000 in Centerline Holding Company through a newly-issued convertible preferred stock. The preferred stock will pay dividends at an 11% annual distribution rate and will be convertible at a $10.75 per share conversion rate for an aggregate of approximately 12.2 million common shares of Centerline Holding Company. The transaction, which is subject to completion of definitive documentation, is expected to close in January 2008. Centerline will use the net proceeds to reduce corporate debt and fund the Company's growth plans.***

Repositioning as an Alternative Asset Manager

Centerline will implement several strategic initiatives to further align the Company with other publicly-traded alternative asset managers, including:

Increase Assets Under Management: Centerline anticipates raising $3.3 billion - $4.0 billion of new assets under management in 2008, including $1.7 billion - $2.0 billion of commercial real estate debt and equity funds, $1.0 billion - $1.2 billion of affordable housing funds and new mortgage bond investments and $600 million - $800 million of commercial loan investments.

Change Revenue Composition: The nature of Centerline's revenue composition has changed and will now be derived from (i) investment management fees, including fund sponsorship, asset management, servicing and incentive fees; (ii) transactional fees, including origination and credit enhancement fees; and (iii) investment income, including income from co-investments and interest. Centerline anticipates investment management fees and transactional fees will comprise approximately 60% - 65% of the Company's revenues in 2008.

Reduce Leverage: Centerline repaid the Company's existing term loan and revolver and entered into two new debt facilities, resulting in a net reduction of $120 million of corporate debt, including liabilities associated with the transaction. The new facilities include a revolving line of credit with a maximum capacity of $300 million and a term loan with a maximum capacity of $150 million. The lead arrangers of the new debt facilities are Bank of America and Citibank. Centerline expects its future corporate debt levels to be significantly lower than in the past.

***Change Dividend Policy: Effective in the first quarter of 2008, Centerline's dividend on an annualized basis is expected to be $0.60 per share ($0.15 on a quarterly basis), subject to approval by our Board of Trustees.*** The Company will deploy its retained cash flows to fund growth and reduce debt. Centerline anticipates 30% to 35% of the Company's income will be federally tax-exempt in 2008.

Utilize New Earnings Metrics: Beginning in the first quarter of 2008, Centerline will no longer report CAD as a financial metric. Instead, Centerline will report Adjusted Earnings per Share ("Adjusted EPS"). Adjusted EPS is defined as earnings per share computed pursuant to generally accepted accounting principles ("GAAP") and adjusted for non-cash amortization of acquired intangible assets and acquisition-related, share-based compensation.

**2008 Earnings Guidance**

Centerline anticipates Adjusted EPS for 2008 will range between $1.00 and $1.10.

58.     Following this, on Friday, December 28, 2007, Defendants conducted a conference call to detail the announced securitization and respond to questions:

Marc Schnitzer - Centerline Holding Company - President and CEO:

Good morning. We appreciate everyone calling in on short notice. ***This morning, we announced the closing of a transformational transaction that has been in the works for close to a year and a significant strategic investment in our firm by our larger shareholder.*** We also posted on our website an investor presentation that will be the program for this call, and after we run through it, we will answer any questions that you may have.

\*         \*         \*

Tony Howard  - J.J.B. Hilliard, W.L. Lyons, Inc. – Analyst:

Final question, Marc. Was it considered as far this transformation as far as why not take the Company the private, since basically our shareholders and a lot of shareholders have owned your stock over the years for the dividend and for the tax-free status. So in some way, you're basically not only transforming the Company, but you are changing the shareholder base. ***So you are basically punishing the income (inaudible) the shareholders for a more growth-oriented shareholders that may want to buy your stock in the future.***

Marc Schnitzer - Centerline Holding Company - President and CEO:

Well, certainly nobody is seeking to punish anybody, and certainly not our shareholders, which all of us are as well. But really, the goal is to step back and look at the Company as its two major constituent parts -- the bond portfolio on one hand and the asset manager on the other hand. The key is to put the bond portfolio into the hands of the

most suitable investor and the investor that will value that income stream from the bond portfolio in the highest possible fashion. We're confident that the Freddie Mac transaction has accomplished that goal. Now the next challenge that we have is to demonstrate to our shareholders that we can create growth within the Company and move forward as an alternative asset manager that has attractive growth opportunities and can capitalize on those opportunities. So that is what we are turning to, that is what we're going to be focused on.

*    *    *

Parker Phillips Private Investor:

Right. A lot of my questions have been asked, but *this just seems like a grand bit of financial engineering riddled with conflicts of interest. It doesn't sound like an arm's length transaction regardless of what you guys say and it's all masking massive dilution and a dividend cut.* That is the perception that I have and I think it's the perception that the market's having as well based on how the stock price is doing today. You guys have done a terrible job the last two years and this just sort of caps it off. So, thanks a lot.

Marc Schnitzer - Centerline Holding Company - President and CEO

I'm sorry you feel that way.

*    *    *

Manny Perlman Analyst:

And then, in regard to Morgan Stanley and Bear Stearns, they advised the Board and the Company on this transaction?

Marc Schnitzer - Centerline Holding Company - President and CEO:

They were both retained by the Company.

Manny Perlman Analyst:

Okay. When they made a presentation to the Board, clearly they must have made a presentation to talk about why this transaction was better for the Company and its shareholders than keeping yourself in the form you were prior to this. Can you give us a sense for the valuation ranges they thought that the Company could attain in the market, given this new format?

Marc Schnitzer - Centerline Holding Company - President and CEO:

Rob, do you want to speak to that, sort of the conceptual way that that was looked at, maybe?

Rob Levy - Centerline Holding Company - CFO:

- 24 -

Sure. Obviously we could just talk to the current comps in the marketplace, and then you can make your valuation decisions or adjustments off of that. As we looked at the alternative asset managers in the marketplace, they are trading in the 12 to 13 times the projected earnings of the Company, or EPS of the Company. That is certainly off of today's market and today's valuations, and so that was the immediate metric that we were looking at.

Manny Perlman Analyst

Do the comps pay out similar dividend yields that you were paying out?

Rob Levy - Centerline Holding Company - CFO

***Our dividend yield at this time would be superior to those comps.*** Those yields are more typically in the 3 to 4, well maybe up to about 5%, and I guess we will be at closing just under 6%. We're as of today just under 6%, so we are slightly above the comps are on a dividend yield standpoint.

\*    \*    \*

Matt West Private Investor

Just a closing remark related to the investor by Related. It says that the transaction is expected to close in January 2008. If it hasn't closed, I would suggest not closing it, especially not on the terms that you have put forth. When investors are using words like disgusted, egregious and disingenuous on a call, I think it's evident that this is a bad transaction. The right thing to do might be to do, if you really need capital now, which is arguable, you could do a rights offering and let Related backstop it. And finally, if you are this out of step with institutional shareholders, maybe the right thing to do is just put this company up for sale.

59.     Centerline's announcement shocked the market, given that the Company's sudden and unexpected announcement of its massive $2.9 billion securitization with Freddie Mac, management's self-dealing transaction and the 64% dividend cut to address liquidity issues created by the securitization transaction. Following the December 28, 2007 press release , shares of Centerline stock plummeted $2.57 or 25.0%, closing at $7.70 per share, on heightened volume of 4.1 million shares, for an instant loss of $41 million in market capitalization.

## RULE 23.1 DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

60.     Plaintiff hereby incorporates ¶¶ 1-59 above.

61.     Plaintiff is and has been a shareholder of Centerline stock during the Relevant Period.

62.     This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have. Plaintiff will adequately and fairly represent the interests of Centerline and its shareholders in enforcing and prosecuting their rights.

63.     The Board (or at the very least a majority of it) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow in ¶¶ 64-78 of this Complaint, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

64.     The Board participated in and/or approved many of the acts and omissions or was on notice of the acts and omissions and then in an intentional, reckless, or grossly negligent manner disregarded the wrongs complained of herein.

65.     The acts complained of herein constitute violations of fiduciary duties owed by the Board and these acts are incapable of ratification.

66.     The Board cannot be relied upon to reach a truly independent decision as to whether to consider a demand for action against themselves and the officers responsible for the misconduct alleged in this Complaint, in that, *inter alia*, the Board is dominated by certain Defendants, including Defendants Ross, Blau, and Schnitzer, who were personally and directly involved in the misconduct alleged and/or who each approved the actions complained of, and to whose directives and views the Board has consistently acceded and will continue to accede. This domination of the Board by certain of the Defendants has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept plaintiff's demands.

67.     In order to bring this action for breaching their fiduciary duties, each of the Defendants would have to sue himself/herself and/or his/her fellow trustees and allies in the top

ranks of the Company, who are his/her good friends and with whom he/she has entangling financial alliances, interests and dependencies, which each trustee of the Board would not do. Therefore, the Board would not be able to vigorously prosecute any such action and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves and one another.

68.     The Defendants named herein, receive payments, benefits, stock options and other emoluments by virtue of their membership on the Board and their control of Centerline. They have thus benefited from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

69.     Reasonable doubt exists as to whether the Board can be relied upon to independently consider a pre-suit demand to bring the claims alleged herein. According to the Company's 2007 Proxy, the Company readily acknowledges that defendants Ross, Blau, Schnitzer, Cotton, and White are not independent trustees under the NYSE standards, because of their personal, professional, and financial entanglements with each other and the Company.

70.     Reasonable doubt exists whether defendants Ross and Blau can be relied upon to independently consider pre-suit demand to bring the claims allged herein. Plaintiff alleges that Ross and Blau are two of the key figures in the plan to secretly financially re-engineer the Company without informing shareholders. Ross and Blau are two of the largest shareholders and as owners of The Related Companies and its affiliates stand to benefit handsomely from their wrongs complained of herein. Ross and Blau are also directly involved in the $131 million investment in the Company by a wholly-owned affiliate of The Related Companies, which Plaintiff challenges.

71.     Moreover, Ross and Blau dominate the Board through longstanding business and personal entanglements with the Company. Ross has been the Non-Executive Chairman since 1999, and is one of the Company's largest shareholders. Blau has been a member of the Board since 2003 and is also one of its largest shareholders. Together Ross and Blau own The Related Companies, which is a substantial shareholder, and through its affiliates has ties to the Company.

72.    The examples of the Company's financial involvements with companies controlled by Ross and Blau include:

- The November 17, 2003 Centerline acquisition of Related Capital Company (now Centerline Capital Company LLC), which had been a subsidiary of The Related Companies. Prior to and continuing after the acquisition, Centerline reimbursed all costs incurred by Related Capital and its designees in performing services for the Company plus an amount equal to a market based percentage, as jointly determined from time to time by the Company and Related Capital.

- According to the Company's 2004 proxy, Related Management Company, which is wholly owned by The Related Companies, earned fees for performing property management services for various properties held in investment funds Centerline manages and consolidates. The fees totaled $4.3 million in 2006, $3.2 million, $2.2 million in 2004, $2.9 million in 2003 and $2.5 million in 2002.

- Ross like other Company Board members also serves on the Board of Equinox Holdings, Inc., an affiliate of the The Related Companies.

- The Related Companies provides services to Centerline under a shared services agreement. The services provided include office management, payroll, human resources and other office services. The majority of the services are charged to Centerline at the direct cost incurred by The Related Companies. During 2006, Centerline paid The Related Companies $620,000 for such services.

- During 2006, funds sponsored by Centerline acquired equity interests in three projects developed by affiliates of The Related Companies, investing approximately $7.1 million, $7.5 million and $10 million respectively in the projects.

73.    Reasonable doubt exists as to whether defendant Schnitzer can be relied upon to independently consider a pre-suit demand to bring the claims alleged herein. As the CEO and President of the Company, Defendant Schnitzer is responsible for directing the Company's day-to-day operations and for overseeing its corporate development and strategic planning. Schnitzer was

therefore an integral cog in Defendants' plan to secretly, financially re-engineer the Company for management's benefit and to the detriment of other shareholders. Indeed, Schnitzer repeatedly made false and/or misleading statements to shareholders (and the public) concerning the true state of the Company's financial re-engineering/strategic plans.

74.    Moreover, Schnitzer is financially beholden to the Company and the affiliated companies of Defendants Ross and Blau. For example, the Company paid Schnitzer over $2,145,000 in total compensation for his service as CEO and President in 2006. In February 2007, Schnitzer entered into an employment agreement with the Company to serve as CEO and President of the Company and Executive Managing Director of Centerline Advisors (an affiliate) through 2009 with provisions for annual automatic renewal thereafter. The February 2007 agreement also granted Schnitzer $3,000,000 worth of restricted shares, vesting over three years. Schnitzer also serves as the Chairman of the board of trustees of American Mortgage Acceptance Company, a publicly traded real estate trust managed by an affiliate of the Company, on whose board of trustees sits Defendant Blau. Because of Schnitzer's ties to other Defendants, reasonable doubt exists about the ability of Schnitzer to independently consider a pre-suit demand.

75.    Reasonable doubt exists whether Defendant Cotton can be relied upon to independently consider a pre-suit demand to bring the claims alleged herein. Defendant Cotton has personal and professional entanglements with defendants Ross, Blau, and Schnitzer. Defendant Cotton has been a Managing Trustee and Vice Chairman of the Board since 2006. Defendant Cotton previously served as the CEO of Centerline REIT (formerly ARCap REIT, Inc.), which was acquired by Centerline in 2006. Defendants Cotton also serves as Chairman of the Board of Centerline REIT. Moreover, Defendant Cotton is financially beholden to the Company. The Company paid Defendant Cotton over $1,646,236 in total compensation from August 15, 2006 (after the acquisition of Centerline REIT) to the end of the year. Defendant Cotton currently has an employment agreement with the Company, which provides he is to serve as Chairman of the Board of Directors of Centerline REIT and a trustee of the Board. Moreover, the contract provides that Defendant Cotton is member of the Company's strategic planning committee. Defendant Cotton's employment

- 29 -

agreement provides for an annual base salary of $400,000 and provides for an award of 255,003 restricted Common Shares, which vests over four years in four equal cumulative installments of 25% on each of the first four anniversaries of the grant date, provided that Defendant Cotton is continuously employed by Centerline REIT on each vesting date.

76.    Reasonable doubt exists whether Defendant Dolan can be relied upon to independently consider a pre-suit demand to bring the claims alleged herein. Since 2001, Dolan has been the Dean of the University of Michigan Business School. In September 2004, the University of Michigan Business School received a $100 million endowment made by defendant Ross. As a result of that donation, the school was renamed "Stephen M. Ross School of Business at the University of Michigan." According to the University of Michigan, the $100 million donation by Ross represents the single largest donation ever made to any business school in the United States and the largest gift to the University in its 187-year history. In addition to being Dean of the Stephen M. Ross School of Business, Dolan serves as the Stephen M. Ross Professor of Business. Dolan also chairs the University of Michigan's Development Subcommittee. A reasonable person could find that Defendant Dolan is beholden to Ross, an interested person – both in the financial sense and in terms of the personal and professional relationships that flow from their connection to the "Stephen M. Ross School of Business."

77.    Reasonable doubt exists whether Defendant Halperin can be relied upon to independently consider a pre-suit demand to bring the claims alleged herein. Defendant Halperin holds close alliances with and allegiances to interested trustees, Ross and Blau and is dependent upon them for continuation of his positions on the boards of Centerline and Equinox Holdings Inc. (an affiliate of The Related Companies).

78.    Reasonable doubt exists whether Defendant White can be relied upon to independently consider a pre-suit demand to bring the claims alleged herein. Defendant White is and has been since July 2001 a paid consultant to Centerline, earning $100,000, in addition to his compensation for service on the Board.

## FIRST CAUSE OF ACTION

### For Breaches of Their Fiduciary Duties of Loyalty, Due Care and Good Faith
(Against All Defendants)

79.     Plaintiff incorporates by reference each of the foregoing allegations.

80.     The Defendants are fiduciaries of Centerline and of all of its public shareholders and owe to them the duty to conduct the business of the Company loyally, with due care and in good faith. This cause of action is asserted based upon the Defendants' intentional, reckless or grossly negligent acts, which constitute breaches of their fiduciary duties of loyalty, due care and good faith and waste of the Company's corporate assets, in violation of state law.

81.     The Defendants, in their roles as executives and/or trustees of the Company, participated in the acts of mismanagement alleged herein, or acted in reckless disregard of the facts known to them, and failed to exercise due care to prevent the violation of the federal securities laws. Specifically, the Defendants caused the Company to give shareholders a false impression that their investment in the Company had matured, into a re-branded, stable and profitable dividend-producing business entity. In reality, Defendants re-engineered the Company into a growth-oriented business while concealing their plans from the shareholders. The transformation benefited Defendants at shareholders' expense. The Defendants became aware, or should have become aware through reasonable inquiry, of the facts alleged herein, but Defendants did nothing to correct these false statements and omissions and thereby breached their duty of care, loyalty, accountability and disclosure to the shareholders of the Company.

82.     The Defendants have been responsible for the gross mismanagement of Centerline. The Defendants abdicated their corporate responsibilities by mismanaging the Company in at least the following ways:

        a.     They caused Centerline to violate the federal securities laws;

        b.     They concealed from the Company's shareholders their plans to transform the Company from an income-oriented investment to a growth-oriented investment and to engage in self-dealing; and

c.      They subjected Centerline to adverse publicity, greatly increased its costs to raise capital, and impaired its earnings.

83.     As a result of Defendants' wrongful conduct, Centerline has suffered considerable damage and a drastic diminution in value.

84.     All Defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company.

85.     The Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their high-level positions in the Company.

86.     By reason of the foregoing, the Defendants have breached their fiduciary obligations to Centerline and its shareholders.

87.     Centerline and its shareholders have been injured by reason of the Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company. Plaintiff, as a shareholder and representative of Centerline, seeks damages and other relief for the Company as hereinafter set forth.

## SECOND CAUSE OF ACTION

### Derivative Claim For Waste Of Corporate Assets
(Against All Defendants)

88.     Plaintiff incorporates by reference each of the foregoing allegations.

89.     As a direct result of wrongdoing alleged herein, Defendants have unreasonably and unnecessarily caused Centerline to expend hundreds of millions of dollars of corporate assets to the extreme detriment of the Company.

90.     As a direct and proximate result of Defendants' waste of corporate assets as alleged herein, Centerline has sustained damages.

## THIRD CAUSE OF ACTION

### Unjust Enrichment
(Against All Defendants)

91.     Plaintiff incorporates by reference each of the foregoing allegations.

92.    As a direct result of wrongdoing alleged herein, Defendants received money or other property which, in equity and good conscience and under the law, belongs to Centerline. Defendants have unjustly enriched themselves by breaches of the duty not to engage in self-dealing and interested transactions as pled herein. All such monies and property in the hands of Defendants are due to be repaid to and for the benefit of Centerline.

**REQUEST FOR RELIEF**

WHEREFORE, plaintiff demands judgment on behalf of Centerline as follows:

A.    Against each Defendant for restitution and/or damages in favor of plaintiff, on behalf of Centerline and its public shareholders, and awarding punitive and exemplary damages as appropriate, plus pre-judgment interest, modeled in a fashion to ensure Defendants do not participate therein or benefit thereby;

B.    Equitable and/or injunctive relief, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Centerline has an effective remedy;

C.    Directing Centerline to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with the Sarbanes-Oxley Act of 2002, as well as all other legal requirements to protect the Company and its shareholders from the damaging effects described herein;

D.    Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees, costs and expenses; and

E.    Granting such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:    January 25, 2008

Respectfully submitted,

Beth A. Kaswan (BK 0264)
SCOTT + SCOTT, LLP
29 West 57th Street
New York, NY 10019
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
bkaswan@scott-scott.com

David R. Scott (DS 8053)
SCOTT + SCOTT, LLP
108 Norwich Avenue
P. O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
drscott@scott-scott.com

Walter W. Noss
SCOTT + SCOTT, LLP
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: (216) 229-6088
Facsimile: (216) 229-6092
wnoss@scott-scott.com

SCOTT + SCOTT, LLP
Arthur Shingler, III
600 B Street Suite 1500
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508

**Counsel for Plaintiff**

## VERIFICATION

I, John Carfagno, hereby declare and verify under penalty of perjury that that I have reviewed the foregoing Verified Derivative Complaint, and I believe that the matters alleged therein are true and correct to the best of my knowledge, information, and belief. Executed this 22 the Day of January 2008.

John Carfagno