UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CARFAGNO,<br><br>   Plaintiff,<br><br> v.<br><br>SCHNITZER, et al.,<br><br>   Defendants, | Case No. 08-CV-00912 (SAS)<br><br>**CORRECTED NOTICE** |

  Plaintiff files this Corrected Notice of Subpoena to be served upon Morgan Stanley & Co. Incorporated.

Dated: New York, New York
    April 4, 2008

                   s/_____
                   Beth Kaswan (BK-0264)
                   SCOTT + SCOTT, LLP
                   29 West 57th Street
                   New York, NY 10019
                   Phone: (212) 223-6444
                   Fax: (212) 223-6334
                   Email: bkaswan@scott-scott.com

                   *Counsel for Plaintiff John Carfagno*

2

**CERTIFICATE OF SERVICE**

I hereby certify that on April 4, 2008, the foregoing Corrected Notice was filed electronically with the Court's Case Management/Electronic Case Files (CM/ECF) docketing system. Notice of this filing will be sent to all parties by operation of the CM/ECF system. Parties may access this filing through the CM/ECF system.

s/_____
Beth Kaswan (BK-0264)
SCOTT + SCOTT, LLP
29 West 57th Street
New York, NY 10019
Phone: (212) 223-6444
Fax: (212) 223-6334
Email: bkaswan@scott-scott.com

*Counsel for Plaintiff John Carfagno*

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

__Southern__     DISTRICT OF     __New York__

CARFAGNO,

V.

SCHNITZER, et al.,

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]    1:08-cv-00912-SAS

TO: Morgan Stanley & Co. Incorporated
1633 Broadway
New York, NY 10019

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects place, date, and time specified below (list documents or objects):

See Schedule A.

| PLACE | DATE AND TIME |
|---|---|
| Scott + Scott, LLP<br>29 West 57th Street<br>New York, NY 10019 | April 18, 2008 at 1:00 PM |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *[signature]* Attorney for Plaintiff | April 3, 2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Beth Kaswan, Scott + Scott, LLP, 29 West 57th Street, New York, NY 10019, (212) 223-6444

[1] If action is pending in district other than district of issuance, state district under case number.

| PROOF OF SERVICE | |
|---|---|
| DATE | PLACE |

SERVED

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A

*(Morgan Stanley Subpoena)*

## DEFINITIONS

1. "All" means "any and all" and the word "any" means "any and all."

2. "And" and "or" are to be read interchangeably so as to give a particular request in which either or both is used the broadest possible meaning.

3. "Morgan Stanley" means Morgan Stanley & Co., Inc., its present and former directors, officers, employees, attorneys, agents, subsidiaries, affiliates, acquisitions, successors or predecessors, and any other person acting in whole or in part on behalf of Morgan Stanley.

4. "Centerline" means Centerline Holding Company, its present and former trustees, directors, officers, employees, attorneys, agents, subsidiaries, affiliates, acquisitions, successors or predecessors, and any other person acting in whole or in part on behalf of Centerline.

5. "Communication" includes all oral, written or other exchanges, presentations, reports or other transmissions of information (in the form of facts, ideas, opinions, inquiries or otherwise) whether in person, by telephone, or by electronic or any other means.

6. "Concerning" means concerning, relating to, referring to, reflecting, describing, evidencing or constituting.

7. "Document" or "documents" shall be synonymous in meaning and equal in scope to the usage of this term in Rule 34(a) of the Federal Rules of Civil Procedure and include, but is not limited to, written, printed, photocopied, computer generated or electronically transmitted materials including, but not limited to, writings, publications, e-mails, messages, communications, facsimiles, computer tapes, microfilm or microfiche, drawings, graphs, charts,

photographs, and other data compilations from which information can be obtained, and translated if necessary, by you into reasonably usable and searchable form, including information in native format. A draft or non-identical copy is considered a separate document.

8. "Including" means including without limitation.

9. "Preferred Shares" means the Centerline convertible preferred shares, designated as 11.0% Cumulative Convertible Preferred Shares, Series A-1, having a liquidation preference of $11.70 per share and a conversion price of $10.75 per share.

10. "Rights Offering" means the $131,250,000 million rights offering announced by Centerline in its January 23, 2008 press release.

11. "You" and "your" and their cognates mean Morgan Stanley (as defined above).

12. The use of the singular form of any word includes the plural and vice versa, and the use of any tense of any verb shall also include within its meaning all other tenses of the verb.

## INSTRUCTIONS

1. You are requested to produce any and all responsive documents in your possession, custody or control. A document shall be deemed to be in your control if you have the right or power, directly or indirectly, to obtain the document or copy thereof from another person having possession or custody thereof.

2. Documents are to be produced in full. If any requested document cannot be produced in full, produce it to the extent possible, indicating which document, or portion of that document, is being withheld, and the reason that document is being withheld.

3. Documents shall be produced in the file folder, envelope or other container in which the documents are kept or maintained. All documents shall be produced intact in their original files, without disturbing the organization of documents employed during the conduct of

the ordinary course of business and during the subsequent maintenance of the documents.

4.      Documents shall be produced in such fashion as to identify the department, branch, office or custodian in whose possession it was located and, where applicable, the natural person in whose possession it was found and the business address of each document's custodian(s).

5.      Documents attached to each other should not be separated.

6.      Documents not otherwise responsive to this discovery request shall be produced if such documents mention, discuss, refer to, or explain the documents which are called for by these requests, or if such documents are attached to documents called for by this discovery request and constitute routing slips, transmittal memoranda, or letters, comments, evaluations or similar materials.

7.      When an objection is made to the production of any document described herein, the objection shall state all grounds with specificity. If only a portion of a document request is objected to, produce all documents responsive to all portions of the request to which you do not object.

8.      If any document is withheld, in whole or in part, for any reason, including, without limitation, any claim of privilege, whether work-product or attorney-client, confidentiality or trade secret, set forth separately with respect to each such document:

      a.    the nature of the privilege or ground of confidentiality claimed;

      b.    the type of documents;

      c.    the authors of the document;

      d.    all persons who received copies of the document;

      e.    the date of the document; and

  f. the general subject matter of the document.

If a claim of attorney client privilege or attorney work product is made, identify those persons who are attorneys, and the employer of each author, addressee and person who received copies of the document at the time that the document was created and transcribed.

9. If a document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible without thereby disclosing the privileged material. If a privilege is asserted with regard to part of the material contained in a document, you must clearly indicate the portions as to which the privilege is claimed, and include the information provided in ¶ 8 above.

10. You are required to produce the original of each document requested together with all non-identical copies and drafts of that document. If the original of any document cannot be located, provide a copy in lieu thereof, which shall be legible and bound or stapled in the same manner as the original.

## DOCUMENTS REQUESTED

1. All documents concerning any communications with Centerline or any members of its Board of Trustees concerning the initiatives disclosed in Centerline's December 28, 2007 News Release, attached hereto.

2. All documents, including any advice, analysis, evaluations, memoranda, notes, opinions, plans, proposal or studies, concerning the initiatives disclosed in Centerline's December 28, 2007 News Release, attached hereto.

3. All documents concerning any communications with Centerline or any members of its Board of Trustees about the January 2008 $131.2 million private placement of Centerline Preferred Shares.

4

5

4.    All documents, including any advice, analysis, evaluations, memoranda, notes, opinions, plans, proposal or studies, concerning the January 2008 $131.2 million private placement of Centerline Preferred Shares.

5.    All documents concerning any communications with Centerline or any members of its Board of Trustees about the March 2008 Rights Offering of Centerline Preferred Shares.

6.    All documents, including any advice, analysis, evaluations, memoranda, notes, opinions, plans, proposal or studies, concerning the March 2008 Rights Offering of Centerline Preferred Shares.

EX-99.1 2 ex99-1.htm PRESS RELEASE

**Exhibit 99.1**

## CENTERLINE HOLDING COMPANY COMPLETES SECURITIZATION OF $2.8 BILLION TAX-EXEMPT AFFORDABLE HOUSING BOND PORTFOLIO WITH FREDDIE MAC

*- Commitment Secured from Affiliate of Related Companies for $131 Million Equity Investment -*

NEW YORK, NY – **December 28, 2007** – Centerline Holding Company (NYSE: CHC), the parent company of Centerline Capital Group Inc. ("Centerline" or the "Company"), today announced the completion of a securitization of the Company's $2.8 billion tax-exempt affordable housing bond portfolio with Freddie Mac. For accounting purposes, most of the securitization will be treated as a sale. The transaction represents a major step in Centerline's plan to transform itself into an alternative asset management company. Centerline also announced a $131 million equity investment commitment from an affiliate of Related Companies, its largest shareholder.

"Over the past several years, the strategic vision embraced by Centerline's Board of Trustees and management has been to transform Centerline into an alternative asset management company," said Marc D. Schnitzer, Chief Executive Officer and President of Centerline. "With the securitization of our bond portfolio with Freddie Mac, we have accelerated our progress toward that goal. The transaction has materially improved our risk profile by reducing the funding and interest rate risk inherent in our liability structure. Centerline now has a leaner balance sheet, improved credit metrics and an increased percentage of revenues derived from asset management services. As an alternative asset manager with $11.6 billion of assets under management, we aim to produce returns and growth comparable to other publicly-traded alternative asset managers."

"Centerline's goals are to increase assets under management and to create greater earnings power. With Related's investment, we have the resources to achieve our goals," continued Mr. Schnitzer. "Greater liquidity will enable us to capitalize on opportunities arising from the volatility in the capital markets. Our growth plans adhere to our core investment strategy of Buy-Watch-Fix: invest prudently, monitor performance diligently and manage investments aggressively."

Stephen M. Ross, Chairman of Related Companies and Centerline, added, "Centerline has undergone an amazing evolution from the affordable housing firm I started 35 years ago to an industry leader in real estate investment and finance. Centerline has a premier, seasoned management team and a compelling growth story as an alternative asset manager. This equity investment in Centerline will help the Company implement its new initiatives and build the foundation for future expansion. I strongly endorse Centerline's growth strategy and the ability of the management team to execute it."

**Freddie Mac Transaction**
Centerline completed a securitization of the Company's $2.8 billion tax-exempt affordable housing bond portfolio with Freddie Mac. The bond portfolio is secured by mortgages on approximately 59,000 units of affordable multifamily properties in 31 states. For accounting purposes, most of the securitization will be treated as a sale. Centerline retained a high-yielding first-loss position (the "B-Piece") in the portfolio and will remain the primary and special servicer.

"We are thrilled to partner with Freddie Mac on this innovative transaction," said Mr. Schnitzer. "Retaining the B-Piece and our ongoing servicing arrangement creates a fund management

structure for the bond portfolio similar to our other funds. Through our partnership with Freddie Mac, as their first Targeted Affordable Housing Lender, we will improve the competitiveness of our affordable housing business and assist in the expansion of assets under management."

Centerline used the proceeds from the Freddie Mac bond securitization to redeem its existing financing arrangements, retire corporate debt and pay the costs and expenses associated with the transaction.

In connection with the transaction, Centerline expects to record net, one-time charges of $45 million to $55 million in the fourth quarter of 2007. Net of minority interest allocations, the Company expects these charges to reduce net income by $30 million to $40 million. Gains incorporated in the net charge include a gain on the sale of the bonds, previously deferred revenues and recovery of impairment charges. Losses incorporated in the net charge include writing off deferred costs associated with the bonds and securitization trusts, recognizing fair value losses on certain interest rate swaps, costs to terminate existing financing arrangements and transaction related costs. These transaction-related costs of approximately $95 million will impact the Company's 2007 Cash Available for Distribution ("CAD"). Centerline has reduced the Company's previous CAD per share guidance for 2007 from $1.89 to a range of $1.70 to $1.75, exclusive of the transaction related costs associated with the securitization.

**$131 Million Investment from An Affiliate of Related Companies**
An affiliate of Related Companies has committed to invest $131,250,000 in Centerline Holding Company through a newly-issued convertible preferred stock. The preferred stock will pay dividends at an 11% annual distribution rate and will be convertible at a $10.75 per share conversion rate for an aggregate of approximately 12.2 million common shares of Centerline Holding Company. The transaction, which is subject to completion of definitive documentation, is expected to close in January 2008. Centerline will use the net proceeds to reduce corporate debt and fund the Company's growth plans.

**Repositioning as an Alternative Asset Manager**
Centerline will implement several strategic initiatives to further align the Company with other publicly-traded alternative asset managers, including:

- *Increase Assets Under Management:* Centerline anticipates raising $3.3 billion - $4.0 billion of new assets under management in 2008, including $1.7 billion - $2.0 billion of commercial real estate debt and equity funds, $1.0 billion - $1.2 billion of affordable housing funds and new mortgage bond investments and $600 million - $800 million of commercial loan investments.

- *Change Revenue Composition:* The nature of Centerline's revenue composition has changed and will now be derived from (i.) investment management fees, including fund sponsorship, asset management, servicing and incentive fees; (ii.) transactional fees, including origination and credit enhancement fees; and (iii.) investment income, including income from co-investments and interest. Centerline anticipates investment management fees and transactional fees will comprise approximately 60% - 65% of the Company's revenues in 2008.

- *Reduce Leverage:* Centerline repaid the Company's existing term loan and revolver and entered into two new debt facilities, resulting in a net reduction of $120 million of corporate debt, including liabilities associated with the transaction. The new facilities include a revolving line of credit with a maximum capacity of $300 million and a term

loan with a maximum capacity of $150 million. The lead arrangers of the new debt facilities are Bank of America and Citibank. Centerline expects its future corporate debt levels to be significantly lower than in the past.

- *Change Dividend Policy*: Effective in the first quarter of 2008, Centerline's dividend on an annualized basis is expected to be $0.60 per share ($0.15 on a quarterly basis), subject to approval by our Board of Trustees. The Company will deploy its retained cash flows to fund growth and reduce debt. Centerline anticipates 30% to 35% of the Company's income will be federally tax-exempt in 2008.

- *Utilize New Earnings Metrics*: Beginning in the first quarter of 2008, Centerline will no longer report CAD as a financial metric. Instead, Centerline will report Adjusted Earnings per Share ("Adjusted EPS"). Adjusted EPS is defined as earnings per share computed pursuant to generally accepted accounting principles ("GAAP") and adjusted for non-cash amortization of acquired intangible assets and acquisition-related, share-based compensation.

**2008 Earnings Guidance**
Centerline anticipates Adjusted EPS for 2008 will range between $1.00 and $1.10.

*Reconciliation of Adjusted EarningsPer Share to GAAP EarningsPer ShareGuidance*

| (per share) | Low | High |
|---|---|---|
| **GAAP Earnings Per Share** | **$0.84** | **$0.94** |
| *Amortization of IntangibleAssets* | $0.11 | $0.11 |
| *Amortization of Acquisition-Related Share-Based Compensation* | $0.05 | $0.05 |
| **Adjusted Earnings Per Share** | **$1.00** | **$1.10** |

**Conference Call**
Centerline management will conduct a conference call today, December 28, 2007, at 10:00 a.m. Eastern Standard Time to review the details of this transaction and the other issues covered in this press release. Callers will be invited to ask questions. Investors, brokers, analysts and shareholders wishing to participate may call (877) 719-9786. A webcast of the presentation will be available live and may be accessed through the Company's website: www.centerline.com. To listen to the presentation via webcast, please go to the website's "Investor Relations" section at least 15 minutes prior to the start of the presentation. For interested individuals unable to join the conference call, a replay of the call will be available through Friday, January 4, 2008, at (888) 203-1112 (Passcode 4192115) or on our website, through Friday, February 15, 2008.

**Financial Advisors**
Morgan Stanley & Co. Incorporated and Bear, Stearns & Co. Inc. acted as financial advisors to Centerline for the initiatives discussed in this press release.

**About the Company**
Centerline Capital Group, a subsidiary of Centerline Holding Company (NYSE:CHC), is an alternative asset manager with a core focus on real estate and more than $11.6 billion of assets under management. Centerline is headquartered in New York, New York and has over 500 employees in nine offices throughout the United States. For more information, please visit Centerline's website, www.centerline.com, or contact the Corporate Communications Department directly at (800) 831-4826.

*Certain statements in this document may constitute forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. These statements are based on management's current expectations and beliefs and are subject to a number of factors and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. These risks and uncertainties include the risk that we are unable to successfully implement the Company's new strategy outlined in this press release and uncertainty of the market's reception of the new strategy and dividend policy, and other risks and uncertainties which are detailed in Centerline Holding Company's most recent Annual Report on Form 10-K and in its other filings with the Securities and Exchange Commission, and include, among others, adverse changes in real estate markets; competition with other companies; interest rate fluctuations; general economic and business conditions; environmental/safety requirements; changes in applicable laws and regulations; our tax treatment, the tax treatment of our subsidiaries and the tax treatment of our investments; risk of default associated with the mortgage revenue bonds and other securities held by us or our subsidiaries; risks associated with providing credit enhancement; risk of loss under mortgage loan loss sharing agreements; risk of loss from direct and indirect investments in CMBS; the risk that relationships with key investors and developers may not continue; our ability to generate fee income may not continue; and risks related to the form and structure of our financing arrangements. Words such as "anticipates", "expects", "intends", "plans", "believes", "seeks", "estimates" and similar expressions are intended to identify forward-looking statements. Such forward-looking statements speak only as of the date of this document. Centerline Holding Company expressly disclaims any obligation or undertaking to release publicly any updates or revisions to any forward-looking statements contained herein to reflect any change in Centerline Holding Company's expectations with regard thereto or change in events, conditions, or circumstances on which any such statement is based.*

###