UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN CARFAGNO, derivatively on behalf of CENTERLINE HOLDING COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>MARC D. SCHNITZER, *et al.*,<br><br>Defendants. | 08-CV-912-SAS |
| TONY BROY, derivatively and on behalf of Nominal Defendant CENTERLINE HOLDING COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>JEFF T. BLAU, *et al.*,<br><br>Defendants. | 08-CV-1971-SAS |

## DECLARATION OF RICHARD A. ROSEN

RICHARD A. ROSEN, under penalty of perjury, declares and certifies as follows:

1.     I am a partner with the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, attorneys for individual defendants Marc D. Schnitzer, Robert L. Levy, Leonard W. Cotton, Peter T. Allen, Robert J. Dolan, Robert A. Meister, Nathan Gantcher, Jerome Y. Halperin, Robert L. Loverd, Janice Cook Roberts and Thomas W. White in this action. I respectfully submit this declaration in support of Defendants' motion to dismiss to supply the Court with certain public documents, and documents that plaintiffs have incorporated by reference in their Consolidated Amended Verified Complaint.

2.     Attached hereto as Exhibit A is a true and correct copy of Section 7.3 of CharterMac's Second Amended and Restated Trust Agreement dated November 17, 2003.

3.    Attached hereto as Exhibit B is a true and correct copy of Article III, Section 17(b) of CharterMac's Fifth Amended and Restated Bylaws dated March 2007.

4.    Attached hereto as Exhibit C is a true and correct copy of a Centerline conference call transcript dated November 8, 2007.

5.    Attached hereto as Exhibit D is a true and correct copy of an excerpt from Centerline's April 23, 2007 Schedule 14A Proxy Statement Pursuant to Section 14(a) of the securities Exchange Act of 1934.

6.    Attached hereto as Exhibit E is a true and correct copy of Section 303A of the Corporate Governance Rules of the New York Stock Exchange as of November 3, 2004.

7.    Attached hereto as Exhibit F is a true and correct copy of a report by Bloomberg L.P. of the closing price of Centerline common stock on May 12, 2008.

Dated:  May 12, 2008

_____
RICHARD A. ROSEN

# EXHIBIT A

**CHARTERMAC**

Second Amended and Restated Trust Agreement

Dated: November 17, 2003

(b)    No provision of this Trust Agreement shall require the Registered Trustee to take any action, to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights, powers or obligations hereunder, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such action, risk or liability is not reasonably assured or provided to it;

(c)    Under no circumstance shall the Registered Trustee be personally liable for any representation, warranty, covenant or other obligation or indebtedness of the Trust;

(d)    The Registered Trustee shall not be personally responsible for or in respect of the validity or sufficiency of this Trust Agreement, or the form, validity, value or sufficiency of the Trust Property;

(e)    The Registered Trustee shall not be personally liable for its good faith reliance on the provisions of this Trust Agreement;

(f)    Under no circumstances shall the Registered Trustee be personally liable for (i) any action it takes or omits to take in good faith in accordance with the instruction of the Board of Trustees or the Manager, (ii) the acts or omissions of the Board of Trustees or the Manager or (iii) the supervision of or the failure of the Board of Trustees or the Manager to discharge their respective duties hereunder or pursuant to the Management Agreement; and

(g)    The Registered Trustee shall not incur any liability to anyone in acting upon any document believed in good faith by it to be genuine and believed in good faith by it to be signed by the proper party or parties and need not investigate any fact or matter pertaining to or in any such document. The Registered Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any Person as conclusive evidence that such resolution has been duly adopted by such Person and that the same is in full force and effect. As to any fact or matter, the method of the determination of which is not specifically prescribed herein, the Registered Trustee may for all purposes hereof rely on a certificate, signed by any officer of the relevant Person, as to such fact or matter, and such certificate shall constitute full protection to the Registered Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon.

7.3    *Managing Trustees; Employees.* To the maximum extent that Delaware law in effect from time to time permits limitation of the liability of trustees of a statutory trust, Managing Trustee or employee of the Trust, when acting in such respective capacities, shall not be personally liable to any Person other than the Trust or a Shareholder for any act, omission or obligation of the Trust, the Registered Trustee, the Manager or any Managing Trustee. To the maximum extent that Delaware law in effect from time to time permits limitation of the liability of trustees of a statutory trust, no Managing Trustee shall be liable to the Trust or to any Shareholder for monetary damages for breach of any duty (including, without limitation, fiduciary duty) as a

Managing Trustee, except (i) for acts or omissions of such Managing Trustee that involve actual fraud or willful misconduct, or (ii) for any transaction from which such Managing Trustee derived improper personal benefit. Neither the amendment nor repeal of this Section 7.3 nor the adoption or amendment of any other provision of this Trust Agreement inconsistent with this Section 7.3 shall apply to or affect in any respect the applicability of the immediately preceding sentence with respect to any act or failure to act that occurred prior to such amendment, repeal or adoption.

7.4 **Reliance on Agents, Attorneys, Etc.** In the exercise of their rights and obligations hereunder, the Registered Trustee and the Managing Trustees (i) may act directly, or at the expense of the Trust, through agents (including, without limitation, a Manager) or attorneys pursuant to agreements entered into with any of them, and they shall not be liable for the default or misconduct of such agents or attorneys if such agent or attorney shall have been selected in good faith and (ii) may, at the expense of the Trust, consult with counsel to be selected in good faith, and employed by them, and shall not be liable for anything done, suffered or omitted in good faith in accordance with the advice or opinion of any such counsel.

## 8. INTENTIONALLY DELETED

## 9. ALLOCATION OF INCOME, LOSS AND DISTRIBUTIONS

9.1 **Allocations.** Net Income, Net Loss and Available Cash shall be allocated in the manner hereinafter provided.

9.2 **Apportionment Among Shareholders of Net Income, Net Loss and Distributions Generally.**

(a) <u>Non-Capital Events</u>. Net Income, Net Loss and Distributions, other than Net Income, Net Loss and Distributions attributable to a Capital Event, allocated to the Shareholders shall be apportioned each calendar quarter among the Persons who were Shareholders of record on the last day of each calendar quarter in accordance with their Percentage Interests based upon the number of Shares owned by each such Shareholder on the last day of such calendar quarter without regard to Capital Accounts or the number of days during such calendar quarter in which a Person was a Shareholder.

(b) <u>Capital Events</u>. That portion of Distributions attributable to a Capital Event and allocations of Net Income and Net Loss from a Capital Event which is allocated to the Shareholders shall be apportioned among the Persons who were Shareholders of record on the last day of the month during which the Trust received the proceeds of such Capital Event in accordance with their Percentage Interests based upon the number of Shares owned by each such Shareholder on the last day of such month without regard to Capital Accounts or the number of days during such month in which a Person was a Shareholder.

# EXHIBIT B

# CHARTERMAC

## FIFTH AMENDED AND RESTATED BYLAWS

## ARTICLE I

### OFFICES

Section 1.    PRINCIPAL OFFICE.  The principal office of the Trust shall be located at such place as the Board of Trustees may designate in its sole discretion.

Section 2.    ADDITIONAL OFFICES.  The Trust may have additional offices at such places as the Board of Trustees may from time to time determine in its sole discretion or the business of the Trust may require.

## ARTICLE II

### MEETINGS OF SHAREHOLDERS

Section 1.    PLACE.  All meetings of Shareholders shall be held at the principal office of the Trust or at such other place within the United States as shall be stated in the notice of the meeting.

Section 2.    ANNUAL MEETING.  An annual meeting of the Shareholders shall be held for the election of Managing Trustees whose terms have expired and the transaction of any other proper business on such date and at such time and place as may be designated by resolution of the Board of Trustees from time to time.

Section 3.    SPECIAL MEETINGS.  Special meetings of the Shareholders (or of Shareholders holding Shares of any class or series having a separate class or series vote on any matter pursuant to the Trust Agreement or applicable law) may be called by the Board of Trustees pursuant to a resolution adopted by a majority of the whole Board of Trustees, including a majority of the Independent Trustees.  Shareholders may not call special meetings of Shareholders.

Section 4.    NOTICE.  Not less than 10 nor more than 90 days before each meeting of Shareholders, the Board of Trustees shall give to each Shareholder entitled to vote at such meeting and to each Shareholder not entitled to vote who is entitled to notice of the meeting written or printed notice stating the time and place of the meeting and, in the case of a special meeting or as otherwise may be required by any statute, stating briefly the purpose for which the meeting is called, either by mail or by presenting it to such Shareholder personally or by leaving it at the Shareholder's residence or usual place of business.  If mailed, such notice shall be deemed to be given when deposited in the United States mail addressed to the Shareholder at the Shareholder's address as it appears on the records of the Trust, with postage thereon prepaid.

(e)      Limitations on the time allotted to questions or comments by participants. Unless and to the extent determined by the Board of Trustees or the chairman of the meeting, meetings of Shareholders shall not be required to be held in accordance with the rules of parliamentary procedure.

Section 15.    ACTION BY CONSENT OF SHAREHOLDERS.  Any action required or permitted to be taken at any annual or special meeting of the Shareholders may be taken, in the sole discretion of the Board of Trustees, without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding Shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Shares entitled to vote thereon were present and voted and shall be delivered (by regular mail) to the Trust by delivery to its principal place of business, or an agent of the Trust having custody of the book in which proceedings of minutes of Shareholders are recorded.  The Trust shall make a public announcement of the taking of the action without a meeting by less than unanimous written consent.  Unless the Board of Trustees, acting in its sole discretion, decides that Shareholders may act by consent or consents in writing, Shareholders shall have no right with respect to any matter to act by a consent or consents in writing.

Section 16.    RECORD DATE FOR ACTION BY CONSENT OF SHAREHOLDERS.  In order that the Trust may determine the Shareholders entitled to consent to action in writing without a meeting, the Trustees may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Trustees, and which date shall not be more than 10 days after the date upon which the resolution fixing the record date is adopted by the Board of Trustees.

## ARTICLE III

## MANAGING TRUSTEES

Section 1.    GENERAL POWERS.  The business and affairs of the Trust shall be managed under the direction of its Board of Trustees.

Section 2.    LIMITATIONS ON POWERS.  The Board of Trustees shall not have the authority to:

(a)      cause the Trust to acquire Minority Positions which, in the aggregate, are in excess of 15% of Total Market Value (measured at the time of such investment);

(b)      cause the Trust to invest in a First Mortgage Bond secured by a Mortgage Loan on any one Underlying Property if the principal of such First Mortgage Bond would exceed, in the aggregate, an amount equal to 20% of Total Market Value (measured at the time of such investment);

(c)      cause the Trust to invest in First Mortgage Bonds secured by Mortgage Loans to any one borrower if the principal of such First Mortgage Bonds would exceed, in the aggregate, an amount greater than 20% of Total Market Value (measured at the time of such investment);

(d)     cause the Trust to invest in First Mortgage Bonds secured by Mortgage Loans on unimproved real property or Tax-Exempt Securities relating to unimproved real property in an amount in excess of 10% of Total Market Value (measured at the time of such investment);

(e)     cause the Trust to invest in a First Mortgage Bond secured by a Mortgage Loan on any one Underlying Property if the aggregate amount of all mortgage loans outstanding on the Underlying Property, including the principal amount of the Mortgage Loan, would exceed an amount equal to 85% of the appraised fair market value of the Underlying Property, as determined by an independent appraiser, unless the Board of Trustees or the Manager determines that substantial justification exists for investing in such a First Mortgage Bond because of other aspects of the loans, such as the net worth of the borrower, the credit rating of the borrower based on historical financial performance, additional collateral (such as a pledge or assignment of other real estate or another real estate mortgage) or an assignment of rents under a lease or where the Trust has purchased a First Mortgage Bond at a price that is no more than 85% of the value of the Underlying Property (notwithstanding that the face amount of the outstanding mortgage loans with respect to the Underlying Property exceeds 85% of the appraised fair market value of the Underlying Property), provided that any loans relating to the Underlying Property which are advanced by third parties (and which cause the aggregate amount of all mortgage loans outstanding on the Underlying Property to exceed 85% of the appraised fair market value of the Underlying Property) are subordinated to the Trust's investment and do not entitle such third party lender to any material rights upon default without the Trust's consent until after the Trust's First Mortgage Bond and related Mortgage Loan with respect to such Underlying Property have been repaid;

(f)     do any act in contravention of these Bylaws or which would make it impossible to carry on the ordinary business of the Trust;

(g)     confess a judgment against the Trust in connection with any threatened or pending legal action;

(h)     possess any Trust asset or assign the rights of the Trust in specific Trust assets for other than a Trust purpose;

(i)     perform any act (other than an act required by these Bylaws or any act taken in good faith reliance upon counsel's opinion) which would, at the time such act occurred, subject any Shareholders to liability in any jurisdiction;

(j)     commingle the Trust funds with those of any other Person;

(k)     operate the Trust in such a manner as to have the Trust classified as (1) an "investment company" for purposes of the Investment Company Act of 1940, as amended, or (2) other than as a partnership for purposes of the Code;

(l)     cause the Trust to invest in real estate contracts of sale, otherwise known as land sale contracts, unless such contracts of sale are in recordable form and are appropriately recorded in the chain of title; and

(m)    incur aggregate financing or leverage (whether secured or unsecured but not including trade debt incurred in the ordinary course of business) in excess of 65% of Total Market Value (calculated at the time any additional financing or leverage is incurred) (the "**Leverage Limitation**"). For purposes of this Section 2(m), preferred equity securities issued by the Company or its subsidiaries and outstanding as of November 17, 2003 (collectively the "**Outstanding Preferred Securities**") shall not be deemed to be "financing or leverage" notwithstanding the fact that SFAS 150 or any other existing or future accounting or other governmental rule and regulations would classify Outstanding Preferred Securities as liabilities. In addition, any assets or liabilities required to be consolidated into the Company's financial statements pursuant to FIN 46 or any other existing or future accounting or other governmental rules and regulations having similar effect shall not be taken into account in calculating the Leverage Limitation.

Section 3.    NUMBER, TENURE AND QUALIFICATIONS.  At any regular meeting or at any special meeting called for that purpose, two-thirds of the entire Board of Trustees may establish, increase or decrease the number of Managing Trustees, provided that the number thereof shall never be less than three nor more than sixteen, and at least a majority of the Managing Trustees, by at least (i) one trustee while Mr. White is on the Board of Trustees and, (ii) two trustees if Mr. White is not on the Board of Trustees shall be Independent Trustees, and further provided that the tenure of office of a Managing Trustee shall not be affected by any decrease in the number of Managing Trustees.

Section 4.    ANNUAL AND REGULAR MEETINGS.  An annual meeting of the Board of Trustees shall be held immediately after and at the same place as the annual meeting of Shareholders, no notice other than this Bylaw being necessary.  The Board of Trustees may provide, by resolution, the time and place, either within or without the State of Delaware, for the holding of regular meetings of the Board of Trustees without other notice than such resolution.

Section 5.    SPECIAL MEETINGS.  Special meetings of the Board of Trustees may be called by or at the request of the chairman of the Board of Trustees, or by a majority of the Managing Trustees then in office.  The Person or Persons authorized to call special meetings of the Board of Trustees may fix any place, either within or without the State of Delaware, as the place for holding any special meeting of the Board of Trustees called by them.

Section 6.    NOTICE.  Notice of any special meeting of the Board of Trustees shall be delivered personally or by telephone, email, facsimile transmission, United States mail or courier to each Managing Trustee at his email, business or residence address.  Notice by personal delivery, by telephone, email or a facsimile transmission shall be given at least two days prior to the meeting.  Notice by mail shall be given at least five days prior to the meeting and shall be deemed to be given when deposited in the United States mail properly addressed, with postage thereon prepaid.  Telephone notice shall be deemed to be given when the Managing Trustee is personally given such notice in a telephone call to which he is a party.  Email and facsimile transmission notice shall be deemed to be given upon completion of the transmission of the message to the number given to the Trust by the Managing Trustee and receipt of a completed answer-back indicating receipt. Neither the business to be transacted at, nor the purpose of, any annual, regular or special meeting of the Board of Trustees need be stated in the notice, unless specifically required by statute or these Bylaws.

Section 7.     QUORUM.  A majority of the Managing Trustees shall constitute a quorum for transaction of business at any meeting of the Board of Trustees, provided that, if less than a majority of such Managing Trustees are present at said meeting, a majority of the Managing Trustees present may adjourn the meeting from time to time without further notice, and provided further that if, pursuant to the Trust Agreement or these Bylaws, the vote of a majority of a particular group of Managing Trustees is required for action, a quorum must also include a majority of such group, but only with respect to a vote on such action.

The Managing Trustees present at a meeting which has been duly called and convened may continue to transact business until adjournment, notwithstanding the withdrawal of enough Managing Trustees to leave less than a quorum.

Section 8.     VOTING.  The action of the majority of the Managing Trustees present at a meeting at which a quorum is present shall be the action of the Board of Trustees (including with respect to actions to merge, consolidate or convert the Trust), unless the concurrence of a greater proportion is required for such action by the Trust Agreement or applicable law. Notwithstanding the foregoing, where any action is required pursuant to the terms of the Trust Agreement to be approved by a majority vote of the Independent Trustees or by a majority of the Independent Trustees (or like wording), then the action of a majority of the total number of Persons at the time serving on the Board of Trustees who constitute Independent Trustees shall be the action of the Board of Trustees.

Section 9.     TELEPHONE MEETINGS.  Managing Trustees may participate in a meeting by means of a conference telephone or similar communications equipment if all Persons participating in the meeting can hear each other at the same time.  Participation in a meeting by these means shall constitute presence in person at the meeting.

Section 10.     INFORMAL ACTION BY MANAGING TRUSTEES.  Any action required or permitted to be taken at any meeting of the Board of Trustees may be taken without a meeting, if a consent in writing to such action is signed by each Managing Trustee and such written consent is filed with the minutes of proceedings of the Board of Trustees.

Section 11.     VACANCIES.

(a)     General.  If for any reason any or all the Managing Trustees cease to be Managing Trustees, such event shall not annul, dissolve or terminate the Trust or affect these Bylaws or the powers of the remaining Managing Trustees hereunder (even if fewer than three Managing Trustees remain).  Any individual elected as Managing Trustee in accordance with this Section 11 shall hold office until the next annual meeting of Shareholders at which such Managing Trustee's class is to be elected and until his successor is elected and qualifies.

(b)     Independent Trustees.  If any vacancy, whether or not created by an increase in the number of Managing Trustees, must be filled with an Independent Trustee to comply with the terms of Section 3.1 of the Trust Agreement, and there are any remaining Independent Trustees, replacement Independent Trustees shall be nominated by the Nominating Committee of the Board of Trustees, which nominations shall be subject to the approval of two-thirds of the Managing Trustees, and the vacancy shall be filled by a majority vote of the Managing Trustees

electing a nominated replacement Independent Trustee. All Managing Trustees shall have the right to recommend to the Nominating Committee for its consideration their choices for the replacement Independent Trustee nominees. If there is no remaining Independent Trustee, any such vacancies shall be filled by a majority of the remaining Managing Trustees.

(c)    Non-Independent Trustees. Subject to the provisions of the Trust Agreement (including, without limitation, any Certificate of Designation attached thereto), if any vacancy, whether or not created by an increase in the number of Managing Trustees, must be filled with a non-Independent Trustee to comply with the terms of Section 3.1 of the Trust Agreement, replacement non-Independent Trustees shall be nominated by the Nominating Committee of the Board of Trustees and the vacancy shall be filled by a majority vote of the Managing Trustees. All Managing Trustees shall have the right to recommend to the Nominating Committee for its consideration their choices for the replacement non-Independent Trustee nominee.

Section 12.    COMPENSATION. Managing Trustees other than Independent Trustees shall not receive any salary or other compensation for their services as Managing Trustees. By resolution of the Board of Trustees, Independent Trustees may receive fixed sums, Shares in the Trust or other compensation per year and/or per meeting and/or for any service or activity they performed or engaged in as Managing Trustees. Managing Trustees may be reimbursed for expenses of attendance, if any, at each annual, regular or special meeting of the Board of Trustees or of any committee thereof and for their expenses, if any, in connection with any other service or activity they performed or engaged in as Managing Trustees; but nothing herein contained shall be construed to preclude any Managing Trustees from serving the Trust in any other capacity and receiving compensation therefor.

Section 13.    LOSS OF DEPOSITS. No Trustee shall be liable for any loss which may occur by reason of the failure of the bank, trust company, savings and loan association, or other institution with whom moneys or property have been deposited.

Section 14.    SURETY BONDS. Unless required by law, no Trustee shall be obligated to give any bond or surety or other security for the performance of any of his duties.

Section 15.    RELIANCE. Each Trustee, officer (if any), employee and agent of the Trust shall, in the performance of his or her duties with respect to the Trust, be fully justified and protected with regard to any act or failure to act in reliance in good faith upon the books of account or other records of the Trust, upon an opinion of counsel or upon reports made to the Trust by any of its officers (if any) or employees (if any) or by the adviser, accountants, appraisers or other experts or consultants selected by the Board of Trustees or officers (if any) of the Trust, regardless of whether such counsel or expert may also be a Trustee.

Section 16.    CERTAIN RIGHTS OF TRUSTEES, OFFICERS, EMPLOYEES AND AGENTS. The Trustees shall have no responsibility to devote their full time to the affairs of the Trust. Any Trustee or officer (if any), employee (if any) or agent of the Trust, in his personal capacity or in a capacity as an affiliate, employee, or agent of any other Person, or otherwise, may have business interests and engage in business activities similar to or in addition to or in competition with those of or relating to the Trust.

Section 17.    CERTAIN RIGHTS OF THE INDEPENDENT TRUSTEES.

(a)    Charter Mac Corporation.  Notwithstanding any provision herein to the contrary, at any time at which there are any Independent Trustees in office, the powers and duties conferred and imposed upon the Trust as sole shareholder of Charter Mac Corporation in accordance with Article 13 of the certificate of incorporation of Charter Mac Corporation relating to (i) the taking or refraining from taking of action by Charter Mac Corporation with respect to any consents, waivers, amendments, approvals, elections or similar actions under or pertaining to any of the RCC Acquisition Documents (as defined below) that may affect the rights or obligations of any of APH Associates L.P., DLK Associates L.P., Marc Associates, L.P., Related General II L.P. and SJB Associates L.P., or their Affiliates (as defined in that certain Contribution Agreement dated as of December 17, 2002, as amended from time to time (the **"Contribution Agreement"**) by and among CharterMac Capital Company, LLC and the other parties named therein), or (ii) any amendment to this Section 17, shall be exercised and performed by the Independent Trustees.  For such purposes, the Independent Trustees shall act by the affirmative vote of a majority of the persons who are then serving as Independent Trustees at a meeting at which at least a majority of the Independent Trustees are present or by unanimous written consent of the Independent Trustees.  The provisions of these bylaws and of Delaware Statutory Trust Act shall govern such action at a meeting or by written consent as if the Independent Trustees constituted the Board of Trustees.  For the purposes of this Section 17, **"RCC Acquisition Documents"** shall mean collectively the Contribution Agreement and each of the Collateral Agreements (as defined in the Contribution Agreement).

(b)    Trustee Liability.  The personal liability of the Independent Trustees acting pursuant to Section 17(a) hereof is hereby eliminated to the fullest extent permitted by Delaware Statutory Trust Act, as the same may be amended and supplemented.

### ARTICLE IV

### COMMITTEES

Section 1.    NUMBER, TENURE AND QUALIFICATIONS.  The Board of Trustees may appoint an Audit Committee, a Compensation Committee, a Nominating Committee and any other committees determined to be necessary or advisable by the Board of Trustees.  Such committees shall be comprised of one or more Managing Trustees and may also be comprised of individuals appointed by the Board of Trustees who are not trustees of the Trust.  Each of the Audit Committee, the Compensation Committee and the Nominating Committee shall be entirely comprised of Independent Trustees or individuals that are not trustees of the Trust who would otherwise qualify as an Independent Trustee.

Section 2.    POWERS.  The Board of Trustees may delegate to committees appointed under Section 1 of this Article any of the powers of the Board of Trustees, except as prohibited by law.

Section 3.    MEETINGS.  Notice of committee meetings shall be given in the same manner as notice for special meetings of the Board of Trustees.  A majority of the members of

# EXHIBIT C



**NewsRoom**

11/8/07 Fin. Disclosure Wire 15:00:00

FD Wire
Copyright 2007 CCBN, Inc. and FDCH e-Media, Inc.

**November 8, 2007**


Q3 2007 Centerline Holding Company Earnings Conference  **Call** - Final

OPERATOR: Good day and welcome to Centerline Holding Company's third-quarter earnings conference  **call** . Today's  **call**  is being recorded. The Company's press release and supplemental financial package were issued this morning.

We would like to remind you that certain statements in this morning's press release, supplemental financial package, and today's conference  **call**  may constitute forward-looking statements within the meaning of the Safe Harbor provisions of the Private Securities Litigation Reform Act 1995. These statements are based on management's current expectations and beliefs and are subject to a number of factors and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements.

Such forward-looking statements speak only as of the date of the press release, supplemental financial package, and today's conference  **call**. Centerline Holding Company urges you to review its Form 10-K and 10-Q on file with the Securities and Exchange Commission for a discussion of such factors and uncertainties and the risks related to an investment in the Company. The Centerline Holding Company expressly disclaims any obligation or undertaking to release publicly any updates or revisions to any forward-looking statements contained in the press release supplemental financial package or today's  **call**  to reflect any change in the Company's expectations with regard to or change in events, conditions, or circumstances on which any such statement is based.

With us today from the Company are Mark Schnitzer, Chief Executive Officer and President; and Rob Levy, Chief Financial Officer. At this time, I would like to turn to  **call**  over to Marc Schnitzer. Please go ahead, sir.

MARC SCHNITZER, PRESIDENT AND CEO, CENTERLINE HOLDING COMPANY: Thank you, Anthony. We would like to thank everyone for joining us today and for your continued interest in Centerline Holding Company. We're pleased to report our operating and financial results for the third quarter ended September 30.

Despite the ongoing credit crisis, Centerline had another strong quarter of operations. In very difficult market conditions, we closed a $585 million high yield CMBS fund and priced and closed a $986 million collateralized debt obligation for one of our CMBS investment funds. In addition, our affordable housing group

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

closed a $108 million guaranteed tax credit fund. We believe these accomplishments are evidence of the strength of the Centerline brand and are a strong endorsement of our ability to assess and manage real estate risk.

Our business has not been immune to the volatile marketplace. We expect to complete less transaction volume in some areas of our business this year. However, we're pleased with the credit quality of the transactions we have closed in 2007. Our continued access to capital has enabled us to adapt to changing market conditions and take advantage of opportunistic investments. As a result, our direct assets under management grew to $18.2 billion, an increase of 6.5% over the second quarter.

One of the busier areas of our Company over the past quarter was high yield CMBS investments within our commercial real estate group. While many CMBS **investors** sat on the sideline, we found excellent investment opportunities with solid credit metrics and attractive risk-adjusted returns.

In the third quarter, we acquired over $413 million of triple-B and unrated CMBS investments for our recently closed CMBS fund. Consequently, we expect the capital deployment phase of our CMBS Fund III to be shorter than we initially anticipated.

The credit quality of the assets in our CMBS funds continues to be strong and delinquencies remain at historically low levels. At September 30, our delinquencies totaled just $211 million out of our $105 billion special servicing portfolio. Our default rate of 21 basis points is 34% below the industry average of 32 basis points as reported by [TREP].

In the past weeks, several other special services have reported an increase in delinquencies. We have not seen this trend in our portfolio. Our strategy of buy, watch, fix where we buy carefully, watch closely, and fix broken assets quickly has been the key to our strong credit performance.

On the new product front, our commercial real estate group has begun marketing a private placement of a $1 billion real estate debt opportunity fund. The fund will target investments in undervalued or underperforming commercial real estate mortgages and structured products such as CMBS and CDOs. We believe there are abundant opportunities to acquire bonds and mortgages, trading at depressed market values due to factors such as market illiquidity, poor collateral performance, or court poor asset management. We can add value to these assets to by employing our buy, watch, fix strategy. The initial feedback from our **investors** for this fund has been very positive.

On the whole loan origination side, our commercial real estate group has focused on our agency executions through. Through the first nine months of 2007, we originated over $637 million of multi-family mortgages on behalf of Fannie Mae and Freddie Mac. Agency pricing continues to be very competitive, while many conduits have significantly reduced their origination activity.

This pullback has impacted our business since historically we have been an active coordinator for conduits. As a result, we anticipate our commercial mortgage loan origination volume to be well below budgeted levels.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Despite the ongoing market turmoil, we remain bullish on the commercial real estate sector. In order for the market to normalize, **investors** need to have restored confidence in the sector and we believe the passage of time will help. We're developing our 2008 business plan based on the expectation that the commercial real estate capital markets will normalize in the second half of next year.

In the interim, our diversified business model will enable us to shift resources to capitalize on current market trends. When our commercial loan origination slowed down in the third quarter, we redeployed our commercial loan originators to focus on both due diligence for CMBS investments and agency executions. Our access to capital and our ability to be nimble will be the two key elements to our success in this volatile market.

The market instability continues to have a modest impact on our affordable housing equity business. We closed a $108 million guaranteed tax credit fund in the third quarter and subsequent to quarter end, we closed an additional $201 million multi-**investor** fund, bringing our year-to-date equity raise to $750 million. While we expect to reach our anticipated level of tax credit fund volume in 2007, the composition of our funds will be different than budgeted.

Originally, we expected to complete more guaranteed business this year which is a higher margin business for us. Several guaranteed buyers have reduced their investment volume in 2007 and it has been necessary for us to adapt our fund mix the to accommodate the market.

We continue to struggle to find appropriate risk-adjusted yields in our private placement tax-exempt bond business due to strong competition for originations, mostly from large banks that acquire bonds to satisfy their community reinvestment act requirements. For the first nine months of the year, we acquired $146 million of bonds. We anticipate we will acquire $200 million of bonds in 2007, which is below our budgeted range.

The credit quality of our bond portfolio remains very stable. As of September 30, delinquencies totaled just $88.9 million, or approximately 3.1% of our $2.9 billion portfolio. This is a slight increase over the previous quarter. Over the past five years, our bond portfolio has averaged less than 23 basis points of permanent impairments.

In our credit risk products group we continue to move forward with our collateralized loan obligation or CLO initiative. We have assembled a very talented team of credit and leveraged finance professionals who have spent much time setting up the policies and procedures and the management tools we will use to track this business. We have entered into a warehouse and CLO facility with a major investment bank to finance our investments and expect to be in the market with our first CLO in the beginning of 2008.

This is a very exciting initiative for us because it represents our first fund product outside of real estate and is an important step in our evolution into a diversified fund manager. We will employ the same credit discipline in our CLO business that is characteristic of our existing real estate funds.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

I will now turn the **call** over to our CFO, Rob Levy who will review our financial results. Thank you very much.

ROB LEVY, CFO, CENTERLINE HOLDING COMPANY: Thanks, Mark and good morning everyone. Before I go into some detail on our earnings for the third quarter, I would like to take a moment to update you on our balance sheet and our liquidity position.

As I stated before, please keep in mind that all of the earnings, revenues, and expense numbers that I'm going to discuss in this speech have been adjusted to exclude consolidated partnerships. Please refer to the as adjusted column on the income statement and balance sheet of our quarterly supplemental for additional details.

As of September 30, 2007 we had $2.5 billion in debt outstanding, equating to a 60% ratio of debt to total assets on balance sheet. Of the $2.5 billion in debt, $1.9 billion, or 75% of it, consists of the financing of our taxes and bonds in the high-grade tax-exempt municipal market. Although this market has not been totally immune to the recent market disruptions with credit downgrades of some of the key market players, this remains one of the most liquid markets in the world. In fact, our bond financing costs have continued to decline over the past few months.

In April and May, prior to the recent market issues, the SIFMA index off of which we borrow stood at about 3.9%. Today the index stands at 3.26%. Although the index has dropped by about 65 basis points over this period, the spreads that we pay on a portion of our floating-rate securitizations have [gapped] out due to the credit downgrades. About 35% of our floaters today trade about 20 basis points wide of where they traded six months ago. The remainder trade at the 12 to 15 basis points spreads that we have experienced historically. We continue to speak with additional credit providers to ensure efficient access to this market.

As I noted in the second quarter conference **call**, the remainder of our debt on balance sheet is not subject to mark-to-market risk. We borrowed $250 million from the syndicated banks and loan **investors** to acquire ARCap back in August of 2006. This is a six year term loan with 100% of the interest rate exposure on that loan hedged.

We have a $320 million corporate revolver which was upsized in June of this year from $250 million. As of September 30, we had $51 million in availability on that three year line. And, we have a $250 million facility that we use to finance our origination of multi-family housing loans for Fannie Mae and Freddie Mac. This line is nonrecourse to central line and is drawn to originate loans only when there is a specified take out in place by either Fannie Mae or Freddie Mac. That is currently the primary sources of funding on our balance sheet.

In summary, we continue to have relatively little mark-to-market risk and we're fully compliant with all covenants on all of our facilities. Finally, we continue to carefully monitor and maintain our liquidity. As of September 30, 2007 Centerline had about $140 million in liquidity including $88 million in unrestricted cash and $51 million in availability on our corporate revolver.

With regards to our earnings, for the three months ended September 30, 2007, Centerline reported cash available for distribution or CAD, of $30.1 million or

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

$0.53 per diluted share compared to $43.6 million or $0.75 per diluted share in the corresponding three month period of 2006. Total revenues for the three months ended September 30, 2007 were $104.8 million versus $102.4 million in the corresponding period last year. This year-over-year 2.4% increase is primarily due to the impact of the ARCap acquisition which closed halfway through the third quarter of 2006 and the increased size of our taxes and bond portfolio.

Year-to-date, we have acquired $173 million in bonds from our balance sheet, while the average yield on the portfolio has held relatively steady at 6.6%. Year-to-date we have had almost no repayments of bonds and do not expect a significant number this year. Our bond portfolio remains very healthy from a credit perspective. We recognized one impairment totaling $0.5 million in the third quarter.

Total expenses for Centerline for the three months ended September 30, 2007 were $103.6 million versus $87.8 million in the three months ending September 30, 2007. Interest expense, excluding preferred dividends climbed by $12.9 million to $46.7 million in the third quarter 2007 from the second quarter of 2007. The primary reason for this increase was an $8 million charge in the third quarter for the fair value of swaps on the CMBS portfolio. That portfolio has been subsequently sold to our third CMBS fund.

With regard to interest rate exposure, we currently have $725 million in interest rate swaps outstanding and $451 million in fixed-rate securitizations outstanding. Therefore, approximately 46% of our total debt is fixed-rate in nature, due to the hedges and fixed-rate financings in place. And 65% of our total capital structure is fixed-rate in nature.

Salary and related expenses have held steady in the third quarter at $27.5 million. Nonsalary related G&A expenses increased slightly to $16.7 million in the third quarter from $15.9 million in the second quarter of 2007. Also during the third quarter of 2007, pursuant to a 10b5-1 trading plan entered into during the second quarter of 2006, the Company purchased approximately 70,000 shares at an average price of $18.21.

Finally, we are reiterating our CAD per share earnings guidance that we gave on the second quarter conference **call**. At that time, we provided guidance for flat growth in 2007. We remain comfortable with that guidance. Based on our current outlook, we're confident that we will earn CAD in excess of our dividend and would therefore not recommend a change in dividend policy to our Board.

I would now like to turn the **call** over to questions.

OPERATOR: (Operator Instructions) Fred Taylor, [MGX Asset Management].

FRED TAYLOR, ANALYST, [MG ASSET MANAGEMENT]: Could you go into a little bit more detail on the new CLO initiative? Will that be staffed in-house or will you be going outside and hiring an outside manager, perhaps lifting out a team and bringing them in?

MARC SCHNITZER: We hired a gentleman probably six months ago who had about 12 years experience in that marketplace with some very significant players who himself had managed about a $3 billion similar type portfolio. And he has over the past

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

several months assembled a team of portfolio managers and analysts and such that we believe is sufficient to launch the business and get through the first six months or so. We will add to that team over time but we have filled in all of the portfolio management and credit people that we need to get the business started. So, it will be staffed in-house.

FRED TAYLOR: Well, great. Given where your term loan is trading at around $0.90 on the dollar, I hope that that's one of their first investments if they can do that.

MARC SCHNITZER: We may want to take a look at that actually.

OPERATOR: [Jim Likins], Hilliard, Lyons.

JIM LIKINS, ANALYST, HILLIARD, LYONS: I just have a few questions if I may. First of all, the $986 million CDO and the $585 million high yield CMBS fund, I'm just wondering if you could talk little bit about the opportunities with both of these funds and also could you just touch on what what the risks could be involved with both of these as well?

MARC SCHNITZER: Well, the CDO that we priced and closed in the third quarter pertain to our CBMS Fund II and when we acquire assets for our CMBS funds, we do so with repo financing at fairly low leverage levels. And then, once we assemble a sufficient mass of investments, we permanently finance them recently using CDO technology; again, not at particularly high leverage levels. On a long-term basis, probably 60 or so percent -- really not looking to lever those as much as possible. So, that's a little bit of color on the CDO that closed in the third quarter.

As far as the opportunities that we see, specifically we're in the market everyday looking at what has historically been called the B-pieces. That is the below investment grade tranches of the CMBS offerings -- and, have employed some very helpful credit metrics over the past number of years to look at those. What we've seen is that the credit metrics have improved since the spring of this year on a number of the pools that we look at.

And, where we found opportunities, those have been in many cases on the triple-B or low investment grade tranches on the pools that we were buying the B-pieces on where we really liked the credit metrics, suddenly the yields on the triple-Bs widened considerably and we were able to make some opportunistic acquisitions of those. So, we're very pleased with the credit, the underlying credit metrics and we were especially pleased with the spreads.

JIM LIKINS: Actually that's kind of a lead in for another thing I was going to ask you is I'm just wondering if there are any tranches out there that are kind of a concern right now.

ROB LEVY: The things that we own?

JIM LIKINS: With the CMBS.

ROB LEVY: Are you referring to things that we own or things that we just see out in the marketplace?

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

JIM LIKINS: The things that you own right now. (multiple speakers) Given that your delinquencies are at all-time lows. I'm just wondering if there's something out there on the horizon that would be of a concern.

ROB LEVY: Well, we actually don't see that at this point in our portfolio. Transfers to special servicing continue to be low. As I mentioned, we have I believe a 21 basis point default rate in the portfolio which is way below the industry average. I did see a couple of other special servicers put out press releases and such indicating that they had seen some increase.

But, in that business, we buy a particular type of B-pieces which really relates to the metric that we've developed which is a pool refinance loss factor that really focuses on the cash flows underlying the assets. And so, we stick very closely to that metric and only buy pools that score well on that metric.

And to date at least, that has enabled us to assemble a portfolio that appears to be of higher quality than the market. And then of course, you have to be good at the special servicing and the surveillance. So, we don't see anything out there at this point that we think it's going to materially increase the default rate.

JIM LIKINS: With CAD, your fees for GAAP were a negative $1.4 million this quarter versus $14.4 million last quarter. I wonder if there's any timing issues here or if you'll be able to recover any of that.

ROB LEVY: Well, that's just the adjustment for GAAP. I think the key question is, what are the reasons why CAD per share was down this quarter versus last year's similar quarter -- was due to the closings of the affordable housing tax credit fund transactions which tend to have a significant impact on CAD within those quarters that they close. And a lot of that is just due to timing. As Mark mentioned, we've closed some significant transactions here in the fourth quarter which will therefore instead of having an impact on the third quarter will have an impact on the fourth quarter.

So a lot of that is just timing; third quarter of last year versus third quarter this year. If you look in the supplemental you'll see then, the third quarter of last year was a very heavy and strong quarter for closings of affordable housing transactions and this third quarter was lighter. But that business should be just shifting to the fourth quarter.

OPERATOR: [Damian Augustine] at George Weiss.

DAMIAN AUGUSTINE, ANALYST, GEORGE WEISS: I just wanted to go over -- you said there was an $8 million charge during the quarter on swaps which was associated with the CMBS you placed into the consolidated fund (multiple speakers)

ROB LEVY: That's right.

DAMIAN AUGUSTINE: And so, that's non-recurring?

ROB LEVY: That's correct. So, this was CMBS that we held on balance sheet in the second quarter that was targeted for -- when we acquired -- it was targeted to be placed into our third CMBS fund. That third CMBS fund was raised and closed in the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

third quarter. And so those assets were moved over and the mark-to-market on that swap was a negative $8 million dollars which hit interest expense in the third quarter.

DAMIAN AUGUSTINE: Right. And you [ran up] to the interest expense. So, what would be a better run rate for your interest expense on a go-forward basis?

ROB LEVY: I think the third quarter number, if you subtract out the $8 million, I don't think there were any other onetime issues in there. So, if you take out that $8 million, that's probably a good run rate based on where BMA is today. Of course where SIFMA is today -- of course with our floating rates exposure, you just have to adjust for where your expectations are for the floating rate to go.

DAMIAN AUGUSTINE: Okay great. Any progress on the [distressed] fund at all? Or any --?

MARC SCHNITZER: Yes. I mentioned we are beginning marketing of that actually this week and have had very positive feedback thus far. We think the timing is good. We've received a lot of positive feedback from our **investors** and we will be on the road marketing that fund next week.

OPERATOR: [Doug Assad], Wachovia Securities.

DOUG ASSAD, ANALYST, WACHOVIA SECURITIES: I have a couple of questions here. Where and to what degree do you see your risks if this credit crunch continues or worsens and would one of those risks be your guaranteed access to capital?

MARC SCHNITZER: Well, I think -- and perhaps Rob will comment on this also -- but, as things worsen some of the impact on a few of our key institutional partners has made things a little bit less predictable. We have extensive relationships with Citibank, Merrill Lynch, Morgan Stanley, and many other firms, many of which have been going through some of their own turmoil recently.

So, to the extent things are going through some instability, that could have an impact on us. We are watching that very carefully. But right now, things have not gotten to the point where we have any concern about access to capital. Rob, do you want to add to that?

ROB LEVY: The only thing I will add is that I think as you may be aware, most of the capital that we raised as Mark mentioned in his speech is at the fund level and we continue to have access to that capital due to some of the opportunities that we see in the market. On the balance sheet, as Mark just mentioned, we don't see any kind of issues that we're dealing with right now as far as our access to capital. But we're exploring other relationships or with our existing relationships to make sure that we have that access when we need it.

I think probably the biggest thing that is impacting us from an on balance sheet perspective right now is our common stock price and our inability to raise common stock at these levels or at least our lack of desire to raise common stock at these levels. And with the preferred markets somewhat shutdown also if this were to continue for a long time, this could inhibit our ability to grow at the levels that we would like to just because whenever we raise funds, we have co-investment

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

requirements etcetera. So we do need to raise some additional capital at the -- on balance sheet level.

DOUG ASSAD: Have you thought about a stock buyback in here?

ROB LEVY: Well, we have a stock buyback in place. We have put it on hold for now due to covenant restrictions and requirements within our bank facilities and also to maintain liquidity within the Company. You know, we want to make sure that we maintain as much liquidity on balance sheet as possible. Even though we do believe at this level the stock is a very attractive and accretive investment, we do want to maintain our liquidity for our other growth purposes, for the funds that we're managing and our other growth initiatives at the Company.

DOUG ASSAD: Two other quick ones. Historically, the delinquency -- is any of that recoverable?

MARC SCHNITZER: You are referring to the -- in the CMBS portfolio, certainly, when we quote the delinquency, those are really loans that are in default, in special servicing. And we are the special servicer on behalf of the trust that's issued the bonds, that owns those mortgages. So absolutely -- and we've been extremely successful on the realization level and a couple of the different metrics that are quoted are not only the default rate but the realization rate on recoveries.

I don't have that statistic in front of me right now but, typically at least in the CMBS marketplace, we have been ahead of the rest of the industry in terms of recoveries on defaults. On the bond portfolio, certainly when we take a permanent impairment on a bond, it ultimately can be recovered when that bond either repays or the conditions that led to taking that impairment change. So, absolutely, those are all potentially recoverable.

DOUG ASSAD: Okay one other quick one. Approximately what percentage of your dividend is AMT?

MARC SCHNITZER: It's -- I'm sorry (multiple speakers) --?

UNIDENTIFIED COMPANY REPRESENTATIVE: 93.

MARC SCHNITZER: Yes, 93% -- significant.

OPERATOR: Howard Bloom, UBS.

HOWARD BLOOM, ANALYST, UBS: Good report. I had a question I think mostly on some of the things Rob was talking about. He did helpfully clarify some of the timing issues on closings. But, in the last conference call, he indicate guidance was moving down to last year's number and that there would be no issue about the CAD coverage. And you seemed to sort of soften that comment a little bit. I wondered if you could be more specific.

ROB LEVY: I certainly did not mean to soften that comment. I think that I was hoping to communicate was that we're still comfortable with the same guidance that we gave last quarter and that there's been no change to that guidance.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

OPERATOR: [Leigh Pelso], **Investor**.

LEIGH PELSO, PRIVATE **INVESTOR**: I had questions about CAD. I think they've all been answered. Thank you.

OPERATOR: Carlos Botelho, Marathon Asset.

CARLOS BOTELHO, ANALYST, MARATHON ASSET MANAGEMENT: With regards to your bond portfolio, have you securitized any of those assets this quarter?

ROB LEVY: Yes, we have. We have securitized assets this quarter. I don't know the exact dollar amount but we have been active in the floater market this quarter.

CARLOS BOTELHO: And how does that compare with the environment before the credit crunch? How is that -- your funding strategy on that side had to adapt?

ROB LEVY: I guess the answer is, it depends on -- we are -- most of the floating-rate certificates that we securitize in the market are seven-day floaters and so they are continually being remarketed and resold. Certainly, the market today as I mentioned in my discussion is more difficult today than it was four or five or six months ago and spreads have gapped out, especially with some of the credit downgrades that we have discussed.

We have -- some of our securities are floated through Merrill Lynch and those securities have gapped out by about 20 basis points. Other of our securities are through Goldman Sachs and those are performing very well. We have other relationships that we're talking to you right now about shifting some of that over from Merrill to them so that we can maintain that liquidity and reduce our cost of capital going into 2008. So, it certainly is I guess a more difficult market than it is today. But I think we have a good number of options and we're exploring all of them.

CARLOS BOTELHO: And your ability to obtain the wrap that **investors** usually require to buy these securities? Think you have a very strong relationship with IXIS? How is their appetite for -- to continue to support your programs?

ROB LEVY: IXIS specifically, their appetite has reduced. They do not have as much appetite as they have had in the past. We're working with them on ways that we can continue to increase their appetite. But, right now it is less than it has been. And so (multiple speakers)

CARLOS BOTELHO: Is that for new issuances or for the existing ones?

ROB LEVY: For new issuances, not for the existing ones, for new issuance. So we have about three relationships right now we're talking to about providing additional credit.

CARLOS BOTELHO: Besides IXIS, who else do you work with on a regular basis?

ROB LEVY: We work with as I said, Goldman Sachs, Merrill Lynch. We have very

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

strong relationships with other banks. I would rather not name all those banks because we're in the process of working with them on potential financing; so, the major investment banks that are involved in the municipal tax-exempt market.

CARLOS BOTELHO: Okay, so -- but basically what you're saying is that in terms of new issuances, the volume has not been substantially affected?

MARC SCHNITZER: I think that really the broad message is that we're still able to get the financing but due to some of the credit issues in the marketplace, the cost has gone up a little bit with respect to some of the wrappers. So, we still have access to be able to securitize our bonds but we would like to reduce the cost. So we're talking to other people now to kind of broaden the group that we're working with.

CARLOS BOTELHO: So it's not the volume. It's just a cost issue at this point?

MARC SCHNITZER: That's correct right now.

ROB LEVY: It's primarily a cost issue. Also keep in mind that we are originating fewer bonds today and less dollar amount bonds today than we have been in the past due to some market issues there that Mark discussed. So -- (multiple speakers)

CARLOS BOTELHO: I think new investments this year in bonds was what, about $100 million?

ROB LEVY: We anticipate about $200 million for the year, whereas in past years we've been more kind of north of $400 million and close to $500 million.

CARLOS BOTELHO: And how much was it (inaudible) last quarter?

ROB LEVY: We've done $150 million year-to-date.

CARLOS BOTELHO: 150 year-to-date. And how much on the last quarter, do you know?

MARC SCHNITZER: We expect to end the year at about $200 million.

CARLOS BOTELHO: And on the third quarter, how many new investments in bonds have you done?

ROB LEVY: Hold on one second.

MARC SCHNITZER: We'll check the exact number. Just give us a second. It's in the supplemental package and we're going to check it.

ROB LEVY: If it's there I will look for it. It's okay.

UNIDENTIFIED COMPANY REPRESENTATIVE: We originated $99 million of new bonds in the third quarter.

CARLOS BOTELHO: Okay, that's what I thought. Great. And with regards to the low

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

income housing tax credit fund business, you mentioned you still are hoping to achieve your target. If you could clarify what the target is for the year, that would be great. But you did mention that there is a changing mix I guess with less of the guaranteed funds and perhaps more of other types of funds. Maybe you could just refresh a little bit our memory on what are these types of funds and then in what way is this going to impact your profitability.

MARC SCHNITZER: The overall goal for that business is approximately $1.2 billion of volume which is just slightly more than we did last year. We anticipated this year that we would do about $500 million out of the $1.2 billion in a format where we provide an investment-grade guarantee of the **investors** yield -- or I should say should say we provide. We bring a third party in to provide an investment-grade guarantee.

It looks like the volume for that product line is going to be down a bit, probably closer to the $300 million range. And we make an additional profit on that type of business just in the form of the additional fee paid for the guarantee. So, that's what I was referring to when I said that the business mix has changed. So, the other nonguaranteed type of funds have increased to offset that difference but that is slightly less profitable business.

OPERATOR: Nicole Jacoby, Liberation Investments.

NICOLE JACOBY, ANALYST, LIBERATION INVESTMENTS: I just wanted to ask you guys, particularly in the current market environment you've been putting us out some really solid performance. However, it's obvious in your stock price that you're not being rewarded for that in the marketplace. You addressed before a little bit about your -- you're thinking about stock buybacks. But more generally, can you walk us through your thinking about how you can help close that value gap or initiatives you might take to close that gap between where your stock price is and the true value of the Company?

MARC SCHNITZER: Well yes, we believe and we have believed for some time that the way to really increase the value of the Company is to continue to evolve the Company into a fund manager. And, many of you will recall that back in 1997, when we were called CharterMac and the company first went public, it had one line of business and that was really to be a tax-exempt bond fund that lent money long and borrowed short.

Ever since that time, our growth has really focused on evolving into externally managed funds whether it's our tax credit funds, our CMBS funds, our high yield debt funds, our joint venture equity funds, the CLO business. All of these significant growth initiatives and others that we're thinking about, such as this debt opportunity fund are steering us toward an evolution into much more of a pure fund manager which is where we really see the growth for the Company and we believe that the marketplace rewards companies like that with a higher valuation on their income stream to a much greater extent than our Company realizes today.

So, we've been going through this evolution. We will continue to go through this evolution and our goal will be to make the Company into much more of a pure fund manager and then go out and tell the world about it in the most effective way that we can. And our thesis would be that our multiple should go up and that's what our advisors have suggested. So, that's more of a global approach. I don't know if that

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

is as specific an answer as you wanted.

NICOLE JACOBY: Well, I understand. I think we've had some of these discussions before about turning into a fund manager. There are two further issues. One is, you are obviously executing along that track. But the market still doesn't seem to either recognize it or be rewarding it. And, sort of related to that, have you ever considered putting -- taking the bonds off your balance sheet or letting them roll off into some other sort of vehicle?

MARC SCHNITZER: Well, clearly a strategy like that plays into the overall evolution of the Company. So, clearly it's something that we've thought of from time to time. We're not yet in a position where we can make the case in a very compelling way that we are a pure fund manager when we have $2.9 billion of bonds on our balance sheet which is reminiscent of the bond fund that we were. So, I think that complicates the story and our goals are really to try to simplify the story as much as we can.

NICOLE JACOBY: And is there anything -- so you generally thought about the bond issue but I guess you're not commenting right now on the specifics of it?

MARC SCHNITZER: We've thought about that and many other options. But, clearly that's one that would come to mind right away.

OPERATOR: Tayo Okusana, UBS.

TAYO OKUSANA, ANALYST, UBS: Going back to the question in regards to transforming yourself into a pure fund management business I guess in light of the larger macro issues we're having now in regards to the credit markets, what exactly are you seeing in regards to the continued appetite for the type of funds that you're currently managing and the kind of funds that you're currently trying to grow as part of your overall platform?

MARC SCHNITZER: Well, I think we reported that our assets under management went up by about 6.5% over the past quarter. So, that's good; that's a good fact, clearly. Let's kind of go across the landscape. In the affordable housing business, we continue to see very strong demand for those funds. We will raise about $1.2 billion of new equity this year for that fund product. We don't see any fundamental changes. That is a business that we expect to grow modestly. We don't think that's a business that's going to have explosive growth going forward.

When you look at our commercial real estate businesses, we have had very strong demand for our CMBS funds. We just closed a nearly $600 million fund in the third quarter. We continue to have strong demand for our high yield debt funds, our special situations funds. There is very strong interest in that product as well as this new opportunity fund that we're coming out with that we have had a lot of very positive feedback on. And hopefully I will be able to report some good progress on that on the next earnings call.

And then, with our joint venture equity funds, we are in the market with another product there, an urban opportunity fund. And then similarly, in the CLO marketplace, we've seen that market bounce back frankly faster than the real estate capital markets has. So, we're encouraged by the signs of life in that marketplace.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

So, I think that's really the bright spot to tell you the truth, the **investor** demand. Smart money is clearly seeing opportunities now and we want to be there to deploy that capital for them.

OPERATOR: (Operator Instructions). [Sims Alafon], Stephens.

SIMS ALAFON, ANALYST, STEPHENS: Could you elaborate on the -- if you don't mind -- the relationship you may have with American Mortgage, AMC? If you've already spoken about this, I'm sorry. I may not have heard it.

MARC SCHNITZER: That's -- I would be happy to. We're the external advisor to that company. It pays us an annual management fee. It is very similar to any of our externally advised funds with the obvious difference being that that is a public company. So, the relationship is that we get paid a management fee for conducting its business and we have about a 9% stake in the company in the form of a co-investment.

OPERATOR: (Operator Instructions). With no further questions left in the queue, I would like to turn the conference back over to Mr. Schnitzer for any additional or closing remarks.

MARC SCHNITZER: We would just like to thank everyone for calling in and look forward to speaking to all of you again in the future. Thanks a lot.

OPERATOR: This does conclude today's presentation. We thank everyone for their participation. You may disconnect your lines at any time.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference **calls** upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE **CALL** AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE **CALLS**. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE **CALL** ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[Copyright: Content copyright 2007 Thomson Financial. ALL RIGHTS RESERVED.
Electronic format, layout and metadata, copyright 2007 Voxant, Inc.
(www.voxant.com) ALL RIGHTS RESERVED. No license is granted to the user of this
material other than for research. User may not reproduce or redistribute the
material except for user's personal or internal use and, in such case, only one
copy may be printed, nor shall user use any material for commercial purposes or in
any fashion that may infringe upon Thomson Financial's or Voxant's copyright or
other proprietary rights or interests in the material; provided, however, that
members of the news media may redistribute limited portions (less than 250 words)
of this material without a specific license from Thomson Financial and Voxant so
long as they provide conspicuous attribution to Thomson Financial and Voxant as the
originators and copyright holders of such material. This is not a legal transcript
for purposes of litigation.]

---- INDEX REFERENCES ----

COMPANY: CENTERLINE HOLDING CO; FINANCIAL AND PROFESSIONAL RISK SOLUTIONS INSURANCE
AGENCY INC; CHARTER MUNICIPAL MORTGAGE ACCEPTANCE CO; SOCI00C9,ET00C9,E FINANCIAL
SA; MORGAN STANLEY; GOLDMAN SACHS AND CO; WACHOVIA SECURITIES LLC; MERRILL LYNCH
AND CO INC; BARRA INC; FINANCIAL AND INVESTMENT MANAGEMENT GROUP LTD; FEDERAL HOME
LOAN MORTGAGE CORP; WACHOVIA CORP; MERRILL LYNCH; CENTRAL BANK OF BAHRAIN;
FINANCIAL AND INVESTMENT MANAGEMENT GROUP LTD/MI; CHARTERMAC; FANNIE MAE; CARTRIDGE
ACTUATED DEVICES INC; FINANCIAL AND PROFESSIONAL RISK SOLUTIONS INC; SITE
(NETHERLANDS); FREDDIE MAC; US SECURITIES AND EXCHANGE COMMISSION; MERRILL LYNCH
AND CO CANADA LTD; MORGAN STANLEY AND CO INC; GOLDMAN SACHS; AMERICAN MORTGAGE
ACCEPTANCE CO; GOLDMAN SACHS GROUP INC (THE)

NEWS SUBJECT: (Corporate Financial Data (1XO59); U.S. Residential Mortgage-Backed
Securities (1US15); Corporate Funding (1XO17); Social Issues (1SO05); Business
Management (1BU42); Securitization (1SE75); Market Share (1MA91); Sales & Marketing
(1MA51); Funding Instruments (1FU41); Socio Economic Groups (1SO18); Major
Corporations (1MA93))

INDUSTRY: (Housing (1HO38); Mortgage Banking (1MO85); Subprime Lending (1SU05);
Investment Management (1IN34); Securities Investment (1SE57); Retail Banking
Services (1RE38); Banking (1BA20); Urban Housing Policy (1UR02); Financial Services
(1FI37); Consumer Finance (1CO55); Real Estate (1RE57))

Language: EN

OTHER INDEXING: (AMERICAN MORTGAGE; BMA; CAD; CBMS FUND; CDO; CDOS; CENTERLINE;
CENTERLINE HOLDING CO; CFO; CHARTERMAC; CLO; CMBS; CMBS FUND; COMPANY; FANNIE MAE;
FINANCIAL; FREDDIE MAC; GOLDMAN SACHS; IXIS; LEIGH PELSO; MERRILL LYNCH; MGX;
MORGAN STANLEY; OPERATOR; SECURITIES AND EXCHANGE COMMISSION; SIFMA; SITE;
TRANSCRIPTION; TRANSCRIPTS; TREP; UNIDENTIFIED CO; USERS; VOXANT; WACHOVIA
SECURITIES) (Bs; Fred Taylor; George Weiss; Howard Bloom; JIM; JIM LIKINS;
Liberation Investments; Marathon Asset; Mark; Mark Schnitzer; Nonsalary; Rob; Rob
Levy; Schnitzer; SEC FILINGS; Sims Alafon; Smart; Transfers)

Word Count: 8246
11/8/07 FINDISCLOSURE 15:00:00
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT D

# CENTERLINE HOLDING CO (CHC)

625 MADISON AVENUE
NEW YORK, NY 10022
212. 421.5333
http://www.centerline.com/

# DEF 14A

**Filed on 04/23/2007 − Period: 06/13/2007**
File Number 001−13237



LIVEDGAR Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**SCHEDULE 14A**
Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934

Filed by the Registrant          [X]
Filed by a Party other than the Registrant          [  ]
Check the appropriate box:
[  ]   Preliminary Proxy Statement
[  ]   **Confidential, for Use of the Commission Only (as permitted by Rule 14a–6(e)(2))**
[X]   Definitive Proxy Statement
[  ]   Definitive Additional Materials
[  ]   Soliciting Material Pursuant to §240.14a–12

**CENTERLINE HOLDING COMPANY**
(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):
[X]   No fee required.
[  ]   Fee computed on table below per Exchange Act Rules 14a–6(i)(1) and 0–11.
    1)   Title of each class of securities to which transaction applies: _____
    2)   Aggregate number of securities to which transaction applies: _____
    3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0–11 (Set forth the amount
        on which the filing fee is calculated and state how it was determined): _____
    4)   Proposed maximum aggregate value of transaction: _____
    5)   Total fee paid: _____
[  ]   Fee paid previously with preliminary materials.
[  ]   Check box if any part of the fee is offset as provided by Exchange Act Rule 0–11(a)(2) and identify the filing for which the
    offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the
    date of its filing.
    1)   Amount Previously Paid: _____
    2)   Form, Schedule or Registration Statement No.: _____
    3)   Filing Party: _____
    4)   Date Filed: _____

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS
AND MANAGEMENT AND RELATED SHAREHOLDERS**

As of March 31, 2007, the following shareholder was the only beneficial owner of more than 5% of our outstanding Common Shares.

| Class | Name and Address | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| Common Shares | Related General II, L.P.<br>60 Columbus Circle<br>New York, NY 10023 | 10,195,085(1) | 12.8% |

(1)  Related General II, L.P. owns 685 Common Shares and 10,194,400 Special Common Units of Centerline Capital Company, LLC (formerly known as CharterMac Capital Company LLC), which are convertible into Common Shares of the Company on a one−for−one basis, subject to certain restrictions, and the associated 10,194,400 Special Preferred Voting Shares. Related General II, L.P. is owned by TRCLP. Mr. Ross owns 92% of TRCLP and Mr. Blau owns the remaining 8%.

As of March 31, 2007, trustees and executive officers of the Company owned directly or beneficially Common Shares as follows:

| Name | Title | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| Stephen M. Ross | Chairman | 11,070,430 (1) | 13.9% |
| Marc D. Schnitzer | Managing Trustee, Chief Executive Officer and President | 1,244,731 (2) | 1.6% |
| Robert L. Levy | Chief Financial Officer | 112,936 (3) | * |
| Jeff T. Blau | Managing Trustee | 10,295,085 (4) | 13.0% |
| Leonard W. Cotton | Managing Trustee | 366,008 (5) | * |
| Thomas W. White | Managing Trustee | 972 | * |
| Peter T. Allen | Managing Trustee (independent trustee) | 11,407 | * |
| Robert J. Dolan | Managing Trustee (independent trustee) | — | * |
| Nathan Gantcher | Managing Trustee (independent trustee) | 148,499 (6) | * |
| Jerome Y. Halperin | Managing Trustee (independent trustee) | 5,281 | * |
| Robert L. Loverd | Managing Trustee (independent trustee) | 9,849 | * |
| Robert A. Meister | Managing Trustee (independent trustee) | 37,859 (7) | * |
| Janice Cook Roberts | Managing Trustee (independent trustee) | 7,959 (8) | * |
| Christopher Crouch | Senior Managing Director | 143,282 (9) | * |
| Daryl J. Carter | Executive Managing Director | 315,406 (10) | * |
| Donald J. Meyer | Executive Managing Director | 411,753 (11) | * |
| Donald J. Meyer | Executive Managing Director | 29,394 (12) | * |
| Nicholas A. Mumford | Executive Managing Director | 35,411 (13) | * |
| Andrew J. Weil | Executive Managing Director | 93,120 (14) | * |
| All Executive Officers and Trustees of the Company as a group (19 persons) | | 14,144,297 (15) | 17.6%(16) |

– 53 –

\*     Less than 1% of the outstanding Common Shares.

(1)    Includes (i) 475,345 Common Shares owned directly by Mr. Ross; (ii) 10,194,400 Special Common Units (which Special Common Units are pledged as security for a line of credit) and 685 Common Shares owned by Related General II, L.P. TRCLP owns 100% of Related General II, L.P. and Mr. Ross owns 92% of TRCLP; (iii) 400,000 options exercisable for Common Shares on a one–for–one basis (which are exercisable within 60 days).

(2)    Includes (i) 42,365 Common Shares owned directly by Mr. Schnitzer; (ii) 864,229 Special Common Units owned by Marc Associates, LP, of which Mr. Schnitzer owns 100% (which Special Common Units are pledged as security for a line of credit); (iii) 5,455 restricted Common Shares which vest on January 3, 2008; (iv) 13,618 restricted Common Shares, of which 6,809 vest on January 3, 2008 and 6,809 vest on January 3, 2009; (v) 142,045 restricted Common Shares which vest over a three–year period commencing on February 1, 2008; (vi) 39,349 restricted Common Shares which vest over a three–year period commencing on March 1, 2008; and (vi) 137,670 options exercisable for Common Shares on a one–for–one basis (which are exercisable within 60 days).

(3)    Includes (i) 26,000 Common Shares owned directly by Mr. Levy; (ii) 6,466 restricted Common Shares, which vest on November 17, 2007; (iii) 1,789 restricted Common Shares, which vest on February 28, 2008; (iv) 6,041 restricted Common Shares, of which 3,021 vest on March 1, 2008, and 3,020 vest on March 1, 2009; (v) 59,524 restricted Common Shares, which vest over a five–year period commencing November 28, 2007; and (iv) 13,116 restricted Common Shares, which vest over a three–year period commencing March 1, 2008.

(4)    Includes (i) 60,000 Common Shares owned directly by Mr. Blau; (ii) 10,194,400 Special Common Units and 685 Common Shares owned by Related General II, L.P. TRCLP owns 100% of Related General II, L.P. and Mr. Blau owns 8% of TRCLP; and (iii) 40,000 Special Common Units owned directly by Mr. Blau.

(5)    Includes (i) 111,005 Special Common Interests owned directly by Mr. Cotton; and (ii) 255,003 restricted Common Shares, which vest over a four–year period commencing August 15, 2007.

(6)    Includes (i) 86,691 Common Shares owned directly by Mr. Gantcher; (ii) 30,000 Common Shares owned by Gantcher Family Partners, LLC; (iii) 15,000 shares held by Alice Gantcher, who is Mr. Gantcher's wife; (iv) 8,000 shares held by Gantcher Family 1986 Trust; (v) 1,272 restricted Common Shares, which cliff–vest on June 30, 2007; (vi) 1,023 restricted Common Shares, which cliff–vest on December 31, 2007; (vii) 1,135 restricted Common Shares, which cliff–vest on June 30, 2008; (viii) 1,181 restricted Common Shares, which cliff–vest on December 31, 2008; (ix) 2,241 restricted Common Shares, which cliff–vest on June 30, 2009; and (x) 1,956 restricted Common Shares, which cliff–vest on January 3, 2010.

(7)    Includes (i) 30,000 Common Shares owned directly by Mr. Meister; (ii) 1,272 restricted Common Shares, which cliff–vest on June 30, 2007; (iii) 1,023 restricted Common Shares, which cliff–vest on December 31, 2007; (iv) 1,135 restricted Common Shares, which cliff–vest on June 30, 2008; (v) 1,181 restricted Common Shares, which cliff–vest on December 31, 2008; (vi) 1,734 restricted Common Shares, which cliff–vest on June 30, 2009; and (vii) 1,514 restricted Common Shares, which cliff–vest on January 3, 2010.

(8)    Includes (i) 1,272 restricted Common Shares, which cliff–vest on June 30, 2007; (ii) 1,023 restricted Common Shares, which cliff–vest on December 31, 2007; (iii) 1,135 restricted Common Shares, which cliff–vest on December 31, 2008; (v) 1,788 restricted Common Shares, which cliff–vest on June 30, 2009; (vi) 1,560 restricted Common Shares, which cliff–vest on January 3, 2010.

(9)    Restricted Common Shares, which vest over a four–year period commencing August 15, 2007.

(10)    Includes (i) 278,203 Special Membership Units owned directly by Mr. Carter; and (ii) 13,593 restricted Common Shares, of which 3,398 vest on March 1, 2008, 3,398 vest on March 1, 2009 and 6,797 vest on March 1, 2010; and (iii) 23,610 restricted Common Shares which vest over a three–year period commencing March 1, 2008.

(11)    Includes (i) 156,750 Special Common Interests owned directly by Mr. Duggins; and (ii) 255,003 restricted Common Shares, which vest over a four–year period commencing August 15, 2007.

(12)    Includes (i) 3,677 Common Shares owned directly by Mr. Meyer; (ii) 4,333 restricted Common Shares, of which 2,167 vest on August 1, 2007, and 2,166 vest on August 1, 2008; (iii) 3,021 restricted Common Shares, of which 1,510 vest on March 1, 2008, 1,511 vest on March 1, 2009; and (iv) 18,363 restricted Common Shares, which vest over a three–year period commencing March 1, 2008.

(13)    Restricted Common Shares, which vest over a three–year period commencing January 16, 2008.

(14)    Includes (i) 46,560 Special Common Units owned directly by Mr. Weil; and (ii) 46,560 restricted Special Common Units which vest on November 17, 2007.

– 54 –

(15)    Includes (i) 685 Common Shares owned by Related General II, L.P.; (ii) 537,670 options exercisable for Common Shares on a one-for-one basis (which are exercisable within 60 days); (iii) 11,191,749 Special Common Units; (iv) 278,203 Special Membership Units (v) 267,755 Special Common Interests; and (vi) 1,126,966 restricted Common Shares.

(16)    Based on the Common Shares outstanding as of March 31, 2007 (51,299,100) plus (i) the Common Shares issuable upon (w) the exercise of all options to purchase Common Shares which are exercisable within 60 days (1,064,421); (x) the conversion of all CRA Preferred Shares (10,391,855); (y) the conversion of all Special Common Units (14,693,311); (z) the conversion of all Special Membership Units (278,203); (aa) the conversion of all Special Common Interests (267,755); and (ii) all restricted Common Shares (2,423,989).

# EXHIBIT E

**Section 303A**

**Corporate Governance Rules**

*As of November 3, 2004*

What follows are the corporate governance rules of the New York Stock Exchange approved by the SEC on November 4, 2003, and amended on November 3, 2004, other than Section 303A.08, which was filed separately and approved by the SEC on June 30, 2003. These rules are codified in Section 303A of the NYSE's Listed Company Manual.

On August 3, 2004, the NYSE filed SR-NYSE-2004-41 with the Securities and Exchange Commission, which proposed amendments to the corporate governance rules set out in Section 303A of the NYSE Listed Company Manual. The NYSE initially requested expedited SEC approval, but subsequently amended the filing on August 30, 2004 to delete that request. The NYSE amended the filing again on October 28, 2004. This second amendment reflected comments from the SEC and the public. Specifically, it withdrew the NYSE's proposed changes to the definition of immediate family member for use in the context of the bright line independence test relating to a listed company's audit firm. On November 2, 2004, the NYSE filed a third amendment to include language in the proposed amendments giving listed companies until their first annual meeting after June 30, 2005, to replace a director who was independent under the prior test but who would not be independent under the proposed revised Section 303A.02(b)(iii) bright line test for director independence relating to audit firms.

**303A Corporate Governance Standards**

**General Application**

Companies listed on the Exchange must comply with certain standards regarding corporate governance as codified in this Section 303A. Consistent with the NYSE's traditional approach, as well as the requirements of the Sarbanes-Oxley Act of 2002, certain provisions of Section 303A are applicable to some listed companies but not to others.

**Equity Listings**

Section 303A applies in full to all companies listing common equity securities, with the following exceptions:

Controlled Companies

A listed company of which more than 50% of the voting power is held by an individual, a group or another company need not comply with the requirements of Sections 303A.01, .04 or .05. A controlled company that chooses to take advantage of any or all of these

1

exemptions must disclose that choice, that it is a controlled company and the basis for the determination in its annual proxy statement or, if the company does not file an annual proxy statement, in the company's annual report on Form 10-K filed with the SEC. Controlled companies must comply with the remaining provisions of Section 303A.

Limited Partnerships and Companies in Bankruptcy

Due to their unique attributes, limited partnerships and companies in bankruptcy proceedings need not comply with the requirements of Sections 303A.01, .04 or .05. However, all limited partnerships (at the general partner level) and companies in bankruptcy proceedings must comply with the remaining provisions of Section 303A.

Closed-End and Open-End Funds

The Exchange considers the significantly expanded standards and requirements provided for in Section 303A to be unnecessary for closed-end and open-end management investment companies that are registered under the Investment Company Act of 1940, given the pervasive federal regulation applicable to them. However, closed-end funds must comply with the requirements of Sections 303A.06, .07(a) and (c), and .12. Note, however, that in view of the common practice to utilize the same directors for boards in the same fund complex, closed-end funds will not be required to comply with the disclosure requirement in the second paragraph of the Commentary to 303A.07(a), which calls for disclosure of a board's determination with respect to simultaneous service on more than three public company audit committees. However, the other provisions of that paragraph will apply.

Business development companies, which are a type of closed-end management investment company defined in Section 2(a)(48) of the Investment Company Act of 1940 that are not registered under that Act, are required to comply with all of the provisions of Section 303A applicable to domestic issuers other than Sections 303A.02 and .07(b). For purposes of Sections 303A.01, .03, .04, .05, and .09, a director of a business development company shall be considered to be independent if he or she is not an "interested person" of the company, as defined in Section 2(a)(19) of the Investment Company Act of 1940.

As required by Rule 10A-3 under the Exchange Act, open-end funds (which can be listed as Investment Company Units, more commonly known as Exchange Traded Funds or ETFs) are required to comply with the requirements of Sections 303A.06 and .12(b) and (c).

Rule 10A-3(b)(3)(ii) under the Exchange Act requires that each audit committee must establish procedures for the confidential, anonymous submission by employees of the listed issuer of concerns regarding questionable accounting or auditing matters. In view of the external management structure often employed by closed-end and open-end funds, the Exchange also requires the audit committees of such companies to establish such procedures for the confidential, anonymous submission by employees of the investment adviser, administrator, principal underwriter, or any other provider of accounting related

services for the management company, as well as employees of the management company. This responsibility must be addressed in the audit committee charter.

<u>Other Entities</u>

Except as otherwise required by Rule 10A-3 under the Exchange Act (for example, with respect to open-end funds), Section 303A does not apply to passive business organizations in the form of trusts (such as royalty trusts) or to derivatives and special purpose securities (such as those described in Sections 703.16, 703.19, 703.20 and 703.21). To the extent that Rule 10A-3 applies to a passive business organization, listed derivative or special purpose security, such entities are required to comply with Sections 303A.06 and .12(b).

<u>Foreign Private Issuers</u>

Listed companies that are foreign private issuers (as such term is defined in Rule 3b-4 under the Exchange Act) are permitted to follow home country practice in lieu of the provisions of this Section 303A, except that such companies are required to comply with the requirements of Sections 303A.06, .11 and .12(b) and (c).

**Preferred and Debt Listings**

Section 303A does not generally apply to companies listing only preferred or debt securities on the Exchange. To the extent required by Rule 10A-3 under the Exchange Act, all companies listing only preferred or debt securities on the NYSE are required to comply with the requirements of Sections 303A.06 and .12(b) and (c).

**Effective Dates/Transition Periods**

Except for Section 303A.08, which became effective June 30, 2003, listed companies will have until the earlier of their first annual meeting after January 15, 2004, or October 31, 2004, to comply with the new standards contained in Section 303A, although if a listed company with a classified board would be required (other than by virtue of a requirement under Section 303A.06) to change a director who would not normally stand for election in such annual meeting, the listed company may continue such director in office until the second annual meeting after such date, but no later than December 31, 2005. In addition, foreign private issuers will have until July 31, 2005 to comply with the new audit committee standards set out in Section 303A.06, and will not be required to provide the written affirmations required by Section 303A.12(c) until after that date. As a general matter, the existing audit committee requirements provided for in Section 303 continue to apply to listed companies pending the transition to the new rules. On November 3, 2004, the SEC approved a change to the Section 303A.02(b)(iii) bright line test for director independence relating to audit firms. Companies will have until their first annual meeting after June 30, 2005, to replace a director who was independent under the prior test but who is not independent under the current test.

Companies listing in conjunction with their initial public offering will be permitted to phase in their independent nomination and compensation committees on the same

schedule as is permitted pursuant to Rule 10A-3 under the Exchange Act for audit committees, that is, one independent member at the time of listing, a majority of independent members within 90 days of listing and fully independent committees within one year. Such companies will be required to meet the majority independent board requirement within 12 months of listing. For purposes of Section 303A other than Sections 303A.06 and .12(b), a company will be considered to be listing in conjunction with an initial public offering if, immediately prior to listing, it does not have a class of common stock registered under the Exchange Act. The Exchange will also permit companies that are emerging from bankruptcy or have ceased to be controlled companies within the meaning of Section 303A to phase in independent nomination and compensation committees and majority independent boards on the same schedule as companies listing in conjunction with an initial public offering. However, for purposes of Sections 303A.06 and .12(b), a company will be considered to be listing in conjunction with an initial public offering only if it meets the conditions of Rule 10A-3(b)(1)(iv)(A) under the Exchange Act, namely, that the company was not, immediately prior to the effective date of a registration statement, required to file reports with the SEC pursuant to Section 13(a) or 15(d) of the Exchange Act.

Companies listing upon transfer from another market have 12 months from the date of transfer in which to comply with any requirement to the extent the market on which they were listed did not have the same requirement. To the extent the other market has a substantially similar requirement but also had a transition period from the effective date of that market's rule, which period had not yet expired, the company will have the same transition period as would have been available to it on the other market. This transition period for companies transferring from another market will not apply to the requirements of Section 303A.06 unless a transition period is available pursuant to Rule 10A-3 under the Exchange Act.

**References to Form 10-K**

There are provisions in this Section 303A that call for disclosure in a listed company's Form 10-K under certain circumstances. If a listed company subject to such a provision is not a company required to file on Form 10-K, then the provision shall be interpreted to mean the annual periodic disclosure form that the listed company does file with the SEC. For example, for a closed-end fund, the appropriate form would be the annual Form N-CSR. If a listed company is not required to file either an annual proxy statement or an annual periodic report with the SEC, the disclosure shall be made in the annual report required under Section 203.01 of the NYSE Listed Company Manual.

1.    **Listed companies must have a majority of independent directors.**

*Commentary*: Effective boards of directors exercise independent judgment in carrying out their responsibilities. Requiring a majority of independent directors will increase the quality of board oversight and lessen the possibility of damaging conflicts of interest.

2.  **In order to tighten the definition of "independent director" for purposes of these standards:**

(a) **No director qualifies as "independent" unless the board of directors affirmatively determines that the director has no material relationship with the listed company (either directly or as a partner, shareholder or officer of an organization that has a relationship with the company). Companies must identify which directors are independent and disclose the basis for that determination.**

*Commentary:* It is not possible to anticipate, or explicitly to provide for, all circumstances that might signal potential conflicts of interest, or that might bear on the materiality of a director's relationship to a listed company (references to "company" would include any parent or subsidiary in a consolidated group with the company). Accordingly, it is best that boards making "independence" determinations broadly consider all relevant facts and circumstances. In particular, when assessing the materiality of a director's relationship with the listed company, the board should consider the issue not merely from the standpoint of the director, but also from that of persons or organizations with which the director has an affiliation. Material relationships can include commercial, industrial, banking, consulting, legal, accounting, charitable and familial relationships, among others. However, as the concern is independence from management, the Exchange does not view ownership of even a significant amount of stock, by itself, as a bar to an independence finding.

The identity of the independent directors and the basis for a board determination that a relationship is not material must be disclosed in the listed company's annual proxy statement or, if the company does not file an annual proxy statement, in the company's annual report on Form 10-K filed with the SEC. In this regard, a board may adopt and disclose categorical standards to assist it in making determinations of independence and may make a general disclosure if a director meets these standards. Any determination of independence for a director who does not meet these standards must be specifically explained. A company must disclose any standard it adopts. It may then make the general statement that the independent directors meet the standards set by the board without detailing particular aspects of the immaterial relationships between individual directors and the company. In the event that a director with a business or other relationship that does not fit within the disclosed standards is determined to be independent, a board must disclose the basis for its determination in the manner described above. This approach provides investors with an adequate means of assessing the quality of a board's independence and its independence determinations while avoiding excessive disclosure of immaterial relationships.

(b) **In addition, a director is not independent if:**

5

**(i) The director is, or has been within the last three years, an employee of the listed company, or an immediate family member is, or has been within the last three years, an executive officer,[1] of the listed company.**

*Commentary:* Employment as an interim Chairman or CEO or other executive officer shall not disqualify a director from being considered independent following that employment.

**(ii) The director has received, or has an immediate family member who has received, during any twelve-month period within the last three years, more than $100,000 in direct compensation from the listed company, other than director and committee fees and pension or other forms of deferred compensation for prior service (provided such compensation is not contingent in any way on continued service.**

*Commentary:* Compensation received by a director for former service as an interim Chairman or CEO or other executive officer need not be considered in determining independence under this test. Compensation received by an immediate family member for service as an employee of the listed company (other than an executive officer) need not be considered in determining independence under this test.

**(iii) (A) The director or an immediate family member is a current partner of a firm that is the company's internal or external auditor; (B) the director is a current employee of such a firm; (C) the director has an immediate family member who is a current employee of such a firm and who participates in the firm's audit, assurance or tax compliance (but not tax planning) practice; or (D) the director or an immediate family member was within the last three years (but is no longer) a partner or employee of such a firm and personally worked on the listed company's audit within that time.**

**(iv) The director or an immediate family member is, or has been within the last three years, employed as an executive officer of another company where any of the listed company's present executive officers at the same time serves or served on that company's compensation committee.**

**(v) The director is a current employee, or an immediate family member is a current executive officer, of a company that has made payments to, or received payments from, the listed company for property or services in an amount which, in any of the last three fiscal years, exceeds the greater of $1 million, or 2% of such other company's consolidated gross revenues.**

---

[1] For purposes of Section 303A, the term "executive officer" has the same meaning specified for the term "officer" in Rule 16a-1(f) under the Securities Exchange Act of 1934.

6

*Commentary*: In applying the test in Section 303A.02(b)(v), both the payments and the consolidated gross revenues to be measured shall be those reported in the last completed fiscal year of such other company. The look-back provision for this test applies solely to the financial relationship between the listed company and the director or immediate family member's current employer; a listed company need not consider former employment of the director or immediate family member.

Contributions to tax exempt organizations shall not be considered "payments" for purposes of Section 303A.02(b)(v), provided however that a listed company shall disclose in its annual proxy statement, or if the listed company does not file an annual proxy statement, in the company's annual report on Form 10-K filed with the SEC, any such contributions made by the listed company to any tax exempt organization in which any independent director serves as an executive officer if, within the preceding three years, contributions in any single fiscal year from the listed company to the organization exceeded the greater of $1 million, or 2% of such tax exempt organization's consolidated gross revenues. Listed company boards are reminded of their obligations to consider the materiality of any such relationship in accordance with Section 303A.02(a) above.

*General Commentary to Section 303A.02(b)*: An "immediate family member" includes a person's spouse, parents, children, siblings, mothers and fathers-in-law, sons and daughters-in-law, brothers and sisters-in-law, and anyone (other than domestic employees) who shares such person's home. When applying the look-back provisions in Section 303A.02(b), listed companies need not consider individuals who are no longer immediate family members as a result of legal separation or divorce, or those who have died or become incapacitated.

In addition, references to the "company" would include any parent or subsidiary in a consolidated group with the company.

**Transition Rule**. Each of the above standards contains a three-year "look-back" provision. In order to facilitate a smooth transition to the new independence standards, the Exchange will phase in the "look-back" provisions by applying only a one-year look-back for the first year after adoption of these new standards. The three-year look-backs provided for in Section 303A.02(b) will begin to apply only from and after November 4, 2004.

As an example, until November 3, 2004, a listed company need look back only one year when testing compensation under Section 303A.02(b)(ii). Beginning November 4, 2004, however, the listed company would need to look back the full three years provided in Section 303A.02(b)(ii).

3. **To empower non-management directors to serve as a more effective check on management, the non-management directors of each listed company must meet at regularly scheduled executive sessions without management.**

7

*Commentary:* To promote open discussion among the non-management directors, companies must schedule regular executive sessions in which those directors meet without management participation. "Non-management" directors are all those who are not executive officers, and includes such directors who are not independent by virtue of a material relationship, former status or family membership, or for any other reason.

Regular scheduling of such meetings is important not only to foster better communication among non-management directors, but also to prevent any negative inference from attaching to the calling of executive sessions. A non-management director must preside over each executive session of the non-management directors, although the same director is not required to preside at all executive sessions of the non-management directors. If one director is chosen to preside at all of these meetings, his or her name must be disclosed in the listed company's annual proxy statement or, if the company does not file an annual proxy statement, in the company's annual report on Form 10-K filed with the SEC. Alternatively, if the same individual is not the presiding director at every meeting, a listed company must disclose the procedure by which a presiding director is selected for each executive session. For example, a listed company may wish to rotate the presiding position among the chairs of board committees.

In order that interested parties may be able to make their concerns known to the non-management directors, a listed company must disclose a method for such parties to communicate directly with the presiding director or with the non-management directors as a group. Such disclosure must be made in the listed company's annual proxy statement or, if the company does not file an annual proxy statement, in the company's annual report on Form 10-K filed with the SEC. Companies may, if they wish, utilize for this purpose the same procedures they have established to comply with the requirement of Rule 10A-3 (b)(3) under the Exchange Act, as applied to listed companies through Section 303A.06.

While this Section 303A.03 refers to meetings of non-management directors, if that group includes directors who are not independent under this Section 303A, listed companies should at least once a year schedule an executive session including only independent directors.

4.  **(a) Listed companies must have a nominating/corporate governance committee composed entirely of independent directors.**

**(b) The nominating/corporate governance committee must have a written charter that addresses:**

**(i) the committee's purpose and responsibilities – which, at minimum, must be to: identify individuals qualified to become board members, consistent with criteria approved by the board, and to select, or to recommend that the board select, the director nominees for the next annual meeting of shareholders; develop and recommend to the board a**

set of corporate governance guidelines applicable to the corporation; and oversee the evaluation of the board and management; and

(ii) an annual performance evaluation of the committee.

*Commentary:* A nominating/corporate governance committee is central to the effective functioning of the board. New director and board committee nominations are among a board's most important functions. Placing this responsibility in the hands of an independent nominating/corporate governance committee can enhance the independence and quality of nominees. The committee is also responsible for taking a leadership role in shaping the corporate governance of a corporation.

If a listed company is legally required by contract or otherwise to provide third parties with the ability to nominate directors (for example, preferred stock rights to elect directors upon a dividend default, shareholder agreements, and management agreements), the selection and nomination of such directors need not be subject to the nominating committee process.

The nominating/corporate governance committee charter should also address the following items: committee member qualifications; committee member appointment and removal; committee structure and operations (including authority to delegate to subcommittees); and committee reporting to the board. In addition, the charter should give the nominating/corporate governance committee sole authority to retain and terminate any search firm to be used to identify director candidates, including sole authority to approve the search firm's fees and other retention terms.

Boards may allocate the responsibilities of the nominating/corporate governance committee to committees of their own denomination, provided that the committees are composed entirely of independent directors. Any such committee must have a published committee charter.

5.  (a) Listed companies must have a compensation committee composed entirely of independent directors.

(b) The compensation committee must have a written charter that addresses:

(i) the committee's purpose and responsibilities – which, at minimum, must be to have direct responsibility to:

(A) review and approve corporate goals and objectives relevant to CEO compensation, evaluate the CEO's performance in light of those goals and objectives, and, either as a committee or together with the other independent directors (as directed by the board), determine and approve the CEO's compensation level based on this evaluation; and

(B) make recommendations to the board with respect to non-CEO executive officer compensation, and incentive-compensation and equity-based plans that are subject to board approval; and

(C) produce a compensation committee report on executive officer compensation as required by the SEC to be included in the listed company's annual proxy statement or annual report on Form 10-K filed with the SEC;

(ii) an annual performance evaluation of the compensation committee.

*Commentary:* In determining the long-term incentive component of CEO compensation, the committee should consider the listed company's performance and relative shareholder return, the value of similar incentive awards to CEOs at comparable companies, and the awards given to the listed company's CEO in past years. To avoid confusion, note that the compensation committee is not precluded from approving awards (with or without ratification of the board) as may be required to comply with applicable tax laws (i.e., Rule 162(m)). Note also that nothing in Section 303A.05(b)(i)(B) is intended to preclude the board from delegating its authority over such matters to the compensation committee.

The compensation committee charter should also address the following items: committee member qualifications; committee member appointment and removal; committee structure and operations (including authority to delegate to subcommittees); and committee reporting to the board.

Additionally, if a compensation consultant is to assist in the evaluation of director, CEO or executive officer compensation, the compensation committee charter should give that committee sole authority to retain and terminate the consulting firm, including sole authority to approve the firm's fees and other retention terms.

Boards may allocate the responsibilities of the compensation committee to committees of their own denomination, provided that the committees are composed entirely of independent directors. Any such committee must have a published committee charter.

Nothing in this provision should be construed as precluding discussion of CEO compensation with the board generally, as it is not the intent of this standard to impair communication among members of the board.

6.  **Listed companies must have an audit committee that satisfies the requirements of Rule 10A-3 under the Exchange Act.**

*Commentary:* The Exchange will apply the requirements of Rule 10A-3 in a manner consistent with the guidance provided by the Securities and Exchange Commission in SEC Release No. 34-47654 (April 1, 2003). Without limiting the generality of the foregoing, the Exchange will provide companies the opportunity to cure defects provided in Rule 10A-3(a)(3) under the Exchange Act.

7.   **(a) The audit committee must have a minimum of three members.**

> *Commentary:* Each member of the audit committee must be financially literate, as such qualification is interpreted by the listed company's board in its business judgment, or must become financially literate within a reasonable period of time after his or her appointment to the audit committee. In addition, at least one member of the audit committee must have accounting or related financial management expertise, as the listed company's board interprets such qualification in its business judgment. While the Exchange does not require that a listed company's audit committee include a person who satisfies the definition of audit committee financial expert set out in Item 401(h) of Regulation S-K, a board may presume that such a person has accounting or related financial management expertise.

> Because of the audit committee's demanding role and responsibilities, and the time commitment attendant to committee membership, each prospective audit committee member should evaluate carefully the existing demands on his or her time before accepting this important assignment. Additionally, if an audit committee member simultaneously serves on the audit committees of more than three public companies, and the listed company does not limit the number of audit committees on which its audit committee members serve to three or less, then in each case, the board must determine that such simultaneous service would not impair the ability of such member to effectively serve on the listed company's audit committee and disclose such determination in the listed company's annual proxy statement or, if the company does not file an annual proxy statement, in the company's annual report on Form 10-K filed with the SEC.

**(b) In addition to any requirement of Rule 10A-3(b)(1), all audit committee members must satisfy the requirements for independence set out in Section 303A.02.**

**(c) The audit committee must have a written charter that addresses:**

**(i) the committee's purpose – which, at minimum, must be to:**

**(A) assist board oversight of (1) the integrity of the listed company's financial statements, (2) the listed company's compliance with legal and regulatory requirements, (3) the independent auditor's qualifications and independence, and (4) the performance of the listed company's internal audit function and independent auditors; and**

**(B) prepare an audit committee report as required by the SEC to be included in the listed company's annual proxy statement;**

**(ii) an annual performance evaluation of the audit committee; and**

11

> **(iii) the duties and responsibilities of the audit committee – which, at a minimum, must include those set out in Rule 10A-3(b)(2), (3), (4) and (5) of the Exchange Act , as well as to:**
>
> > **(A) at least annually, obtain and review a report by the independent auditor describing: the firm's internal quality-control procedures; any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and (to assess the auditor's independence) all relationships between the independent auditor and the listed company;**

*Commentary:*  After reviewing the foregoing report and the independent auditor's work throughout the year, the audit committee will be in a position to evaluate the auditor's qualifications, performance and independence. This evaluation should include the review and evaluation of the lead partner of the independent auditor. In making its evaluation, the audit committee should take into account the opinions of management and the listed company's internal auditors (or other personnel responsible for the internal audit function). In addition to assuring the regular rotation of the lead audit partner as required by law, the audit committee should further consider whether, in order to assure continuing auditor independence, there should be regular rotation of the audit firm itself.  The audit committee should present its conclusions with respect to the independent auditor to the full board.

> > **(B) meet to review and discuss the listed company's annual audited financial statements and quarterly financial statements with management and the independent auditor, including reviewing the company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations";**
>
> > **(C) discuss the listed company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies;**

*Commentary:*  The audit committee's responsibility to discuss earnings releases, as well as financial information and earnings guidance, may be done generally (i.e., discussion of the types of information to be disclosed and the type of presentation to be made).  The audit committee need not discuss in advance each earnings release or each instance in which a listed company may provide earnings guidance.

> > **(D) discuss policies with respect to risk assessment and risk management;**

*Commentary:* While it is the job of the CEO and senior management to assess and manage the listed company's exposure to risk, the audit committee must discuss guidelines and policies to govern the process by which this is handled. The audit committee should discuss the listed company's major financial risk exposures and the steps management has taken to monitor and control such exposures. The audit committee is not required to be the sole body responsible for risk assessment and management but, as stated above, the committee must discuss guidelines and policies to govern the process by which risk assessment and management is undertaken. Many companies, particularly financial companies, manage and assess their risk through mechanisms other than the audit committee. The processes these companies have in place should be reviewed in a general manner by the audit committee, but they need not be replaced by the audit committee.

**(E) meet separately, periodically, with management, with internal auditors (or other personnel responsible for the internal audit function) and with independent auditors;**

*Commentary:* To perform its oversight functions most effectively, the audit committee must have the benefit of separate sessions with management, the independent auditors and those responsible for the internal audit function. As noted herein, all listed companies must have an internal audit function. These separate sessions may be more productive than joint sessions in surfacing issues warranting committee attention.

**(F) review with the independent auditor any audit problems or difficulties and management's response;**

*Commentary:* The audit committee must regularly review with the independent auditor any difficulties the auditor encountered in the course of the audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management. Among the items the audit committee may want to review with the auditor are: any accounting adjustments that were noted or proposed by the auditor but were "passed" (as immaterial or otherwise); any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement; and any "management" or "internal control" letter issued, or proposed to be issued, by the audit firm to the listed company. The review should also include discussion of the responsibilities, budget and staffing of the listed company's internal audit function.

**(G) set clear hiring policies for employees or former employees of the independent auditors; and**

*Commentary:* Employees or former employees of the independent auditor are often valuable additions to corporate management. Such individuals' familiarity with the business, and personal rapport with the employees, may be attractive

13

qualities when filling a key opening. However, the audit committee should set hiring policies taking into account the pressures that may exist for auditors consciously or subconsciously seeking a job with the company they audit.

**(H) report regularly to the board of directors.**

*Commentary:* The audit committee should review with the full board any issues that arise with respect to the quality or integrity of the listed company's financial statements, the company's compliance with legal or regulatory requirements, the performance and independence of the company's independent auditors, or the performance of the internal audit function.

*General Commentary to Section 303A.07(c):* While the fundamental responsibility for the listed company's financial statements and disclosures rests with management and the independent auditor, the audit committee must review: (A) major issues regarding accounting principles and financial statement presentations, including any significant changes in the company's selection or application of accounting principles, and major issues as to the adequacy of the company's internal controls and any special audit steps adopted in light of material control deficiencies; (B) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; (C) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the listed company; and (D) the type and presentation of information to be included in earnings press releases (paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information), as well as review any financial information and earnings guidance provided to analysts and rating agencies.

**(d) Each listed company must have an internal audit function.**

*Commentary:* Listed companies must maintain an internal audit function to provide management and the audit committee with ongoing assessments of the company's risk management processes and system of internal control. A listed company may choose to outsource this function to a third party service provider other than its independent auditor.

*General Commentary to Section 303A.07:* To avoid any confusion, note that the audit committee functions specified in Section 303A.07 are the sole responsibility of the audit committee and may not be allocated to a different committee.

**8.** No change.

**9. Listed companies must adopt and disclose corporate governance guidelines.**

*Commentary:* No single set of guidelines would be appropriate for every listed company, but certain key areas of universal importance include director qualifications and responsibilities, responsibilities of key board committees, and

14

director compensation. Given the importance of corporate governance, each listed company's website must include its corporate governance guidelines and the charters of its most important committees (including at least the audit, and if applicable, compensation and nominating committees). The listed company must state in its annual proxy statement or, if the company does not file an annual proxy statement, in the company's annual report on Form 10-K filed with the SEC that the foregoing information is available on its website, and that the information is available in print to any shareholder who requests it. Making this information publicly available should promote better investor understanding of the listed company's policies and procedures, as well as more conscientious adherence to them by directors and management.

The following subjects must be addressed in the corporate governance guidelines:

- **Director qualification standards.** These standards should, at minimum, reflect the independence requirements set forth in Sections 303A.01 and .02. Companies may also address other substantive qualification requirements, including policies limiting the number of boards on which a director may sit, and director tenure, retirement and succession.

- **Director responsibilities.** These responsibilities should clearly articulate what is expected from a director, including basic duties and responsibilities with respect to attendance at board meetings and advance review of meeting materials.

- **Director access to management and, as necessary and appropriate, independent advisors.**

- **Director compensation.** Director compensation guidelines should include general principles for determining the form and amount of director compensation (and for reviewing those principles, as appropriate). The board should be aware that questions as to directors' independence may be raised when directors' fees and emoluments exceed what is customary. Similar concerns may be raised when the listed company makes substantial charitable contributions to organizations in which a director is affiliated, or enters into consulting contracts with (or provides other indirect forms of compensation to) a director. The board should critically evaluate each of these matters when determining the form and amount of director compensation, and the independence of a director.

- **Director orientation and continuing education.**

- **Management succession.** Succession planning should include policies and principles for CEO selection and performance review, as well as policies regarding succession in the event of an emergency or the retirement of the CEO.

- **Annual performance evaluation of the board.** The board should conduct a self-evaluation at least annually to determine whether it and its committees are functioning effectively.

10. **Listed companies must adopt and disclose a code of business conduct and ethics for directors, officers and employees, and promptly disclose any waivers of the code for directors or executive officers.**

> *Commentary:* No code of business conduct and ethics can replace the thoughtful behavior of an ethical director, officer or employee. However, such a code can focus the board and management on areas of ethical risk, provide guidance to personnel to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, and help to foster a culture of honesty and accountability.
>
> Each code of business conduct and ethics must require that any waiver of the code for executive officers or directors may be made only by the board or a board committee and must be promptly disclosed to shareholders. This disclosure requirement should inhibit casual and perhaps questionable waivers, and should help assure that, when warranted, a waiver is accompanied by appropriate controls designed to protect the listed company. It will also give shareholders the opportunity to evaluate the board's performance in granting waivers.
>
> Each code of business conduct and ethics must also contain compliance standards and procedures that will facilitate the effective operation of the code. These standards should ensure the prompt and consistent action against violations of the code. Each listed company's website must include its code of business conduct and ethics. The listed company must state in its annual proxy statement or, if the company does not file an annual proxy statement, in the company's annual report on Form 10-K filed with the SEC that the foregoing information is available on its website and that the information is available in print to any shareholder who requests it.
>
> Each listed company may determine its own policies, but all listed companies should address the most important topics, including the following:

- **Conflicts of interest.** A "conflict of interest" occurs when an individual's private interest interferes in any way – or even appears to interfere – with the interests of the corporation as a whole. A conflict situation can arise when an employee, officer or director takes actions or has interests that may make it difficult to perform his or her company work objectively and effectively. Conflicts of interest also arise when an employee, officer or director, or a member of his or her family, receives improper personal benefits as a result of his or her position in the company. Loans to, or guarantees of obligations of, such persons are of special concern. The listed company should have a policy prohibiting such conflicts of interest, and providing a means for employees, officers and directors to communicate potential conflicts to the listed company.

- **Corporate opportunities.** Employees, officers and directors should be prohibited from (a) taking for themselves personally opportunities that are discovered through the use of corporate property, information or position; (b) using corporate

property, information, or position for personal gain; and (c) competing with the company. Employees, officers and directors owe a duty to the company to advance its legitimate interests when the opportunity to do so arises.

- **Confidentiality.** Employees, officers and directors should maintain the confidentiality of information entrusted to them by the listed company or its customers, except when disclosure is authorized or legally mandated. Confidential information includes all non-public information that might be of use to competitors, or harmful to the company or its customers, if disclosed.

- **Fair dealing.** Each employee, officer and director should endeavor to deal fairly with the company's customers, suppliers, competitors and employees. None should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice. Listed companies may write their codes in a manner that does not alter existing legal rights and obligations of companies and their employees, such as "at will" employment arrangements.

- **Protection and proper use of company assets.** All employees, officers and directors should protect the company's assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on the listed company's profitability. All company assets should be used for legitimate business purposes.

- **Compliance with laws, rules and regulations (including insider trading laws).** The listed company should proactively promote compliance with laws, rules and regulations, including insider trading laws. Insider trading is both unethical and illegal, and should be dealt with decisively.

- **Encouraging the reporting of any illegal or unethical behavior.** The listed company should proactively promote ethical behavior. The company should encourage employees to talk to supervisors, managers or other appropriate personnel when in doubt about the best course of action in a particular situation. Additionally, employees should report violations of laws, rules, regulations or the code of business conduct to appropriate personnel. To encourage employees to report such violations, the listed company must ensure that employees know that the company will not allow retaliation for reports made in good faith.

11. **Listed foreign private issuers must disclose any significant ways in which their corporate governance practices differ from those followed by domestic companies under NYSE listing standards.**

*Commentary:* Foreign private issuers must make their U.S. investors aware of the significant ways in which their corporate governance practices differ from those required of domestic companies under NYSE listing standards. However, foreign private issuers are not required to present a detailed, item-by-item analysis of these differences. Such a disclosure would be long and unnecessarily complicated. Moreover, this requirement is not intended to suggest that one

17

country's corporate governance practices are better or more effective than another. The Exchange believes that U.S. shareholders should be aware of the significant ways that the governance of a listed foreign private issuer differs from that of a U.S. listed company. The Exchange underscores that what is required is a brief, general summary of the significant differences, not a cumbersome analysis.

Listed foreign private issuers may provide this disclosure either on their web site (provided it is in the English language and accessible from the United States) and/or in their annual report as distributed to shareholders in the United States in accordance with Sections 103.00 and 203.01 of the Listed Company Manual (again, in the English language). If the disclosure is only made available on the web site, the annual report shall so state and provide the web address at which the information may be obtained.

**12. (a) Each listed company CEO must certify to the NYSE each year that he or she is not aware of any violation by the company of NYSE corporate governance listing standards, qualifying the certification to the extent necessary.**

*Commentary:* The CEO's annual certification regarding the NYSE's corporate governance listing standards will focus the CEO and senior management on the listed company's compliance with the listing standards. Both this certification to the NYSE, including any qualifications to that certification, and any CEO/CFO certifications required to be filed with the SEC regarding the quality of the listed company's public disclosure, must be disclosed in the company's annual report to shareholders or, if the company does not prepare an annual report to shareholders, in the company's annual report on Form 10-K filed with the SEC.

**(b) Each listed company CEO must promptly notify the NYSE in writing after any executive officer of the listed company becomes aware of any material non-compliance with any applicable provisions of this Section 303A.**

**(c) Each listed company must submit an executed Written Affirmation annually to the NYSE. In addition, each listed company must submit an interim Written Affirmation each time a change occurs to the board or any of the committees subject to Section 303A. The annual and interim Written Affirmations must be in the form specified by the NYSE.**

**13. The NYSE may issue a public reprimand letter to any listed company that violates a NYSE listing standard.**

*Commentary:* Suspending trading in or delisting a listed company can be harmful to the very shareholders that the NYSE listing standards seek to protect; the NYSE must therefore use these measures sparingly and judiciously. For this reason it is appropriate for the NYSE to have the ability to apply a lesser sanction to deter companies from violating its corporate governance (or other) listing standards. Accordingly, the NYSE may issue a public reprimand letter to any listed company, regardless of type of security listed or country of incorporation, that it determines has violated a NYSE listing standard.

18

For companies that repeatedly or flagrantly violate NYSE listing standards, suspension and delisting remain the ultimate penalties. For clarification, this lesser sanction is not intended for use in the case of companies that fall below the financial and other continued listing standards provided in Chapter 8 of the Listed Company Manual or that fail to comply with the audit committee standards set out in Section 303A.06. The processes and procedures provided for in Chapter 8 govern the treatment of companies falling below those standards.

# EXHIBIT F

Page

Hit <MENU> to return to graph or <PAGE> to continue.

Equity**GPO**

CHC UN Equity

Page 2/2
Currency  USD

THIS PAGE:    05/12/08 - 05/12/08

| | DATE | OPEN | HIGH | LOW | CLOSE | VOL |
|---|---|---|---|---|---|---|
| F | 05/16 | | | | | |
| T | 05/15 | | | | | |
| W | 05/14 | | | | | |
| T | 05/13 | | | | | |
| M | 05/12 | 2.92 | 3.01 | 2.85 | 2.92 | 70000 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900        Singapore 65 6212 1000       U.S. 1 212 318 2000     Copyright 2008 Bloomberg Finance L.P.
                                                                        G986-342-0 12-May-2008 16:06:58

Page

Hit <MENU> to return to graph or <PAGE> to continue.      Equity**GPO**

CHC US Equity

THIS PAGE:   05/12/08 - 05/12/08                                    Page 2/2
                                                                Currency  USD
          DATE                                                           VOL
   F    05/16    | OPEN | HIGH | LOW | CLOSE |
   T    05/15
   W    05/14
   T    05/13
   M    05/12      2.90    3.01    2.85    2.92                        156382

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900      Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2008 Bloomberg Finance L.P.
                                                                    G986-342-1 12-May-2008 16:06:35