UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————X
JOHN CARFAGNO, derivatively on behalf of          :
CENTERLINE HOLDING COMPANY,                       :
                                                  :
                        Plaintiff,                :          08-cv-00912 (SAS)
                                                  :
              vs.                                 :
                                                  :
MARC D. SCHNITZER, et al.,                         :
                                                  :
                        Defendants.               :
————————————————————————X


**<u>PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS ......................................................................................1

ARGUMENT ..........................................................................................................4

I.     The CAC Adequately Pleads Demand Futility. ............................................5

    A.     Demand Is Futile Because The CAC Alleges Particular Facts That Cast A Reasonable Doubt That A Majority Of The Board Were Disinterested And Independent. ........................................................................................5

    B.     Demand Is Futile Because The CAC Alleges Particular Facts That Cast A Reason To Doubt That The Defendants Are Protected By The Business Judgment Rule. ..................................................................................10

II.    Plaintiff's Class Claim Does Not Present A Conflict With His Derivative Claims, Properly States A Claim For Relief Under Controlling Delaware Precedent, And Falls Squarely Within The "Delaware Carve Out" Exceptions To SLUSA. ....................14

    A.     There is No Real Conflict. ................................................................14

    B.     Plaintiff's Class Claim States A Valid Cause Of Action Under Delaware Law. ....................................................................................................15

    C.     Plaintiff's Class Claim Falls Within The Delaware Carve Out Exceptions To SLUSA And Therefore Is Not Preempted. ........................................17

III.   The Complaint States A Valid Claim Based On Non-Disclosure Of The SPINNAKER Plan and Inadequate Disclosure Of Information On The Rights Offering ....................................................................................................19

IV.    Plaintiff Adequately Alleges Misappropriation And Waste Of Corporate Assets (Count 3) ...................................................................................................23

V.     The CAC Adequately Alleges A Claim Of Unjust Enrichment Against All Defendants (Count 4) And Against Ross And Blau (Count 5). ........................................24

CONCLUSION .....................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Andreae v. Andreae*, 1992 WL 43924 (Del. Ch. March 3, 1992) ...............................................6, 7

*Arnold v. Society for Sav. Bancorp, Inc.*, 650 A.2d 1270 (Del. 1994) .........................................21

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) ........................................................................5, 10, 11

*Bell Atlantic v. Twombly*, 127 S.Ct. 1955 (2007) .........................................................................4

*Blasius Indus., Inc. v. Atlas*, 564 A.2d 651 (Del. Ch. 1988) ..........................................................13

*Brehm v. Eisner*, 746 A.2d 244 (2000) ...........................................................5, 7, 10, 24

*Brudno v. Wise*, 2003 WL 1874750 (Del. Ch. April 1, 2003) .........................................................23

*Buckley v. O'Hanlon*, 2007 WL 956947 (D. Del. March 28, 2007) ................................................13

*California Public Employees' Retirement System v. Coulter*, 2002 WL 31888343
  (Del. Ch. Dec. 18, 2002) ...............................................................................................................8

*Emerald Partners v. Berlin*, 726 A.2d 1215 (Del. 1999) ..............................................................12

*Erickson v. Pardus*, 127 S.Ct. 2197 (2007) ...................................................................................5

*Gentile v. Rossette*, 906 A.2d 91 (Del. Supr. 2006) ............................................15, 16, 17, 19, 22

*Grace v. Rosenstock*, 1986 WL 2709 (E.D.N.Y. March 6, 1986) ...................................................15

*Heineman v. Datapoint*, 611 A.2d 950 (Del. 1992) ........................................................................5

*In re CheckFree Corp.*, 2007 WL 3262188 (Nov. 1, 2007) ............................................................21

*In re Luken Inc. Shareholders Litig.*, 757 A.2d 720 (Del. Ch. 1999) .............................................12

*In re Oracle Corp. Derivative Litig.*, 824 A.2d 917 (Del. Ch. 2003) ...............................................8

*In re Pharmaceutical Ins. Sec. Litig.*, 733 F.Supp. 668 (S.D.N.Y. 1990) ....................................21

*In re Staples Inc. Shareholders Litig.*, 792 A.2d 934 (Del. Ch. 2001) ..........................................21

*In re The Limited, Inc. S'holders Litig.*, 2002 WL 537692 (Del. Ch. Mar. 27, 2002) ................8, 9

*In re the Walt Disney Co. Derivative Litig.*, 906 A.2d 27 (Del. Supr. 2006) ...................10, 12, 13

*Levine v. Smith*, 591 A.2d 194 (Del. 1991) ..........................................................5, 6, 11

*Lewis v. Fuqua*, 502 A.2d 962, (Del. 1985) ...............................................................................8, 9

*Lynch v. Vickers Energy corp.*, 383 A.2d 278 (1977) ....................................................................21

*Malone v. Brincat*, 722 A.2d 5 (Del. 1998) .........................................................................18, 20

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71 (2006) ...................................19

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs., Inc.*, 854 A.2d 121
  (Del. Ch. 2004) .............................................................................................................................21

*O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902 (Del. Ch. 1999) .....................................13

*Pogostin v. Rice*, 480 A.2d 619 (Del. Supr. 1984) ..........................................................................7

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993) ................................................................................5

*Ryan v. Aetna Life Ins.*, 765 F.Supp. 133 (S.D.N.Y. 1991) ..........................................................14

*Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007) ....................................................................10, 24

*Sample v. Morgan*, 914 A.2d 647 (Del. Ch. 2007) .......................................................................24

*Saunders v. Wang*, 1999 WL 1044880 (Del. Ch. Nov. 8, 1999) ..................................................12

*Schock v. Nash*, 732 A.2d 217 (Del. 1999) ...................................................................................25

*Speilman v. Merrill Lynch Pierce, Fenner & Smith*, 332 F.2d 116 (2d Cir. 2003) .......................18

*Spiegel v. Buntrock*, 571 A.2d 767 (Del. Supr. 1990) .....................................................................6

*Steiner v. Meyerson*, 1995 WL 441999 (Del. Ch. July 19, 1995) ...................................................6

*Superior Partners v. Chang*, 471 F. Supp. 2d 750 (S.D. Tex. 2007) ............................................18

*Teachers' Retirement System v. Aidinoff*, 900 A.2d 654 (Del. Ch. 2006) ....................................25

*Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212 (3d Cir. 2007) .........................................22

*Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. Supr. 1983)..............................................................7

**Statutes**
15 U.S.C. § 78bb..............................................................................................................17, 18, 19

## INTRODUCTION

This lawsuit arises out of a comprehensive scheme comprised of several interrelated transactions undertaken by the Trustees of Centerline Holding Co. ("Centerline" or "Company"), without the knowledge or approval of Centerline's public shareholders to enrich Company insiders at the expense of both "holding" and "purchasing" public shareholders.    The Consolidated Amended Verified Complaint ("CAC") is brought on behalf of the public "holders" as well as Centerline itself, and alleges the following five causes of action arising under Delaware law: (i) on behalf of the Plaintiff and putative Class of holders of Centerline stock, breach of fiduciary duties of loyalty, due care and good faith; (ii) on behalf of the Company in the derivative action, breach of the same fiduciary duties; (iii) waste; (iv) unjust enrichment against all the Defendants; and (v) unjust enrichment against defendant Trustees Stephen M. Ross ("Ross") and Jeff T. Blau ("Blau") in particular.  As a result of the self-dealing transactions engaged in by the Board of Trustees (the "Board"), the public shareholders lost more than half the value of their investment as the stock plummeted from $10.27 on December 27, 2007 to $4 a share on April 4, 2008.

## STATEMENT OF FACTS

Prior to and throughout 2007 a core part of the business of Centerline, a Delaware statutory trust corporation engaged in real estate finance and investing, was direct ownership of tax-exempt bonds aggregating over $2.8 billion.  (CAC ¶43).  Historically, Centerline earned most of its income from its bond portfolio, and paid a steady and mostly tax exempt dividend. (*Id.*)  Consequently most of Centerline's shareholders were "retail investors" who invested in Centerline for its attractive dividends as opposed to "institutional investors" who invest on the basis of growth potential.  (*Id.* ¶44).  Institutional investors apparently lacked interest in the

Company because its opaque, complex transactions and dealings through its subsidiaries made it hard to assess the true value of the Company's assets, earning and risks.  (*Id.* ¶44).

Centerline's Chairman of Trustees was defendant Ross, who along with Blau, through an entity they owned and controlled aptly named The Related Companies, L.P. ("Related"), were the Company's largest shareholders, holding approximately 13.9% of the shares of the Company. (CAC ¶¶27-28).   Defendant Blau, President of Related, was also a director of several other companies intricately involved with Centerline.  Centerline's CEO and Managing Trustee Marc Schnitzer ("Schnitzer"), owner of 1.6% of the shares of the Company, is also Chairman of the Board of Trustees of American Mortgage Acceptance Company ("AMAC"), a publicly traded real estate investment trust managed by Centerline.  Centerline owns 13.4% of AMAC common stock.  According to the latest 10Q filed with the SEC by AMAC on May 12, 2008 AMAC is insolvent.

Throughout 2007, Centerline issued press releases and made presentations on investor calls that emphasized the strength of the Company's bond portfolio, stated Centerline's belief that it would continue to pay dividends at the expected rate, and reassured investors that the subprime problem sweeping the country did not affect Centerline. (CAC ¶¶6, 7).   In fact, Schnitzer stated in an August 2007 analyst conference, "In spite of the instability in the financial markets, operating fundamentals in the commercial real estate and affordable housing sectors are healthy.   We have sufficient capital resources to execute our business plan and are not experiencing any liquidity problems." (CAC ¶6).  What these public announcements promoting rosy forecasts of the Company's prime business failed to reveal was that insiders Schnitzer, Ross and Blau, with the knowledge and consent of the remaining Trustees, were negotiating the securitization of the bond portfolio to the Federal Home Loan Mortgage Corporation ("Freddie

2

Mac") (CAC ¶¶8, 45-55). Additionally, rather than being unaffected by the subprime crisis, AMAC was facing grave financial condition by the end of December 2007, with Citibank threatening to call its loans and leaving Centerline holding an $80 million unsecured loan to AMAC. (CAC ¶50).

During the Relevant Period, operating under various code names, the Board was orchestrating a fundamental change in the nature of Centerline's business from an income oriented company to a full service real estate finance and investment company that it knew the shareholders would consider detrimental. (CAC ¶45). The Company used the code name, "Project Spinnaker" to refer to the sale of the bond portfolio to Freddie Mac. (CAC ¶¶45, 49). "Project Valencia," ("Preferred Stock Deal" or "TRCLP Deal"), the core of the insider transactions, involved a sale of 12.2 million shares of Centerline's preferred stock at $11.70 per share at a conversion price of $10.75 per share and an 11% dividend to the Related Company. (CAC ¶56). "Project Chelsea" was the Company's code name for its initiative to acquire AMAC or its assets, because Citigroup had threatened to terminate AMAC's loan facility. (CAC ¶50).

With regard to the TRCLP Deal, there is no apparent explanation, and the Company has consistently offered none, as to why the Company needed what its own Chief Financial Officer called "very expensive equity" after reassuring its shareholders for months that Centerline was not affected – and indeed stood to gain – from the subprime credit crisis. (CAC ¶56). Further, with no apparent reason the dividend payable to Related increased to 11% from the 9.5% rate proposed just days before announcement of the deal with Related. (*Id*.). The Defendants also fail to explain why the initial consideration of a tender offer to protect the share price that was expected to tumble upon announcement of the transactions, was ultimately rejected by the Board. (*Id*.).

3

On December 28, 2007 Centerline announced in a press release and a follow up telephone conference with investors and analysts the sale of the bond portfolio to Freddie Mac, the issuance of high-dividend or "rich" preferred shares to insider Related in exchange for $131 million in financing, and the substantial reduction of the Company's annual dividend. (CAC ¶9). The reaction of the shareholders and analysts, expressed on the conference call, was a uniform feeling of betrayal and disgust. (CAC ¶¶12, 13). Following the announcement, the share price of Centerline stock dropped 25.0% on heightened volume of 4.1 million shares for an instant loss of $41 million in market capitalization, and has continued its drop to $4 on April 4, 2008 (CAC ¶18).

The conversion feature of the preferred stock gave the public shareholders a right to vote on it. (CAC ¶58). Since it was abundantly clear from the December 28, 2007 conference call that shareholder approval would not be obtained, the Board, within days, decided to schedule a "Rights Offering". (CAC ¶¶58, 59). This was done primarily to thwart the rights of the shareholders to vote on the Preferred Stock Deal. (CAC ¶59). The Company conducted the Rights Offering from March 7, 2008 to April 4, 2008 without providing anywhere near the minimal disclosures required under Delaware law. (CAC ¶62). In the aftermath of the radical changes implemented by the Board, and without sufficient information to assess the new Company, less than 3% of the public shareholders participated in the inadequately explained Rights Offering, purchasing only 373,136 preferred shares and leaving the lion's share of the 11.2 million preferred shares to be purchased by insider Related exactly as planned. (*Id.*).

## ARGUMENT

Under *Bell Atlantic v. Twombly*, 127 S.Ct. 1955, 1965 (2007), plaintiff must plead enough facts to state a claim for relief that is plausible on its face. *Twombly* did not, however,

change the notion that "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all factual allegations contained in the complaint." *Erickson v. Pardus*, 127 S.Ct. 2197, 2200 (2007).

## I.     The CAC Adequately Pleads Demand Futility.

Delaware law excuses demand as futile "where a reasonable doubt exists that the board has the ability to exercise its managerial power, in relation to the decision to prosecute, within the strictures of its fiduciary obligations." *Heineman v. Datapoint*, 611 A.2d 950, 952 (Del. 1992). The test of demand futility under *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), *overruled on other grounds sub nom. Brehm v. Eisner*, 746 A.2d 244 (2000), applies to this case since a demand to prosecute on behalf of the Company would have to be considered by the identical Board that took the action challenged here, and the CAC is directed at specific Board actions and decisions rather than a failure to act. *See Rales v. Blasband*, 634 A.2d 927, 933-34 (Del.1993) ("[A] court should not apply the *Aronson* test for demand futility where the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit."). Under the *Aronson* rule, demand is excused if a reasonable doubt is created that: (1) the directors were disinterested and independent or; (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. *Aronson*, 473 A.2d at 814; *see also Brehm*, 746 A.2d at 256. "On either showing [of reasonable doubt], it may be inferred that the Board is incapable of exercising its power and authority to pursue the derivative claims directly." *Levine v. Smith*, 591 A.2d 194, 205 (Del. 1991) *overruled on other grounds by Brehm, see supra*.

###     A.     Demand Is Futile Because The CAC Alleges Particular Facts That Cast A Reasonable Doubt That A Majority Of The Board Were Disinterested And Independent.

The Complaint satisfies *Aronson's* first prong because it alleges there is reasonable doubt that a majority of the Board is either "disinterested" or "independent". Centerline's Board has eleven Trustees. Thus, reasonable doubt must exist about the disinterest or independence of at least six members. The Defendants concede that three members of the Board, Schnitzer, Blau and Ross "appear on both sides" of the challenged transaction or "expect to derive personal financial benefit" from the challenged transaction, (Def. Brief at 6). Accordingly, demand is futile in this case if at least three more members of Centerline's Board are interested or non-independent.

The CAC alleges particularized facts to establish a reason to doubt that at least three of the remaining Trustees are not independent "because of domination by an interested party or otherwise." *Steiner v. Meyerson*, 1995 WL 441999, at *9 (Del. Ch. July 19, 1995). Under Delaware law Board members are considered "not independent" where "they are so dominated by the proponent of the transaction that their 'discretion is sterilized.'" *Andreae v. Andreae*, 1992 WL 43924, at *4 (Del. Ch. March 3, 1992). "In such an instance, the board is presumptively unable to produce the sort of business decisions that is accorded strong deference." *Steiner*, 1995 WL 441999, at *9 (citing *Levine*, 591 A.2d at 205; *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. Supr. 1990).

Defendant Halperin is neither disinterested nor independent. Defendant Halperin holds close alliances and allegiances to Ross and Blau and depends on them for his position on Centerline's Board. Moreover, he also sits on the board of directors of Equinox Holdings Inc., an affiliate of Ross and Blau's Related, depending on them for his position on that board, too. *Rales*, 634 A.2d 927, 937 (1993) (where controlling stockholder-directors were positioned to exert substantial influence over a director's continued employment, that director could not

6

objectively consider a demand adverse to their interests).  In addition to being beholden to Ross and Blau, that Halperin sits on the boards of both Centerline and an affiliate of Related with whom Centerline is alleged to have engaged in a "sweetheart deal" places him on both sides of the TRCLP Deal.

Defendants' effort to portray Halperin's conflict as akin to the cases finding there is independence where "Board members sit together, in various configurations, on other boards" misses the mark.  (Def. Brief at 7, n.2).  Plaintiffs have not alleged that Halperin merely sits on some board with some other members of the Centerline Board:  he sits on a board of an affiliate with whom Centerline transacted the challenged transaction.  Directorial interest exists whenever divided loyalties are present.  *Pogostin v. Rice,* 480 A.2d 619, 624 (Del. Supr. 1984) *overruled on other grounds by Brehm, see supra*; *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. Supr. 1983).  There is no exception when "one holds dual or multiple directorships, as in a parent-subsidiary context."  *Weinberger*, 457 A.2d at 710 (citation omitted).  Under Delaware case law, Defendant Halperin is not disinterested in this case.

Defendant Trustee Cotton has a web of professional, personal and financial tie-ins with Ross, Blau and Schnitzer that renders him hopelessly unable, as a matter of law, to make an independent decision whether to sue his three co-Trustees and challenge the transactions at issue in this case.  In addition to his service on the Board of Centerline, Trustee Cotton has (i) served as the CEO of Centerline REIT which was acquired by Centerline in 2006 and continues to serve as Chairman of the Board of Centerline REIT; (ii) received over $1.6 million in compensation from August 15, 2006 until December 2006 (after the acquisition of Centerline REIT); (iii) has an employment agreement with Centerline that provides that he be a member of the strategic planning committee for which he receives a base salary of $400,000; and (iv) stands to receive

an award of 255,003 restricted Common Shares that vest over four years provided he remains continuously employed by Centerline REIT. While it may be true that each of these facts *standing alone* may be insufficient to establish reasonable doubt as to the director's lack of independence, Plaintiffs are aware of no cases, and Defendants cite to none where any trustee with a comparable constellation of financial and professional dependencies is considered to be independent. *See California Public Employees' Retirement System v. Coulter*, 2002 WL 31888343, at *9 (Del. Ch. Dec. 18, 2002) ("If taken separately, none of the individual allegations would be adequate to raise a reasonable doubt as to [the director's] disinterest or independence…Taken together, they give this Court reason to doubt that [the director] is disinterested and independent.").

Finally, reasonable doubt exists as to whether defendant Dolan is independent. Dolan lacks independence by virtue of the facts that Dolan (i) has been the Dean of the University of Michigan Business School since 2001 and serves as the Stephen M. Ross Professor of Business; (ii) accepted Mr. Ross' donation of $100 million to the school in 2004, constituting the largest donation ever made to any business school in the United States and the largest gift to the University in its 187 year history; and (iii) renamed the school the "Stephen M. Ross School of Business at the University of Michigan." (CAC ¶77).

Delaware courts have previously recognized that philanthropic relationships with institutions may give a reason to doubt a director's independence. *See, e.g.*, *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917 (Del. Ch. 2003); *In re The Limited, Inc. S'holders Litig.*, 2002 WL 537692 (Del.Ch. Mar. 27, 2002); *Lewis v. Fuqua*, 502 A.2d 962 (Del.Ch.1985). In *Fuqua*, the court found that a board member was not independent because he was President of Duke University, which had recently received a $10 million pledge from the company he served as

director, and the CEO of that company was also a trustee of Duke. *Fuqua*, 502 A.2d at 966-67. Indeed, the CEO was J.B. Fuqua of the eponymous Fuqua School of Business at Duke University. Additionally, in *The Limited*, the court concluded that a director, the university president of the alma mater of the corporation's largest stockholder, and the corporation's founder, President, Chairman, and CEO, was not independent in part because of a successful solicitation of $25 million donation to the university. *The Limited*, 2002 WL 537692 at *6-7. Thus, under Delaware law, reasonable doubt exists as to whether Dolan -- the Stephen M. Ross professor of the Stephen M. Ross School of Business -- can impartially consider whether to bring suit against defendant Stephen M. Ross and his close allies.

Moreover, this case demonstrates why Delaware Courts have developed the demand futility doctrine – conscience and equity do not require plaintiffs to proceed with empty and futile ceremonies. In this case it would be completely nonsensical for the Trustees to authorize initiation of legal action against Ross and Blau. This is not the garden variety situation where plaintiffs, in a conclusory fashion, contend that a demand should be deemed futile simply because the directors cannot be expected to sue themselves. Here if the directors were to sue Ross and Blau for the TRCLP transaction they would also have to indemnify Ross and Blau for any damages incurred from the lawsuit! Apart from being a "sweetheart deal" in substance, the language in the January 25, 2008 Securities Purchase Agreement between Related and Centerline is remarkably one sided. Indemnities all run from Centerline to Related. Related does not even indemnify for breaches of their own representations and warranties. (See Exh. A to Kaswan Declaration). Moreover to remove any doubt as to the intent of the one-sided indemnification clause, the parties executed a side letter agreement (Exhibit A to CAC) under which they agree that Blau and Ross are also indemnified individually from all "legal actions . . . filed by public

shareholders of the Company challenging the Investment."  It is hard to conceive of a better example of an empty and futile gesture than requiring Plaintiff to request the Centerline Board to initiate suit against Related, Ross and Blau when to do so would only trigger Centerline's duty to indemnify the wrongdoers for any damages resulting from the lawsuit.  The same instrument that attempts to insulate Related, Blau and Ross from all liability to the public shareholders who were damaged in the sweetheart Deal establishes, without more, the futility of the public shareholders making a demand on the Centerline Board.

> **B.    Demand Is Futile Because The CAC Alleges Particular Facts That Cast A Reason To Doubt That The Defendants Are Protected By The Business Judgment Rule.**

Plaintiffs have alleged particularized facts to satisfy the second prong of *Aronson*, which is satisfied "by raising a reason to doubt whether the challenged transactions were a valid exercise of business judgment."  *Ryan v. Gifford*, 918 A.2d 341, 354 (Del.Ch. 2007).  The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Id*. at 357 (quoting *Aronson*, 473 A.2d at 812). Defendants who do not act in "good faith" are not entitled to the benefit of the business judgment rule.  A lack of "good faith" is demonstrated where a director, "intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."  *In re the Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. Supr. 2006).  Finally, directors who make a decision without obtaining all material information that is reasonably available do not satisfy the "informed basis" element of the business judgment rule.  *Brehm*, 746 A.2d at 259.

10

In this case, the CAC alleges numerous facts that raise a reasonable doubt as to whether the Defendants, as Centerline Trustees, acted in good faith and on an informed basis and should be accorded the tremendous benefit of the business judgment rule.  Initially, however, it is important to clarify that the prongs of the *Aronson* test are disjunctive and Defendant's efforts to blur the two *Aronson* prongs must be rejected.  Despite the clear description of facts undertaken by the Trustees that were not in good faith and were in breach of their duty of loyalty to the public shareholders, Defendants nevertheless contend that the CAC "can implicate at most the duty of due care – and not the duty of loyalty" because plaintiff has failed to prove that a majority of directors lacked disinterest or independence under the first test.  (Def. Brief at 11). First, Plaintiff has adequately alleged, and indeed established that at least six Defendants, a majority of the Trustees, lacked disinterest or independence.  Second, regardless of the outcome of the first test, whether there is reasonable doubt that the challenged transactions should be immunized under the business judgment rule is a stand alone test.  *See Levine*, 591 A.2d at 205-06.

Here, the allegations in the CAC, which must be assumed to be true, allege not mere negligence but that the challenged transactions, including the self-dealing TRCLP Deal (CAC ¶84) and the Rights Offering (conducted to thwart the shareholder's right to vote on the TRCLP Deal) (CAC ¶¶92, 93) violate the Board's duty of loyalty owed to the shareholders and the Company under Delaware law.  As such, Centerline's Trust Instrument, which shields the trustees from liability for duty of care violations to the fullest extent permitted by Delaware law, provides no comfort for the Board regarding the demand futility inquiry.  Indeed, it would be difficult to find a well advised Delaware corporation that did not take steps to accord its directors the full protection from liability permitted under Delaware law.  Accepting Defendants'

11

argument therefore would immunize practically every Delaware board from shareholder derivative exposure for breaches of a duty of good faith and care. That is not the law in Delaware. *See O'Reilly v. Transworld Healthcare, Inc*., 745 A.2d 902, 914 (Del. Ch. 1999) (citing *Emerald Partners v. Berlin*, 726 A.2d 1215, 1223-24 (Del. 1999)) (Although the exculpatory clause does not release directors from liability for claims based on breaches of the duty of loyalty or for intentional misconduct done in bad faith, the clause shields directors from liability for claims based on a breach of the duty of care made in good faith); *see also In re the Walt Disney Co.*, 906 A.2d at 65 ("[A] corporation can exculpate its directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith.").

Moreover, Delaware law is clear that exculpatory provisions to shield fiduciaries from personal liability are not amenable to pre-trial disposition because they present an affirmative defense. *Saunders v. Wang*, 1999 WL 1044880, at *11 (Del. Ch. Nov. 8, 1999). In *In re Luken Inc. Shareholders Litig.*, 757 A.2d 720, 733-34 (Del.Ch.1999) the Delaware Court of Chancery stated:

> [I]f a complaint adequately alleges bad faith or disloyalty, or some other exceptional circumstance under 8 Del. C. section 102(b)(7), or if the nature of the alleged breach of duty is unclear, the complaint will not be dismissed on a motion made under Rule 12(b)(6) on the basis of an exculpatory charter provision.

*Id.* (footnotes omitted).

In addition, a central allegation in the CAC is that the Defendants engaged in the Rights Offering – which may on its face comply with the New York Stock Exchange rules – for the purpose of defeating the shareholder's right to vote on the TRCLP Deal (CAC ¶¶16, 58-59, 92-93). Defendants then sabotaged the Rights Offering by withholding the information shareholders needed to evaluate the now "transformed" Company and make an informed decision. Courts "have long exercised a most sensitive and protective regard for the free and effective exercise of

12

voting rights, . . . that suffuse [Delaware] law." *Blasius Indus., Inc. v. Atlas*, 564 A.2d 651, 660 n.2 (Del. Ch. 1988). The Chancery Court has held in *Blasius* that where boards of directors deliberately employ legal strategies either to frustrate or completely disenfranchise a shareholder, "the board bears a heavy burden of demonstrating a compelling justification for such action." *Id*. at 661. Therefore, the defendant Board is not entitled to the usual deference accorded its decisions under the Delaware business judgment rule, where as here there is a well-founded allegation that the Board undertook the Rights Offering primarily to defeat the shareholder's right to vote. Since the bond securitization straight through to the Rights Offering are all of one piece and the Rights Offering was undertaken primarily to defeat the public shareholder's right to vote on the TRCLP Deal, then none of the transactions challenged in this lawsuit are entitled to the presumption of business necessity.

Moreover, as discussed *supra*, the business judgment rule presumption is rebutted, when a plaintiff pleads particularized facts sufficient to raise a reason to doubt that the action was taken in good faith or on an informed basis. *In re The Walt Disney Co. Deriv. Litig*., 825 A.2d at 86. Such doubt is raised when "directors consciously disregard visible 'red flags.'" *Buckley v. O'Hanlon*, 2007 WL 956947, at *5 (D. Del. March 28, 2007) (citations omitted). None of the defendant Trustees can credibly deny that the circumstances surrounding the TRCLP Deal were red flags that were waved in their face. It was not an insignificant transaction. The deal represented a $131 million transaction with a related party, the major shareholder of the Company. The SEC rules and regulations are clear that transactions with related parties require heightened scrutiny. The dividend payable to Related increased substantially, and apparently inexplicably, over that first negotiated with Morgan Stanley, Goldman Sachs and indeed, Related. (CAC ¶56). A tender offer originally considered to support the share price was

13

inexplicably abandoned. (CAC ¶¶14, 56). Apparently no action was taken to prevent the stock price from going into the anticipated free-fall. The Chief Financial Officer opined that the preferred stock transaction was "very expensive equity". The side letter agreement that indemnified individually defendants Blau and Ross from all "legal actions . . . filed by public shareholders of the Company challenging the Investment" was at the very least unusual. All these factors warranted further inquiry. (CAC ¶56). Despite these conspicuous "red flags" that the best interests of Centerline were perhaps being compromised by the TRCLP Deal, the Board took no steps to prevent or remedy the situation, and that failure to take any action resulted in substantial Company losses.

II.   **Plaintiff's Class Claim Does Not Present A Conflict With His Derivative Claims, Properly States A Claim For Relief Under Controlling Delaware Precedent, And Falls Squarely Within The "Delaware Carve Out" Exceptions To SLUSA.**

A.     **There is No Real Conflict.**

Defendants' contention that either Plaintiff's derivative claims or his direct claim must be dismissed because of an "impermissible conflict of interest" reflects a misunderstanding of the nature of Plaintiff's direct claim and a misreading of the Second Circuit law. While there is no doubt that the prerequisites of "adequate class representative" under Rule 23(a) and that a plaintiff in a derivative action "fairly and adequately represent the interests of the shareholders", under Rule 23.1 require a Court and the parties to be vigilant of conflicts of interest, neither the Second Circuit nor Delaware law have endorsed a *per se* rule that prohibits a plaintiff from pursuing simultaneous direct and derivative actions. *See, e.g., Ryan v. Aetna Life Ins.* 765 F. Supp. 133 (S.D.N.Y. 1991). More importantly, even those cases which do find a conflict generally address the situation where a class of purchasers or sellers of stock must elect between the derivative case and the class case because the potential conflict is readily apparent.

14

Here, the putative class consists of "holders" of the securities.  The effort of the Class to remedy the insiders' tortious shift of stock value and voting rights from the Class to themselves involves no conflict at all with the derivative claims and Defendants do not point to any.  The derivative claims seek to obtain for the benefit of the corporation, which indirectly means for *all* the holders of its stock, a recovery for corporate waste, unjust enrichment, and a breach of fiduciary duties perpetuated by the wrongdoer-insiders.  The claims arise from the same nucleus of facts and there is no inherent contradiction between the positions of the Class and derivative Plaintiff.  Since the Company is exactly the same as the Class of shareholders minus the wrongdoers there is no incompatibility of the relief sought by the Plaintiff in his dual role here.  As the Court stated in *Grace v. Rosenstock*, 1986 WL 2709, at *3 (E.D.N.Y. March 6, 1986) "We are in agreement with the plaintiffs that any antagonism between plaintiffs suing as representatives of the class and derivatively on behalf of the corporation are no more than a 'surface duality.'"

**B.    Plaintiff's Class Claim States A Valid Cause Of Action Under Delaware Law.**

The only claim which Plaintiff asserts directly, on behalf of a putative class of shareholders who were qualified to purchase Centerline's 11% preferred stock in the Rights Offering but did not (CAC ¶37), is a breach of the Trustees' fiduciary duties of loyalty, due care, and good faith, involving their failure to protect and instead abrogating the Class' right to vote on the conversion feature of the preferred shares issued to Related. (CAC Count 2).  Plaintiff's claim reads on all fours with the controlling Delaware case, *Gentile v. Rossette*, 906 A.2d 91 (Del. Supr. 2006) that clearly permits both derivative and direct claims to proceed in precisely the situation presented by our case.

In *Gentile* former minority shareholders directly sued the insider director for breach of

fiduciary duty resulting from a debt conversion transaction that reduced the cash value and the voting power of the public stockholders' minority interest and increased correspondingly the value and voting power of the [self-dealing] insider director.  The Chancery Court recognized that even though usually a dilution claim is derivative, there is "one transactional paradigm – a species of corporate overpayment claim – that Delaware case law recognizes as being both derivative and direct in character." *Gentile*, 906 A.2d at 99.  The case at bar fits exactly in that paradigm.  "A breach of fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue excessive shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders."  *Id.*, at 99-100.

In this case the alleged insider-wrongdoers Ross and Blau through Related Company purchased 11.2 million shares of equity in a transaction that Centerline's own Chief Financial Officer acknowledged was "extremely expensive equity."  Moreover, a better deal may have been available to Centerline through another entity and there is a strong indication that the monies received by Related were parlayed to pay the debts of a different company, AMAC, that was owned or controlled by Related, Ross, Blau and Schnitzer.  Plaintiff has clearly satisfied the first test that the stock issued to Related, a controlling shareholder, was "excessive".

Plaintiff also satisfies the second tenet in *Gentile*.  Through the TRCLP Deal and the Rights Offering, Defendants substantially increased their ownership stake and the public shareholders correspondingly decreased their stake.  There is no requirement that the shift in ownership be material: simply that it occurs.  *Id.* at 102.  Thus, the Plaintiff in this case, like

16

those in *Gentile* have a separate and direct claim.  The *Gentile* court's description of the harm to the plaintiff in that case applies equally to the Plaintiff here:

> Because the shares representing the 'overpayment' embody both economic value and voting power, the end result of this type of transaction is an improper transfer –or expropriation – of economic value and voting power from the public shareholder to the majority or controlling stockholder. For that reason the harm resulting from the overpayment is not confined to an equal dilution of the economic value and voting power of each of the corporation's outstanding shares. A separate harm also results; an extraction from the public shareholders, and redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest.  As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefited."

*Id.* at 100.

The Plaintiff and putative class members in this case are clearly permitted under the *Gentile* precedent to pursue a remedy for their unique harm.  As in *Gentile*, "the harm to the minority shareholder plaintiffs resulted from a breach of a fiduciary duty owed to them by the controlling shareholder, namely, not to cause the corporation to effect a transaction that would benefit the fiduciary at the expense of the minority stockholders." *Id.* at 103.  By perpetuating the clandestine sale of the bonds to Freddie Mac, the overly expensive sale of preferred stock to Related, and the illusory "Rights Offering" designed primarily to thwart the public shareholders right to vote on the TRCLP transaction, the public shareholder have suffered a harm separate and apart from that suffered by the nominal corporate defendant and that is precisely the harm for which the second count seeks relief.

### C.    Plaintiff's Class Claim Falls Within The Delaware Carve Out Exceptions To SLUSA And Therefore Is Not Preempted.

The Second Circuit has held that The Securities Litigation Uniform Standards Act, 15 U.S.C. §78bb *et. seq.* ("SLUSA") "was intended to completely preempt the field of **certain types** of securities class actions by essentially converting a state law claim into a federal law claim and

creating federal jurisdiction and venue for specified types of state securities fraud claim."
*Speilman v. Merrill Lynch Pierce, Fenner & Smith*, 332 F.2d 116, 123 (2d Cir. 2003) (emphasis in the original).   SLUSA contains a savings clause, known as the "Delaware carve-out" exception, which preserves certain "covered class actions.[1]   Under Section 78bb(f)(3)(A)(ii), a class action based upon the statutory or common law of the State in which the issuer is incorporated may be maintained if it involves:

> (I)    the purchase or sale of securities by the issuer or an affiliate of the issuer exclusively from or to holders of equity securities of the issuer, or
>
> (II)    any recommendation, position or other communication with respect to the sale of any issuer that (aa) is made by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities of the issuer; and (bb) concerns decisions of such equity holders with respect to voting their securities, acting in response to a tender or exchange offer, or exercising dissenters' or appraisal rights."

The Defendants acknowledge that the TRCLP Deal falls within the literal language of the first prong of the exception, in that it involved a "sale of securities by the issuer . . . exclusively to holders of equity securities of the issuer.[2]  Undeterred by the clear statutory language of SLUSA, Defendants ask this Court to graft a completely unwarranted "exception to the exception" to preempt precisely the actions, such as that brought by Plaintiff here, that Congress intended to preserve. The policy arguments devised by the Defendants in their request to this Court to re-draft the statute are equally misguided.  For example, the exception was clearly

---

[1] "The 'Delaware carve-out' nomenclature comes from *Malone v. Brincat*, 722 A.2d 5 (Del. 1998), a Delaware case in which the court described the savings provisions under 15 U.S.C. §78bb(f)(3) as being particularly applicable to Delaware law and, therefore, described them as "Delaware carve-outs." *Id*. at 13.

[2] The TRCLP transaction is "part and parcel" of the securitization of bonds, and certainly of the Rights Offering.  The SLUSA provisions direct a district court to examine a lawsuit in its entirety. Therefore if the TRCLP transaction falls within the Delaware carve out exception, the entire class claim, must survive.  *See, e.g., Superior Partners v. Chang*, 471 F. Supp. 2d 750 (S.D. Tex. 2007).

intended to preserve class claims traditionally recognized under the state law of the place of incorporation.  Indeed, there is a neat overlap between the language in the first prong of the Delaware exception and the guidelines in the *Gentile* case for permitting class and derivative actions to co-exist.  For example, the exception that the stock sale or purchase be made *exclusively* to equity holders preserves the right of the public shareholders to press their class claims under the *Gentile* ruling.

Rejection of Defendants' invitation to this Court to legislate is in line with the United States Supreme Court's holding in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71 (2006).  While the *Dabit* Court found in favor of broad SLUSA preemption, it noted that "the tailored exceptions to SLUSA's pre-emptive command demonstrate that Congress did not by any means act 'cavalierly' here."  *Dabit*, 547 U.S. at 87.  The Court explained, "The statute carefully exempts from its operation certain class actions based on the law of the State in which the issuer of the covered security is incorporated."  *Id*.  The Court concluded, "The existence of these carve-outs both evinces congressional sensitivity to state prerogatives in this field."  *Id*.

In sum, the Defendants cannot escape the plain language of 15 U.S.C. § 78bb(f)(3)(A)(ii)(I).  This class claim in this case falls solidly within the first prong of the Delaware carve-out exception.

## III.    The Complaint States A Valid Claim Based On Non-Disclosure Of The SPINNAKER Plan And Inadequate Disclosure Of Information On The Rights Offering.

There are essentially two material failures to disclose alleged in the CAC.  First, Defendants' failed to state certain facts necessary to make the statements disseminated by the Trustees not misleading.  This arises from the Company's public statements made in investor calls, press releases and SEC filings that Centerline was unaffected by the subprime credit crisis

19

and would in the immediate future at least retain its fundamental nature and continue dividends at the same level, while simultaneously Defendants were pursuing the exact opposite path by secretly moving forward with "Project Spinnaker".

Second, Defendants failed to disclose sufficient information in connection with the Rights Offering to the public shareholders. Information available to the Company about the Rights Offering included the five-year goals for Return on Earnings ("ROE"), earnings growth, new earnings metrics, earnings/growth projections, information on the change in dividend policy and information on the tender offer for shareholders opposed to the corporate changes. (CAC ¶52). However, Defendants failed to reveal any of this information to Centerline's public shareholders.

Defendants seek dismissal of both types of failure to disclose claims on four grounds: (1) there is no duty to disclose information with respect to the Company's business in the absence of a request for "stockholder action;" (2) the Defendants disagree that disclosures made to the shareholders before the announcement on December 28, 2008 were misleading; (3) Delaware law does not permit holders of securities to pursue class claims based on a decline in stock; and (4) the derivative claim must be dismissed because the Company cannot have suffered harm from the Trustees' failure to disclose unless there is a ruling in the securities class' favor finding that the Company violated federal securities law. (Def. Brief 14-17, n.16).

Each of Defendants' contentions lacks merit. First, there is, indeed, a well recognized duty under Delaware law that all information disseminated to the shareholders by the directors be truthful. In *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998), the Supreme Court of Delaware stated, "Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, *with or without a request for shareholder action*, directors have a fiduciary

duty to shareholders to exercise due care, good faith and loyalty. It follows *a fortiori* that when directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty." (emphasis added). *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs., Inc.*, 854 A.2d 121, 150 (Del. Ch. 2004); *In re Pharmaceutical Ins. Sec. Litig.*, 733 F.Supp. 668, 675 (S.D.N.Y. 1990).

The CAC alleges several instances where the public shareholders were told untruths or half truths by the Company. For instance, when asked if the Company had considered taking the bonds off its balance sheet less than two months before the Freddie Mac deal close, defendant Schnitzer stated the Company was merely "thinking about" this option when in actuality it was well into serious negotiations with Freddie Mac. (CAC ¶¶7, 8). These half truths and untruths state a valid cause of action for breach of fiduciary duties of loyalty, good faith and due care under Delaware law.

Similarly, while the Plaintiff agrees that there is no obligation for a director to disclose to public stockholders *all* of the information furnished to a purchaser in a private placement and the CAC does not claim breach of any such an obligation, there is, however, a long line of Delaware case law establishing an affirmative fiduciary duty on the part of a Delaware company's board to give stockholders financial information material to their decision. *See In re Staples Inc. Shareholders Litig.*, 792 A.2d 934, 953-55 (Del. Ch. 2001). "Stockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely." *In re CheckFree Corp*, 2007 WL 3262188, at *2 (Nov. 1, 2007)(citation omitted); *see also Lynch v. Vickers Energy Corp*, 383 A.2d 278 (1977); *Arnold v. Society for Sav. Bancorp, Inc*. 650 A.2d 1270, 1280 (Del 1994).

In this case, the information given to shareholders in connection with the Rights Offering was woefully deficient to make heads or tails of the Company's assets, liabilities, prospects, plans, and risks. The Rights Offering period ended before the first quarterly report for 2008 was filed, and the stunning news received by the shareholders on December 28, 2007 left them confused about the direction of the Company and understandably skeptical of management.

As to the Defendants' second point, they are free to disagree as to whether or not the Trustees' statements were misleading to shareholders, but this is an argument for the jury and not for a motion to dismiss. Unless they can prove, for example, that the statement made by defendant Schnitzer on November 8, 2007 that the Company was just "thinking about" securitizing its bond portfolio (when that was at best a half truth), was as a matter of law not misleading, there is no place in this motion for such an argument. *See Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212 (3d Cir. 2007) ("Whether any particular representation…was false or misleading is a question of fact.").

The Defendants' third claim that holders of securities may not pursue class claims based on a decline in stock that occurs while they refrain from selling their shares, likewise must fail since Plaintiff's class claim is very carefully limited to fit within the guidelines of *Gentile v. Rossette*, 906 A.2d 91, 100 (Del. 2006).

Finally, Defendants seem to acknowledge that a failure to disclose remedy is a proper derivative claim, but nonetheless contend that the claim must be dismissed because, according to Defendants, the Plaintiff did not allege any injury to the corporation other than those resulting from the Company's alleged violations of the federal securities laws. (Def. Brief at 17, n.16). Since the federal securities claims are merely pending and not yet concluded, Defendants conclude that the derivative claim must be dismissed. Obviously, Defendants' theory is ill

conceived.  The case cited in support of dismissal, *Brudno v. Wise*, 2003 WL 1874750, at *3 (Del. Ch. April 1, 2003), did not dismiss the shareholder derivative complaint; it granted defendant's motion for a stay where "the primary thrust of the derivative complaint is that the defendants should indemnify the … [corporation] … for any harm arising from the Federal Securities Actions . . . ." Thus, the *Brudno* derivative action was essentially a placeholder indemnity action filed on the corporation's behalf.

In this case, under *Brudno*, the derivative and class claims before this Court are not dependent on the outcome of the federal securities actions against Centerline.  For example, the claim that the Rights Offering was illusory and a pretext for defeating the shareholders' right to vote on the TRCLP Deal is not raised in the Federal Securities Action.  There is no basis for staying and certainly not dismissing this action.

## IV.    Plaintiff Adequately Alleges Misappropriation And Waste Of Corporate Assets (Count 3).

The CAC's claim for corporate waste incorporates all the allegations of the Complaint (CAC ¶95) and states a valid claim.  The Defendants made a sweetheart deal with an insider-shareholder, elected to not protect share price by foregoing a tender offer, shocked investors by a surprise announcement that the Company had transformed itself despite public pronouncements to the contrary, thwarted the rights of public shareholders to vote on the Preferred Stock Deal, created great uncertainty among analysts regarding the Company's liquidity, caused the stock to lose more than 60% of its value in three months.  While the Company claims that this highly deleterious series of steps were all necessary to effectuate the securitization of $2.8 million in bonds to Freddie Mac, and thus must be accorded business judgment there is nothing other than Mr. Rosen's argument in the Delaware case to support that theory.  While it is possible that after the relevant evidence has come to light, the Defendants' apparently self-interested transactions

23

may indeed simply be egregiously poor decisions and not constitute corporate waste, a motion to dismiss is certainly not the appropriate means to foreclose Plaintiff's ability to support its well-founded allegations with evidence discovered from the defendant. Under Delaware law, a plaintiff sufficiently states a claim for misappropriation and waste of corporate assets where they allege that valuable corporate assets have been diverted for an improper or unnecessary purpose. *See, e.g., Brehm*, 746 A.2d at 263. *See also Sample v. Morgan*, 914 A.2d 647, 660-61 (Del. Ch. 2007) (explaining that misappropriation and a waste of corporate assets occurs where the challenged transaction served no corporate purpose or where the corporation received no consideration at all).

## V. The CAC Adequately Alleges A Claim Of Unjust Enrichment Against All Defendants (Count 4) And Against Ross And Blau (Count 5).

Defendants admit for purposes of their motion to dismiss that (i) one of the "uses" of the proceeds of the Freddie Mac purchase was the payment of monies to defendant-insider Schnitzer on his secured units ("SCU's") in a Centerline subsidiary, (CAC ¶26); (ii) the sale of preferred stock to Related Company was made on terms which was "very expensive equity" for which Centerline received less than the value of the conversion rights, (CAC ¶6); (iii) Related is 92 % owned by defendant-insider Ross, (CAC ¶27), its President is defendant-insider Blau, (CAC ¶28); and (iv) Centerline assumed outsized liabilities to its insiders to benefit AMAC, which was partially assumed by the insiders, (CAC ¶55). Nonetheless Defendants contend that Plaintiff's claim for unjust enrichment against all the defendants (Count 4) and against Ross and Blau specifically (Count 5) must be dismissed as insufficient under Delaware law.

Defendants' argument does not square with the law in Delaware on unjust enrichment. In *Ryan v. Gifford*, the Chancery Court explained: "Unjust enrichment is 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the

24

fundamental principles of justice or equity and good conscience.'" 918 A.2d 341, 361 (*quoting Schock v. Nash*, 732 A.2d 217, 232-33 (Del. Supr. 1999)).  Similarly, in *Teachers' Retirement System v. Aidinoff*, 900 A.2d 654 (Del.Ch. 2006), the Chancery Court denied defendants' motion to dismiss a claim of unjust enrichment against corporate directors and its subsidiary where company insiders who also controlled the subsidiary agency understood that the agency was getting an unfairly advantageous deal from the company, and intentionally allowed the subsidiary to enrich itself to the detriment of company in breach of their fiduciary duties to the corporation.

As in *Teachers' Retirement System*, Plaintiff has made specific allegations (supported by the 10-Qs filed by Centerline and its subsidiary AMAC after the CAC was filed) that the Defendants profited from the transactions with Freddie Mac, and the TRCLP Deal to the detriment of Centerline. This states a claim for unjust enrichment under Delaware law.

## CONCLUSION

For all the foregoing reasons, Defendants' motion to dismiss should be denied.

Dated:    June 5, 2008
      New York, New York

s/ _____
Beth Kaswan (BK-0264)
Judith Scolnick (JS-0872)
SCOTT + SCOTT LLP
29 West 57th Street
New York, NY 10019
Phone: (212) 223-6444
Fax: (212) 223-6334
Email: bkaswan@scott-scott.com
      jscolnick@scott-scott.com

David R. Scott (DS-8053)
SCOTT + SCOTT LLP
108 Norwich Ave.
P.O. Box 192

Colchester, CT 06415
Phone: (860) 537-5537
Fax: (860) 537-4432
Email: drscott@scott-scott.com

Walter W. Noss
SCOTT + SCOTT LLP
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Phone: (216) 229-6088
Fax: (216) 229-6092
Email: wnoss@scott-scott.com

*Counsel for John Carfagno*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 5, 2008, the foregoing Plaintiff's Opposition To Defendants'

Motion To Dismiss was filed electronically with the Court's Case Management/Electronic Case

Files (CM/ECF) docketing system.  Notice of this filing will be sent to all parties by operation of

the CM/ECF system.  Parties may access this filing through the CM/ECF system.


<u>s/</u>_____
Beth A. Kaswan (BK-0264)
SCOTT + SCOTT LLP
29 West 57th Street, 14th Floor
New York, NY  10019
Phone:  212-223-6444
Fax: (212) 223-6334

*Counsel for John Carfagno*